David York, Pro Se
13101 Brandon St.
Unit 5
Anchorage, Alaska 99515
Phone | 907-764-2998
yorkdave@protonmail.com



RECEIVED

MAY 24 2022

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA AT ANCHORAGE

DAVID YORK,

        Plaintiff,

vs.

UNKNOWN NAMED AGENTS OF THE
FEDERAL BUREAU OF
INVESTIGATION, ALASKA
DEPARTMENT OF LAW, ALASKA
STATE TROOPERS, ANCHORAGE
POLICE DEPARTMENT, FAIRBANKS
POLICE DEPARTMENT, ALASKA BAR
ASSOCIATION.

        Defendants.

Case No.:

*Verified*
COMPLAINT (BIVENS – SEC. 1983)

## COMPLAINT

### I.    PRELIMINARY STATEMENT

1.      This is a case about extraordinary constitutional and civil rights violations in many ways without parallel in United States history. As will be explained, the plaintiff is accused by the State of Alaska of raping three women and attempted sexual assault against nine minors. That is the pretext for the ten years of grotesque constitutional and civil rights violations detailed herein (legal torture).

COMPLAINT (BIVENS – SEC. 1983) - 1

2.      This is an action brought under the United States Constitution pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) and also under 42 U.S.C. § 1983, for a conspiracy between the defendant F.B.I. and defendant Alaska state actors to violate (suspend) plaintiff's Fifth and Sixth Amendment right to counsel, U.S. Constitutional right to be free of law enforcement harassment, U.S. Constitutional right to privacy (personal autonomy — serendipitous druggings), Fifth Amendment right to remain silent, U.S. Constitutional right to privacy (right to medical care), First Amendment and Article I, Sec 10 U.S. Constitutional right to work and contract, Fourth Amendment right to have and possess personal property, First Amendment right to "associate," First Amendment right to freedom of speech, U.S. Constitutional right to privacy (personal privacy), Fourth Amendment right against unlawful seizure, all other U.S. constitutional rights, and Thirteenth Amendment right to be free of slavery and involuntary servitude.

3.      The plaintiff is a pro se litigant. Therefore, the plaintiff asks the court to overlook any minor technical inadequacies this complaint may contain. "A document filed pro se is 'to be liberally construed,' Estelle, 429 U.S., at 106, 97 S.Ct. 285, and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' ibid. (internal quotation marks omitted). Cf. Fed. Rule Civ. Proc. 8(f) ('All pleadings shall be so construed as to do substantial justice')." Erickson v. Pardus, 551 U.S. 89 (2007).

COMPLAINT (BIVENS – SEC. 1983) - 2

## II. JURISDICTION AND VENUE

4.     This court has jurisdiction over the subject matter of this complaint under the (1) First, Fourth, Fifth, Sixth, and Thirteenth Amendments to the Constitution of the United States of America, (2) Article 1, Section 10 of the Constitution of the United States of America, (3) the penumbra of explicitly stated constitutional protections that guarantee the U.S. constitutional right to privacy, and (4) 28 U.S.C. § 1331, and (5) 42 U.S.C. § 1983.

5.     Venue is properly within the District of Alaska under 28 U.S.C. § 1402(b) as most of the U.S. constitutional violations complained of occurred in District of Alaska and most of the defendants' acts that are the subject of this Complaint occurred in the District of Alaska.

## III. PARTIES

6.     Plaintiff David York is a citizen of the United States of America and a resident of Anchorage, Alaska.

7.     Defendant Unknown Named Agents of the Federal Bureau of Investigation were at all times relevant to this complaint employees of the Federal Bureau of Investigation. Most of their activities complained of in this complaint occurred in the District of Alaska. They are sued in their individual capacity. They are sued under this Court's authority pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

COMPLAINT (BIVENS – SEC. 1983) - 3

8.      Defendant Alaska Department of Law is a political subdivision of the State of Alaska. Furthermore, most of its actions complained of in this complaint occurred in the District of Alaska. It is sued under this Court's authority pursuant to 42 U.S.C. § 1983.

9.      Defendant Alaska State Troopers is a division of the Alaska Department of Public Safety. The Alaska Department of Public Safety is a political subdivision of the State of Alaska. All the Alaska State Troopers actions complained of in this complaint occurred in the District of Alaska. The Alaska State Troopers are sued under this Court's authority pursuant to 42 U.S.C. § 1983.

10.     Defendant Anchorage Police Department is a division of the Municipality of Anchorage. The Municipality of Anchorage is a political subdivision of the State of Alaska. All Anchorage Police Department's actions complained of in this complaint occurred in the District of Alaska. The Anchorage Police Department is sued under this Court's authority pursuant to 42 U.S.C. § 1983.

11.     Defendant Fairbanks Police Department is a division of the City of Fairbanks. The City of Fairbanks, through the Fairbanks North Star Bureau, is a political subdivision of the State of Alaska. All Fairbanks Police Department's actions complained of in this Complaint occurred in the District of Alaska. The Fairbanks Police Department is sued under this Court's authority pursuant to 42 U.S.C. § 1983.

COMPLAINT (BIVENS – SEC. 1983) - 4

12.     Defendant Alaska Bar Association is an "instrumentality" of the State of Alaska. Most of its actions complained of in this complaint occurred in the District of Alaska. The Alaska Bar Association is sued under this Court's authority pursuant to 42 U.S.C. § 1983.

## IV.    FACTUAL ALLEGATIONS

13.     Plaintiff graduated Notre Dame Law school in 2004. He was admitted to the Alaska Bar Association in May, 2005. The plaintiff practiced law for three years in Fairbanks (5/5 – 5/8). On May 9th, 2008, plaintiff voluntarily transferred to *disability inactive* Alaska Bar status because he had a drinking problem that he needed to address medically. On December 16, 2009, the Alaska Bar Association retroactively suspended the plaintiff for three years dating back to the date of his transfer to *disability inactive* Alaska Bar status (5/9/08). The plaintiff was suspended mostly for not returning phone calls and client neglect (the typical problems lawyers with alcohol problems tend to face).

14.     On 2/21/11, the plaintiff was charged with third D.U.I. in what began as a real Alaska state court proceeding (3AN-11-02041CR). In May, 2012, "The Law Office of Keri and Kevin Brady" agreed to (1) hire the plaintiff full-time as a "law clerk" (the plaintiff had not yet sought reinstatement), (2) represent the plaintiff in the pending third D.U.I. case (3AN-11-02041CR). "The Law Office of Keri and Kevin Brady" had five employees including the plaintiff. It was located at 750 Christensen Dr, Anchorage, Alaska 99501.

15.     Unbeknownst to the plaintiff, "The Law Office of Keri and Kevin Brady" was not a real law firm. The Alaska Bar Association had given fake Alaska Bar Credentials to two non-lawyer F.B.I. agents.

16.     The plaintiff worked for "The Law Office of Keri and Kevin Brady" from 5/12 — 9/12. The fictitious law firm was a criminal defense law firm. "The Law Office of Keri and Kevin Brady" was supposed to be an "interrogation" for a planned large sex case against the plaintiff. "Keri Brady," "Kevin Brady," and the other two employees wore F.B.I. earpieces and wires the entire summer of 2012. All four spoke and did only as instructed by their F.B.I. ear pieces. As a "law clerk," the plaintiff assigned the task of doing criminal defense motion practice on "fake" court cases. The "fake" cases, themselves, were supposed to be half the "interrogation." In the "fake" cases, the plaintiff was supposed to recognize sex crimes as he did criminal defense motion practice on the cases.

17.     The plaintiff was totally ignorant of all this while it was going on. After about a month, "Keri Brady" and "Kevin Brady" offered to rent their residential basement as an apartment to the plaintiff. The apartment served as partial compensation for plaintiff's full-time work as a law clerk doing written criminal defense motion practice. Thus, from 7/12 — 9/12 the plaintiff lived and worked with "Keri Brady" and "Kevin Brady," whom were actually F.B.I. agents.

18.     As noted, "Keri Brady" and "Kevin Brady" also represented the plaintiff in third D.U.I., which had begun as a real Alaska court case (3AN-11-02041CR). In

COMPLAINT (BIVENS – SEC. 1983) - 6

their capacity as defense counsel for the plaintiff, the plaintiff also had off-hand consultations with them on several matters unrelated to D.U.I. None of those consultations had anything to do with sexual matters. Rather, the F.B.I. had arranged a situation wherein "Keri Brady" and "Kevin Brady" were effectively serving as "general counsel" for the plaintiff. Thus, plaintiff had consultations with them on a variety of non-sexual matters. All these consultations were tape recorded by the F.B.I., of course.

19.     The fact "Keri Brady" and "Kevin Brady" would for four months serve as plaintiff's "general counsel," was by design. By arranging to have "Keri Brady" and "Kevin Brady" represent the plaintiff in what began as a real Alaska Court case (3AN-11-02041CR) and then evolving the situation so that the plaintiff both lived and worked with them, the F.B.I. (and the Alaska Bar Association) had made the "general counsel" situation inevitable. The F.B.I. and Alaska Bar Association arranged for "Keri Brady" and "Kevin Brady" to evolve into plaintiff's "general counsel" in the hopes the plaintiff would initiate an attorney-client consultation with them of regarding a sex crime. However, that never occurred because the plaintiff has never committed a sex crime.

20.     By September, 2012, it was clear to the F.B.I. that the "interrogation" was a "bust." The plaintiff had recognized nothing and was totally oblivious to the situation. The proof of this is all on F.B.I. audio and video.

COMPLAINT (BIVENS – SEC. 1983) - 7

21.     For this reason, in the final few days that the plaintiff worked for "The Law Office of Keri and Kevin Brady," the F.B.I. arranged for entire law firm to be transformed and take-on a directly accusatory tone. The whole law firm and every employee in it took on a directly accusatory tone. First, "Keri Brady" said she disapproved of *Pornhub.com* (in general) and did not like it that plaintiff admitted to watching it in his basement apartment. In voicing this disapproval, "Keri Brady" implied *Pornhub.com* had child pornography on it. On this basis, "Keri Brady" demanded to search plaintiff's personal computers. Stunned, believing she was just an out of touch 1970s feminist, plaintiff simply allowed her to have an I.T. professional data recover plaintiff's personal hard drives. The reason plaintiff allowed this was because he was afraid of losing (1) his job, (2) his apartment, (3) his counsel in his D.U.I. case, and because (4) he has never watched underage pornography in his life nor every spoken with a minor online in his life.

22.     After "Keri Brady" demanded to data recover plaintiff's hard drive, that issue was dropped and a few days later a new issue was raised. "Keri Brady" and "Kevin Brady" did not say directly, but strongly implied, the Alaska Bar Association was doing a discipline investigation regarding the plaintiff relating to adult sexual misconduct. "Keri Brady" did not say so directly, but implied, that there was an Alaska Bar Association conference somewhere wherein women were accusing plaintiff of sexual misconduct. "Keri Brady" did not say so directly, but strongly implied, she was an attendee at this conference and had been appointed to

represent plaintiff in absentia. During this F.B.I. "skit", "Keri Brady" left and returned to the office several times saying things like, for example, "Good, no screaming" (while having a fake tear dripping down her face). At the very same time, plaintiff's internet connection was hijacked wholesale and took-on a directly accusatory tone. For example, on plaintiff's Facebook, all his female Facebook friends' pictures were replaced with images of flowers.

23.     Since (1) all this was done by innuendo, (2) the plaintiff has never committed any sex crime, the plaintiff thought he was imagining things (perhaps developing a mental illness) during his final few days working at "The Law Office of Keri and Kevin Brady". Both the data recovery of plaintiff's hard drives and pretend Alaska Bar Association conference on adult sexual misconduct had occurred in quick succession. In point of fact, the plaintiff's employment at "The Law Office of Keri and Kevin Brady" was terminated with a three-day committal to A.P.I. on 9/13/12. In additional the above referenced two directly accusatory F.B.I. "skits", the subsequently arranged to "spook" the plaintiff by filling Anchorage streets with dozens of people speaking in thinly veiled innuendo. For "hallucinating" this and "hallucinating" he was being accused of crimes at work, the F.B.I. arranged for the plaintiff to be committed to A.P.I. for three-days on 9/13/12.

24.     After the three-day committal to A.P.I., "The Law Office of Keri and Kevin Brady" officially terminated plaintiff's employment on the thinly veiled pretext

COMPLAINT (BIVENS – SEC. 1983) - 9

that his written motion practice was proceeding too slowly. Despite the fact "The Law Office of Keri and Kevin Brady" terminated plaintiff's employment, "Keri Brady" and "Kevin Brady" continued representing plaintiff in what had begun as a real court case: 3AN-11-02041CR (third D.U.I.). In this capacity, "The Law Office of Keri and Kevin Brady" arranged to have plaintiff's bail revoked immediately after the three-day committal to A.P.I. (9/13/12).

25.　　In Alaska, the universal sentence (by custom) for unaggravated third DUI (Felony DUI) is 120 days on ankle monitor. Plaintiff should never have gone to jail at all in that court case. **Despite that, "The Law Office of Keri and Kevin Brady" arranged to have the plaintiff extra-judicially jailed from around September 13th until March 13, 2013 (about six months).** The Alaska Department of Law prosecutor prosecuting the D.U.I. was fully aware that the plaintiff's defense attorneys were two F.B.I. agents. The two Alaska Department of Law prosecutors who prosecuted the D.U.I. wore F.B.I. earpieces themselves and parroted contrived dialogue throughout the "mock" Alaska court case. The plaintiff does not know whether or not the Court was aware the plaintiff had non-lawyer, non-loyal, F.B.I. agents as defense counsels. Given the fact that an entire fictional law firm had appeared out of nowhere ("The Law Office of Keri and Kevin Brady"), plaintiff is inclined to believe the Alaska Superior court judge was aware the proceedings were totally extrajudicial.

COMPLAINT (BIVENS – SEC. 1983) - 10

26.     Immediately after his three-day committal to A.P.I. on 9/13/12 and his bail was revoked, plaintiff was assigned to an Anchorage half-way house. Anchorage's two half-way houses are divided into suites of 6-7 inmates per suite. Gradually, over a period of a few weeks, plaintiff realized every inmate in his suites were undercover F.B.I. agent speaking in thinly veiled innuendo only. **It's at that point, the F.B.I. began the process of telling the plaintiff, from scratch, first the nature of the accusations against him, and then later, the details**.

27.     The data recovery of plaintiff's hard drives had been a one-day incident that occurred out of nowhere. The *strongly implied* Alaska Bar Association conference pertaining to adult sexual misconduct also only lasted a couple days too. Subsequent to both, the plaintiff was committed to A.P.I. Likewise, the plaintiff presumed he had simply hallucinated the directly accusatory tone he had perceived for those three days (in addition to his "hallucination" that dozens of people were following him through the streets of Anchorage speaking in thinly veiled innuendo). For the reason, the plaintiff continued to believe "Keri Brady" and "Kevin Brady" were his loyal counsel. Rather, the plaintiff believed what was occurring in the Anchorage half-way houses was a new unrelated matter.

28.     Within the half-way house, plaintiff's F.B.I. agent suite mates did not start off with a directly accusatory tone. To the plaintiff, it sounded like they were trying to "brand" him as a "criminal" generally (non-specific). Basically, plaintiff's F.B.I. suitemates started off by implying just about every negative thing

COMPLAINT (BIVENS – SEC. 1983) - 11

about the plaintiff generally, with no particular accusation or genre of criminality emphasized. Shortly after the plaintiff realized something strange was going on at his Anchorage half way house, Plaintiff initiated an attorney-client consultation phone with Attorney William R. Satterberg (on a non-sexual matter). Plaintiff told Attorney Satterberg something strange was going on in his Anchorage half-way house. Plaintiff told Attorney Satterberg all his suitemates were (1) systematically implying every possible bad thing about him (insulting everything about him from his intelligence to his morality), (2) attempting to "brand" the plaintiff as a "criminal" on audio (it seemed). Plaintiff told attorney Satterberg that he thought he was being investigated for something but did not know what. Attorney William R. Satterberg was wearing an F.B.I. wire. He twisted the attorney-client consultation into a prosecution. In the telephone attorney-client consultation, the plaintiff said to Attorney William R. Satterberg he was beginning to think he was surrounded by undercover F.B.I. agents for unknown reasons. The plaintiff also said he was thinking of going to the United Kingdom because he was obviously being investigated for something and hadn't done anything. Attorney William R. Satterberg replied that the plaintiff was likely to be arrested in England because of his violent nature. In fact, the plaintiff has never committed a violent act in his entire life. Next, the plaintiff the plaintiff asked Attorney William R. Satterberg a highly technical question about criminal law procedure generally. Attorney William R. Satterberg replied by bringing up the topic of child pornography

inappropriately and out of nowhere. The manner in which Attorney William R. Satterberg spoke strongly implied the plaintiff was the sort of person who might be involved in child pornography. Shortly thereafter, the plaintiff terminated the attorney-client consultation. That was the second time the issue of child pornography was raised out of nowhere.

29.     Thus, the Alaska Bar Association had (1) given fake Alaska Bar credentials to two F.B.I. agents ("The Law Office of Keri and Kevin Brady"), (2) had those two F.B.I. agents masquerade as loyal defense counsels in what had begun as a real court case (3AN-11-02041CR), (3) had those two F.B.I. agents masquerading as loyal "general counsels" conduct multiple attorney-client consultations with the plaintiff on nonsexual matters, and (4) pertained to use its power to compel lawyers to cooperate in disciplinary investigations to compel Attorney William R. Satterberg to wear an F.B.I. wire and parrot contrived dialogue during yet another attorney-client consultation. As plaintiff would later discover (detailed below), the Alaska Bar Association has pertained to use its authority to compel lawyers to cooperate in disciplinary investigations to compel every lawyer in the State of Alaska (5/12 – present) to behave as Attorney William R. Satterberg did (wear an F.B.I. earpiece and parrot contrived dialogue during attorney-client consultations with the plaintiff). In other words, the Alaska Bar Association has pertained do something it has no authority to do. On 5/12, the Alaska Bar Association pertained to completely suspended plaintiff's Fifth and Sixth Amendment right to

counsel indefinitely. As is detailed below. every time the plaintiff has sought an attorney-client consultation (5/12 – present) that consultation has been twisted into a tape-recorded "prosecution" via F.B.I. ear piece. And considering the scope of this F.B.I. project (detailed below), apparently the Alaska Court System is aware of this and has allowed it to occur.

30.     **Thus, plaintiff was extra-judicially confined to Anchorage halfway-house suites wherein every other inmate was an undercover F.B.I. agent from mid-September, 2012 until March 13, 2013.** All day, every day, every member of these suites spoke in thinly veiled innuendo — nonstop. They started off slowly and it was a very gradual process. First, as noted, they implicitly insulted everything about plaintiff and attempted to "brand" him as a "criminal" generally. Next, after about a month, they spoke in thinly veiled innuendo about "rape." Finally, after about two months, there came a day when they spoke extensively about "roofies" (the classic date rape drug) and a wide-variety of other tranquilizers that could be used for that purpose.

31.     It was on the day the plaintiff's F.B.I. suite mates quizzed him extensively about "roofies" and other tranquilizers that the plaintiff began to piece together what he was accused of. After plaintiff's F.B.I. suitemates spent quite a bit of time quizzing him (a particular day) on "roofies" and other similar tranquilizers, the plaintiff remembered (1) his "delusion" that there had been am Alaska Bar Association disciplinary investigation into the plaintiff regarding adult sexual

COMPLAINT (BIVENS – SEC. 1983) - 14

misconduct, (2) the case of "Mr. Mooney" at the "The Law Office of Keri and Kevin Brady."

32.     Plaintiff began working as a "law clerk" at "The Law Office of Keri and Kevin Brady" in May, 2012. On his first day on the job, plaintiff's very first assignment to was to assist in the defense of "Mr. Mooney" (a "fake" court case). "Mr. Mooney" was charged with raping a woman twice in her sleep. "The Law Office of Keri and Kevin Brady" were his defense attorneys. In the "fake" court case, by sheer luck, both of these rapes had been caught on video (Mr. Mooney had a fetish and liked to re-watch the videos of his crimes in his private time). On plaintiff's very first day at "The Law Office of Keri and Kevin Brady" the first task he was assigned to do was watch those two videos. In fact, on his first day of work the plaintiff literally walked in the door of "The Law of Keri and Kevin Brady" and was assigned to watch the two videos immediately (within 10 minutes. After watching the two videos, the next task the plaintiff was assigned to do his first day of work was to find out whether or not "sleeping porn" existed or was a popular fetish (in an attempt to normalize defendant "Mooney's" behavior ostensibly).

33.     These two assignments were just the beginning of the "Mr. Mooney" story at "The Law Office of Keri and Kevin Brady". "Mr. Mooney" was "Keri Brady's" favorite client the entire time the plaintiff worked for "The Law Office of Keri and Kevin Brady" (5/12 - 9/12). In the fictional law firm, she had multiple

file cabinets filled with the thousands of pages of legal pleadings she had written to defend his case (the F.B.I. actually wrote thousands of pages of fake legal pleadings and put them in multiple file cabinets). Whereas "Mr. Mooney" was "Keri Brady's" favorite client, she spent about half her working hours the entire summer of 2012 working on his case. Most importantly of all, both "Keri Brady" and "Kevin Brady" thought "Mr. Mooney" was completely innocent and a great person. Their basis for claiming his complete innocence was the fact the girl he allegedly raped twice in her sleep was "Mr. Mooney's" girlfriend. "Keri Brady" and "Kevin Brady" forced plaintiff to go out to dinner (socially) with "Mr. Mooney" who allegedly was dating a police officer while on bail. "Keri Brady" and "Kevin Brady" also tried to force the plaintiff to attend "Mr. Mooney's" victory party (when he was acquitted in a pretend jury trial), but plaintiff make up an excuse to avoid it.

34.     And, thus, it was on the day that the plaintiff was extensively quizzed about "roofies" and other tranquilizers that plaintiff began putting the pieces together. Perhaps there really had been an Alaska Bar Association into adult sexual misconduct? And perhaps, the "Mr. Mooney" court case was a "fake" court case? If so, were there other "fake" court cases inside "The Law Office of Keri and Kevin Brady?" Although the plaintiff did make all these connections on that day, he presumed he was either imaging things or developing a mental illness.

35.     In fact, throughout his time in the Anchorage halfway houses (6 months – 9/12-3/13) plaintiff vacillated back and forth between (1) believing he was suffering from the onset of mental illness (hearing thinly veiled innuendo everywhere and seeing secret messages in a court case), (2) believing he was really a suspect in one or more crimes.

36.     Plaintiff did not get the hint about minors for a very long time. As noted, "Keri Brady" had searched the plaintiff's person computers and plaintiff had allowed her to. Also as noted, Attorney Satterberg has brought up the issue of "child pornography" out of nowhere. But he had also claimed the plaintiff was "violent" and that's also ridiculously untrue. For a long time, the plaintiff believed both these innuendos were were part and parcel to a general "branding" as a "criminal," and not an accusation per se. Finally, in February 2013, plaintiff's F.B.I. agent suitemate told him a story about his pretend father. In the story, "inmate" had found child pornography on his father's computer. Plaintiff asked the undercover agent "How did you know pornography was underage?" He responded the videos were of very clearly underage girls. At the time that the plaintiff had this discussion, he was still vacillating back and forth between believing he was mentally ill and believing he was actually suspected of one or more crimes. It was in thinking about this discussion after the fact that plaintiff learned he was accused of possessing underage pornography and that it was not just a little underage. (In fact, it wasn't until about six months later, in Corpus

Christi, that plaintiff learned more than mere possession of two pieces of "child pornography" was alleged).

37.     **The fact plaintiff passed the law firm ("The Law Office Of Keri and Kevin Brady") interrogation (with flying colors) is on video and audio tape (5/12-9/12).   The fact the F.B.I. used six-month extrajudicial jailing to "educate" the plaintiff, from scratch, as to first the nature and then the details of the accusations against him in on video and audio tape too (9/12-3/13).  The six months in the half-way house audio and video is six months of non-stop thinly veiled innuendo.  Combined, these videos and audios conclusively prove plaintiff had _no prior knowledge of any of the crimes the F.B.I. accused him of._**

38.     When plaintiff left the half-way house in 3/13, he had put together about half the accusations.  He had put together two girls accused him of rape.  He had also put together he was accused of possessing two videos of underage pornography.  He had further put together he was accused of domestic violence. That's all he had put together from all the bombardment. More importantly, when plaintiff left the half-way house he was still vacillating back and forth between (1) believing he was mentally ill (hearing thinly veiled innuendo everywhere and seeing secret messages in a court cases), (2) believing he was really a suspect in one or more crimes.  In point of fact, he continued to have "The Law Office of Keri and Kevin Brady" represent him. He continued to have "The Law Office of

Keri and Kevin Brady" represent him because (1) he thought he was mentally ill, and also (2) had not yet made the connection between the law firm and what was going on in the half-way house.

39.    **The Plaintiff was not told all the accusations until 2017. However, at this juncture, plaintiff will review all the accusations. *All the accusations are totally preposterous.* First, plaintiff is accused of sexually assaulting his girlfriend's (later wife's) best friend (the plaintiff and her were cheating) (2004). That accusation is preposterous because (1) she told plaintiff she wanted to hook-up again, (2) she remained friends with plaintiff after the pair made-out and she never indicated to plaintiff she felt disrespected in anyway, (3) she never told her best friend, the plaintiff's girlfriend and later wife, that the plaintiff had disrespected her in anyway, (4) a year after we made-out she invited the plaintiff and his wife to her small Mormon wedding. Second, plaintiff is accused of sexually assaulting a Norwegian who lived in Fairbanks (2006). That accusation is preposterous because the next time she saw the plaintiff after the alleged occurrence was about a week later when the plaintiff met her for drinks at a hotel bar. The plaintiff and her held hands and caressed over drinks. After about an hour of that, we found a hotel banquet room that had been left unlocked and had passionate sex in it (on the floor under a table). Third, plaintiff is accused of sexually assaulting a girl he never had any physical contact with (2010). The F.B.I. has told plaintiff when**

COMPLAINT (BIVENS – SEC. 1983) - 19

the alleged occurrence was. That accusation is preposterous because we went on two more dates after the alleged occurrence. And, in addition to that, the last time plaintiff saw her she asked plaintiff to give her a ride across Juneau. Finally, plaintiff is accused of "attempted" sexual assault against "nine" minors. But plaintiff has never had more contact with minors than an average person. Plaintiff doesn't even know who these "nine" minors are. Thus, the F.B.I. has informed plaintiff the "actus reus" of these "nine" "attempted" offenses is conduct akin to "waving hello," etc. The F.B.I. has also informed the plaintiff the entire basis of these "nine" "attempted" accusations is the possession of two underage pornographic videos that plaintiff can easily prove he never saw (see above ¶ 36-37). In fact, plaintiff's *"Pornhub.com"* is a matter of pride and he would happily release all ten years of it to the public. Compared to the population at-large, plaintiff's *"Pornhub.com"* is extremely conservative containing only a narrow range of white girls that are his type (age, size, shape, sex acts).

40.    Plaintiff was released from the extrajudicial jailing in March, 2013 (3AN-11-02041CR). Plaintiff had to think about things for a while to figure out the gist of things. It was unclear what had happened exactly. Two things were certain. It was certain (1) that plaintiff's U.S. Constitutional (same as European Convention on Human Rights rights in this context) had been completely suspended, (2) he was being "framed." After all, plaintiff had just been extra-judicially jailed for six

COMPLAINT (BIVENS – SEC. 1983) - 20

months wherein he was fed innuendo non-stop and "off the record" *for the express purpose of creating the illusion of prior knowledge*.

41.    Plaintiff is a dual citizen of the United States and United Kingdom. Obviously, the plaintiff presumed his European Convention on Human Rights (hereafter E.C.H.R.) rights were still in full force in the United Kingdom. The natural thing to do appeared to the plaintiff to go to the England wherein his fundamental rights were not be suspended. Immediately after being released from the extrajudicial jailing in March, 2013, therefore, plaintiff bought a plane ticket to London. The plane ticket went from Anchorage to London with a connection in Los Angeles.

42.    In March 2013, plaintiff took his initial connecting flight to Los Angeles. In Los Angeles, plaintiff's F.B.I. tail robbed plaintiff of his wallet. Plaintiff had reduced all his money to cash. From that point until 11/15, plaintiff's Fifth and Sixth Amendment right to counsel, U.S. Constitutional right to be free of law enforcement harassment, U.S. constitutional right to privacy (personal autonomy - serendipitous druggings), Fifth Amendment right to remain silent, U.S. Constitutional right to privacy (right to medical care), First Amendment and Article I, Sec 10 right to work and contract, Fourth Amendment right to have and possess personal property, First Amendment right to "associate," First Amendment right to freedom of speech, U.S. constitutional right to privacy (personal privacy), Fourth Amendment right against unlawful seizure, and Thirteen Amendment right

COMPLAINT (BIVENS – SEC. 1983) - 21

to be free of slavery and involuntary servitude were all totally suspended by plaintiff's F.B.I. tail.

43.     Plaintiff had already paid for one night's hotel stay when he was robbed by the F.B.I. in Los Angeles in March, 2013. As soon as that happened, plaintiff telephoned his friends and family in Alaska. Plaintiff had had about one hundred people at his Fairbanks wedding in 2008 (mostly from the Fairbanks legal community). When the plaintiff called his family and friends from Los Angeles after being robbed, he discovered each and every one of his family and friends were wearing F.B.I. ear pieces and parroting contrived dialogue those ear pieces. The F.B.I. had all of plaintiff's friends and family refuse to help. Thus, the day after the F.B.I. robbed the plaintiff in Los Angeles, the plaintiff found himself penniless on the Los Angeles streets surrounded by an enormous F.B.I. "tail." That F.B.I. tail walked by the plaintiff on the left and right (on the sidewalk) and spoke in thinly veiled innuendo all day. Also immediately after the F.B.I. robbed him, plaintiff immediately discovered the F.B.I. was doing its best to anticipate his next destination. Whenever the F.B.I. was able to predict what store the plaintiff was heading to, it went to the store in advance and had all that store's employee's wear F.B.I. ear pieces, speak in thinly veiled innuendo, and pantomime innuendo. The F.B.I. also filled the stores it was able to anticipate plaintiff would visit with "pretend" customers speaking and pantomiming in thinly veiled innuendo too.

44.    **The plaintiff's F.B.I. "tail", which debuted in Los Angeles remains to the present day, is comprised of more than just undercover F.B.I. agents. Plaintiff's F.B.I. tail is comprised of (1) undercover F.B.I. agents, (2) private citizens paid by the F.B.I. to (a) wear F.B.I. ear pieces, (b) speak in thinly veiled innuendo, and (c) pantomime in thinly veiled innuendo, and (3) employees of every kind of institution (businesses, nonprofits, and government agencies) co-opted by the F.B.I. to (a) wear F.B.I. ear pieces, (b) speak in thinly veiled innuendo, and (c) pantomime in thinly veiled innuendo. *In this document, plaintiff's "F.B.I. tail" refers to all of the above.* Moreover, plaintiff's F.B.I. "tail," which debuted in Los Angeles, and remains to the present day, is obviously enormous. Plaintiff's F.B.I. "tail" was then and is now often as many as fifty people at a time. For example, if the F.B.I. anticipates the plaintiff will soon visit a Walmart its not unusual for the F.B.I. to have (a) every employee in the store wear an F.B.I. earpiece, (b) 20 "pretend" customers follow the plaintiff into the Walmart, and (c) have five undercover F.B.I. agents present orchestrating all of the above.**

45.    Thus, having just made the plaintiff a pretend 'felon' by virtue of the extrajudicial jailing (3AN-11-02041CR), the F.B.I. next made the plaintiff a pretend "homeless person" in March, 2013.    All of plaintiff's friends and family had been ordered by the F.B.I. not to help.    Obviously, the plaintiff needed food

and shelter. Thus, after being robbed by the F.B.I., the plaintiff was forced to go to a Los Angeles homeless shelter.

46.     Inside the Los Angeles homeless shelter, the plaintiff found the "suite" dynamic that prevailed in the Anchorage halfway houses prevailed there too. Whether sleeping or eating at the Los Angeles homeless shelter, the plaintiff was surrounded on every side by his F.B.I. tail and they all spoke and pantomimed in thinly veiled innuendo. This occurred every moment plaintiff was at the Los Angeles homeless shelter and soup kitchen except for the eight hours of sleep per night the plaintiff was allowed. The plaintiff had no where else to go so he remained in the homeless shelter under these conditions most of the day. That is, of course, because the situation was no better on the streets of Los Angeles.

47.     Plaintiff stayed in Los Angeles about a month. Everyone he talked to (whether by phone in Alaska) or in Los Angeles was wearing and F.B.I. wire and parroting contrived dialogue. In the off chance the plaintiff contacted someone unexpectedly (a potential friend or employer), on plaintiff's second encounter with them they would be wearing an F.B.I. ear piece and speaking in contrived dialogue.

48.     From Los Angeles, Plaintiff called another attorney in Alaska (Attorney Robert John). Plaintiff initiated a consultation by phone and established an attorney-client relationship on the matter of these accusations. In fact, Robert John had long been serving as plaintiff's "general counsel" and had represented in many

COMPLAINT (BIVENS – SEC. 1983) - 24

matters (before the Bar Association, in a D.U.I., in a Disorderly Conduct, and in dozens of consultations on off-hand matters). The plaintiff was very disoriented when he first called Robert John. For the most part, plaintiff just sounded very disoriented and "freaked out" on the phone. Using its power to compel lawyers the cooperate in disciplinary investigations, the Alaska Bar Association compelled Robert John to wear an F.B.I. ear piece parrot contrived dialogue. The F.B.I. had Robert John parrot contrived dialogue indicating that the plaintiff was imagining things (all of the above including what was occurring in Los Angeles). In the midst of this, the plaintiff asked Robert John for legal advice regarding his Alaska Bar status. He asked if he should voluntarily resign his law license. Robert John continued insisting plaintiff was imagining things on a grand scale but indicated "[a change would do you good and you ought to voluntarily resign his Alaska law license.]" Consequently, the plaintiff resigned his Alaska law license by mail. Thus, the F.B.I. arranged to have the plaintiff resign his law license when totally disoriented and unsure of his own sanity. **In fact, the plaintiff spent about the next year sending attorney-client letters via U.S.P.S. to Attorney Robert John. Plaintiff divulged all his attorney-client secrets regarding these accusations in those attorney-client letters** (this occurred mostly in Corpus Christi — see below). The letters also desperately and repeatedly tried to persuade Robert John the situation was real. The F.B.I. arranged to have Attorney Robert John's response to all plaintiff's emails and letters be the same: that plaintiff was mentally

COMPLAINT (BIVENS – SEC. 1983) - 25

ill and imagining things on a grand scale. And, instead of giving the plaintiff proper legal advice like advising him to remain silent or retain other counsel or file suit, the Alaska Bar Association compelled Robert John to (1) make the plaintiff believe he was suffering from the onset of schizophrenia, (2) give the plaintiff the bad legal advice of voluntarily resigning his Alaska law license by mail, and (3) give all of plaintiff's attorney-client letters to the F.B.I. (a couple dozen long letters).

49. As noted, the plaintiff spent about a month in Los Angeles under these conditions (3/13-4/13). Throughout this period of time, the F.B.I. tried to anticipate plaintiff's next move and sabotage it. If the F.B.I. could anticipate the next store the plaintiff was going to visit, it (1) outfitted all that stores employees with F.B.I. earpieces and had them speak and pantomime in thinly veiled innuendo, and (2) filled that store with "pretend" customers that wore F.B.I. earpieces and had them speak and pantomime in thinly veiled innuendo. For the most part, the F.B.I. arranged to make the ratio of "pretend" to real customers about 1:1 in the stores in occupied. For examples, if a Walmart had fifty real customers in it, the F.B.I. arranged to have about fifty pretend customers inside that Walmart as well, or if a gas station had four real customers in it, the F.B.I. arranged to have four pretend customers inside that gas station as well. The F.B.I. arranged for the same dynamic to prevail at government agencies and non-profits, of course. In addition, the F.B.I. "warned off" every potential friend or employer

plaintiff made contact with. It is obviously very hard to grab someone off the street and makes friends immediately. On the occasions plaintiff did that in Los Angeles, by the second time he encountered that person they were wearing and F.B.I. earpiece and speaking in thinly veiled innuendo. Likewise, the F.B.I. monitored the plaintiff's internet and knew what potential employers he was going to call next and proceeded to "warn them off" as well.

50.     The experience was very disorienting. **After a month in Los Angeles it was clear _all_ the plaintiff's U.S. constitutional rights had somehow been suspended.** Therefore, the plaintiff resolved to reach the British embassy in Mexico City. Obviously, Britain had a legal obligation to repatriate a British citizen whose E.C.H.R. rights (fundamental human rights) were being violated wholesale by another government.

51.     In order to get to Mexico City, the plaintiff needed money. But, the plaintiff was not allowed to work a real job in Los Angeles. That said, the nature of the F.B.I. operation was "undercover" wherein the plaintiff was never given provable evidence of what was being done to him. Desperate to get to the British Embassy in Mexico City, the plaintiff agreed to work for the F.B.I. in "pretend" day labor jobs for several days (4-5 days).

52.     The F.B.I. contracted with a day labor "temp agency" called _Labor Ready_ to create "pretend" day labor jobs for the plaintiff to work. The tasks the plaintiff was assigned to do were not for real customers. Rather, the F.B.I. just arranged

COMPLAINT (BIVENS – SEC. 1983) - 27

for the plaintiff do 3-4 days of day labor doing jobs that were contrived from start to finish. All the jobs were demeaning and replete with innuendo in and of themselves. All the jobs were intended to imply the plaintiff was inherently a "homeless person" and inherently disoriented. On each of the 3-4 days of day labor the plaintiff did for the F.B.I. through *Labor Ready* the plaintiff was assigned to teams of day laborers. The teams ranged in size from three to six day laborers. On each of the 3-4 days the plaintiff did day labor for the F.B.I., the "team" of day laborers to which plaintiff was assigned was entirely made-up of undercover F.B.I. agents speaking and pantomiming in thinly veiled innuendo nonstop.

53. After the plaintiff worked for the F.B.I. for 3-4 days' worth of "day labor" in 4/13, he earned enough money to buy a bus ticket to Guadalajara, Mexico. Obviously, it was impossible to work under those conditions any more then that. Therefore, in April, 2013, plaintiff bought a bus ticket from Los Angeles to Guadalajara, Mexico. The plaintiff resolved to hitchhike from Guadalajara to Mexico City (he had no choice).

54. When plaintiff reached Guadalajara, it immediately became apparently the F.B.I. had replicated in Guadalajara the exact same circumstances that had existed in Los Angeles. Plaintiff's undercover F.B.I. "tail" had followed him to Mexico and was now paying Mexican private citizens to be "pretend" customers and compelling Mexican store employees the wear F.B.I. ear pieces.

55.     Shortly after plaintiff arrived in Guadalajara, he attempted to hitchhike to Mexico City as planned.  But, the F.B.I. kept the plaintiff totally surrounded in Guadalajara and wouldn't let him interact with any member of the Mexican public. Thus, instead of being picked-up as a hitchhiker by a member of the Mexican public, the plaintiff was picked up by undercover F.B.I. agent.  That undercover F.B.I. agent provided the plaintiff a ride to Mexico City but spoke in thinly veiled innuendo the entire way.  Thus, the plaintiff did finally reach Mexico City in late-April, 2013.

56.     As noted, the plaintiff had spent all the money he was allowed to have on his bus ticket to Guadalajara.  He was therefore (1) penniless in Mexico City, (2) totally surrounded by his F.B.I. "tail."  When plaintiff arrived in Mexico City he discovered the F.B.I. had replicated in Mexico City the exact same conditions that had existed in Los Angeles and Guadalajara.  On his first night sleeping on card board boxes in the Mexico City streets, the plaintiff's shoes were stolen (perhaps by the F.B.I. or perhaps by a real Mexican criminal).  The next morning, the plaintiff proceeded to the British embassy in Mexico City, barefoot, penniless, and with only the clothes on his back.  The plaintiff made contact with a British Embassy official and explained the situation.  The plaintiff explained all of the above.  The plaintiff further explained that all of his U.S. Constitutional (the same as E.C.H.R. rights for these purposes) had been suspended in the United States and remained suspended in Mexico too.  On that basis, the plaintiff demanded

repatriation to Britain. Rather than repatriate the plaintiff to Britain as required by both U.K. law and Britain treaty obligations, the British counselor official wore and F.B.I. ear piece and spoke only in contrived dialogue. That British embassy staffer also refused to confirm anything was going on at all. Over about a dozen contacts with the British embassy, that British embassy staffer acted as if the from suffering from delusions on grand scale only.

57. The plaintiff spent a total of about four weeks in Mexico City (4/13-5/13). He spent most of that time barefoot. He spent all of that time penniless and surviving by eating from Mexico City trash cans. For that period of time, he visited the British Embassy, day after day and repeatedly invoked his right to repatriation to Britain. The plaintiff couldn't survive in Mexico City since he couldn't talk to any members of the Mexican public. The F.B.I. had him totally surrounded and anticipated his next move as best as it could. In every Mexico City shop or Church the plaintiff entered, he found it filled with Mexican private citizens ("pretend" customers) that the F.B.I. had paid to wear ear pieces, speak in thinly veiled innuendo, and pantomime in thinly veiled innuendo. The F.B.I. had set-up a blockade intended to starve the plaintiff. More precisely, the F.B.I. had arranged a blockade intended to force the plaintiff to survive by eating from Mexico City trash cans. The F.B.I. did this in order to make videos of the plaintiff as a "pretend" "homeless person." During his about four weeks in Mexico City,

the plaintiff bathed (and washed his clothes) in the sink in the British Embassy restroom.

58.     When the plaintiff first telephoned his mother after being robbed by the F.B.I. in Los Angeles, his mother had begun speaking in contrived dialogue clearly from an F.B.I. earpiece. At that point, the plaintiff obviously resolved he would never speak with his mother again. However, the F.B.I. made the decision early on to make the plaintiff's mother the plaintiff's point of contact with the F.B.I. From the time plaintiff was robbed by the F.B.I. in Los Angles until the present day, the plaintiff's mother has been designated to speak for the F.B.I. and also issue F.B.I.'s "bread and allowance" to the plaintiff.

59.     By the time he reached Mexico City, the plaintiff has come to understand his mother was the F.B.I.'s designated point of contact and spoke for the F.B.I. Plaintiff held out in Mexico City about a month under these conditions before he finally succumb to the F.B.I.'s starvation blockade. After about a month eating from Mexico City trash cans, the plaintiff finally called his mother. Through her, the F.B.I. gave the plaintiff just enough money to return to the United States via bus. Thus, the plaintiff took a bus from Mexico City to Corpus Christi, Texas around May, 2013.

60.     When plaintiff arrived in Corpus Christi around May, 2013, it was immediately apparent that F.B.I. had replicated in Corpus Christi the same conditions that had existed in Los Angeles, Guadalajara, and Mexico City. The

COMPLAINT (BIVENS – SEC. 1983) - 31

plaintiff remained surrounded by undercover F.B.I. agents in Corpus Christi. The F.B.I. continued to try to anticipate plaintiff's next destination and phone calls. In short, plaintiff's F.B.I. tail (as broadly defined in ¶ 32) continued to enforce exactly the same conditions in Corpus Christi as elsewhere.

61.     After being forced the F.B.I.'s blockade of starvation to contact his mother from Mexico City, the plaintiff resolved never to call her again. However, when the F.B.I. stole the plaintiff's wallet in Los Angeles it had also stolen his I.D. Thus, the plaintiff arrived in Corpus Christi, Texas without an I.D. Without an I.D. the plaintiff could neither access food stamps nor about half the soup kitchens in Corpus Christi. The plaintiff held out about two months without an I.D. in Corpus Christi before being forced to call his mother again. In fact, in order to force the plaintiff to call his mother again, the F.B.I. arranged for every single charity in Corpus Christi refuse the trivial amount of money necessary to get a Texas state I.D. That included Catholic Social Services and every similar charitable institution.

62.,    **Thus, after about two months without an I.D., the plaintiff contacted his _mother_ whom he knew was _the F.B.I.'s designated point of contact._** Through her, the F.B.I. transferred the plaintiff enough money to get a Texas State I.D. card. And, through her, the F.B.I. thereafter gave plaintiff a weekly "bread and water" "allowance." Each week, the F.B.I. would transfer the plaintiff

Case 3:22-cv-00131-SLG   Document 1   Filed 05/24/22   Page 32 of 153

between $50-$60 through his mother. This occurred through a once weekly email the plaintiff was forced to send to his mother.

63. The plaintiff was held hostage (as described above and below) in Corpus Christi from 5/13 – 3/14. The F.B.I. made conditions in that Corpus Christi homeless shelter identical to the conditions the F.B.I. had created in the earlier Los Angeles homeless shelter. The shelter was just like the Los Angeles home shelter had been. As had been the case in Los Angeles, the Corpus Christi homeless shelter had been completely taken over by the F.B.I. Every bed adjacent to the plaintiff's was an undercover F.B.I. agent speaking in thinly veiled innuendo. At meal time, every table adjacent to the plaintiff's was comprised of members of plaintiff's F.B.I. tail speaking and pantomiming nonstop in thinly veiled innuendo. And, as in Los Angles, the situation on the street and in stores was no better than in the homeless shelter. Consequently, plaintiff spent a great deal of time at the Corpus Christi homeless shelter being "talking at" nonstop by the F.B.I.

64. After about six weeks in that Corpus Christi homeless shelter, the plaintiff directly confronted the F.B.I.: "[You are an undercover F.B.I. agent. All of you are undercover F.B.I. agents]." The F.B.I. retaliated by having the homeless shelter staff tell the plaintiff he could no longer stay in the shelter because he was [acutely mentally ill and actively hallucinating]. This was, of course, exactly the same instructions the F.B.I. had given to plaintiff's mother and Attorney Robert

COMPLAINT (BIVENS – SEC. 1983) - 33

John.  The F.B.I. had both of them constantly reaffirm that plaintiff was hallucinating on a grand scale.

65.  From the time the plaintiff was robbed in Los Angeles (3/13) to the present day, this same dynamic has prevailed.  That is to say, *the F.B.I. always issued a draconian "punishment" upon the plaintiff if he ever (1) states to anyone what is actually occurring, (2) directly confronts any member of his F.B.I. tail, or (3) directly confronts any of the government officials responsible for suspending all plaintiff's U.S. constitutional rights.*  From the time his was robbed in Los Angeles (3/13) until the present day, the F.B.I. has arranged the situation so that plaintiff must (1) "consume psychological operations" passively, (2) never "talk back," and (3) always "pretend nothing is going on." If the plaintiff verbalizes to anyone, anywhere what is actually going on the F.B.I. issues a draconian "punishment" such as: (1) commits the plaintiff to a psychiatric ward (a "psihushka," see below), (2) arranges for the plaintiff to not have shelter, (4) arranges for the plaintiff not to have food, (4) beats the plaintiff up, (5) serendipitously drugs the plaintiff, and/or (4) violates the other basic human rights rights of the plaintiff.  *And thus, the entire purpose of the F.B.I.'s enterprise, 2013-present, is to force the plaintiff to be passively bombarded with "psychological operations" ("slavery and involuntarily servitude").*

COMPLAINT (BIVENS – SEC. 1983) – 34

66.   It is unusual in a legal pleading to refer to "psychological operations." "Psychological operations are operations to convey selected information and indicators to audiences to influence their emotions, motives, and objective reasoning, and ultimately the behavior of governments, organizations, groups, and individuals."

https://en.wikipedia.org/wiki/Psychological_operations_(United_States).   In fact, the F.B.I.'s entire program of "sensory bombardment" is "psychological operations" intended to "brainwash" the plaintiff.  The thinly veiled innuendo the plaintiff has described is nothing but repetition.  The F.B.I. bombards the plaintiff with the same sentiments hundreds of times a day, every day — now for ten years on end.  In fact, there are only about one hundred major points that the thinly veiled innuendo conveys over, and over, and over.  Now, in 2022, the plaintiff has consumed literally MILLIONS of independent "psychological operations" statements — all repetition — all reaffirming the same about 100 points.  As will be explained, the entire purpose of forcing someone to passively consume literally MILLIONS of independent "psychological operations" sentiments is to "brainwash" or in intelligence parlance, "…influence their emotions, motives, and objective reasoning…"  In this case, the goal being to "brainwash" to the plaintiff into believing he commit crimes.  As will be detailed, the strength of the "psychological operations" deployed by the F.B.I. against plaintiff was increased by orders a magnitude beyond just thinly veiled innuendo after 2017.

COMPLAINT (BIVENS – SEC. 1983) - 35

67.     After the F.B.I. arranged for the plaintiff to be denied shelter in Corpus Christi, he had to sleep outside. As noted, the F.B.I. gave the plaintiff a "bread and water" allowance of about $50-$60 per week through his mother while he was in Texas. After the F.B.I. evicted the plaintiff from the Corpus Christi homeless shelter, plaintiff used his next "allowance" from the F.B.I. to buy a cheap sleeping bag and backpack. Plaintiff relocated his sleep quarters to a storm drain in a park directly behind the downtown Corpus Christi city library. The storm drain provided shelter from the rain. Plaintiff lived in that storm drain from about 9/13 – 3/14. He was surrounded by undercover F.B.I. agents the entire time.

68.     **Shortly after arriving in Corpus Christi around 5/13, the F.B.I. began serendipitously drugging the plaintiff (serendipitously putting drugs in his food, drink, and on his skin). As noted, the plaintiff has been accused of drugging women (see ¶ 68). The F.B.I. has an open and notorious 'case theme' to 'justify' serendipitously drugging the plaintiff: *'Whereas the plaintiff drugs women, he deserves to be serendipitously drugged.'* Beginning** around 5/13 when plaintiff arrived in Corpus Christi and continuing to this day, the F.B.I. has drugged the plaintiff with a wide variety of drugs. In fact, the F.B.I. has serendipitously drugged the plaintiff hundreds of times since 5/13.

69.     **The F.B.I.'s campaign of serendipitously drugging the plaintiff hundreds of times between 5/13 and the present day has included a very wide variety of drugs used for a very wide variety of purposes. First, the F.B.I.**

COMPLAINT (BIVENS – SEC. 1983) - 36

sometimes drugs the plaintiff to "attack" ("assault") the plaintiff. For examples, the F.B.I. serendipitously drugs the plaintiff with (1) drugs designed to elevate his heart-rate and make his head feel like it is going to explode, (2) hallucinogens which cause terrifying bouts of hallucinations. Second, the F.B.I. sometimes drugs the plaintiff to make the plaintiff appear a particular way on video (contrived "scenes" prearranged by the F.B.I.). For examples, the F.B.I. serendipitously drugs the plaintiff with (1) drugs that make him look "high" at particularly inappropriate times like Church, (2) drugs that cause the plaintiff to be "cognitively dull" for certain prearranged "skits," and/or (3) a combination of hallucinogens and drugs that cause the plaintiff to become extremely agitated in order to create video of the plaintiff appearing both "crazy" and "aggressive." Third, the F.B.I. sometimes drugs the plaintiff to force him to talk about the allegations against him (annihilate his Fifth Amendment right to remain silent with drugs). For examples, the F.B.I. serendipitously drugs the plaintiff with (1) "truth serum" (twice only), and/or (2) hallucinogens that make it impossible not to talk when combined with bombardment by "psychological operations." Fourth, the F.B.I. sometimes drugs the plaintiff to get him to do (or not do) certain things at certain times. For examples, the F.B.I. serendipitously drugs the plaintiff with (1) drugs like marijuana to cause him to eat at a particular time, (2) sedatives that make physical activity impossible at a particular time (stop the

COMPLAINT (BIVENS -- SEC. 1983) - 37

plaintiff from doing something he was planning to do), (3) sedatives to put the plaintiff to sleep at a particular time, (4) stimulants designed to make the plaintiff engage in physical activity he wouldn't have otherwise, and (5) stimulants designed to make the plaintiff stay up later than usual. Fifth, the F.B.I. serendipitously drugs the plaintiff to emulate the symptoms of certain mental illnesses. For examples, the F.B.I. serendipitously drugs the plaintiff with (1) stimulants to simulate the hypo-mania associated with bipolar disorder, (2) stimulants to simulate the poor sleep persons experiencing bipolar hypo-mania experience, and/or (3) dopamine active drugs designed to trigger episodes of schizophrenia at certain times. Sixth, the F.B.I. serendipitously drugs the plaintiff for the purpose of blocking his access to this Court. For example, the F.B.I. drugged the plaintiff with hallucinogens after he filed an initial Sec. 1983 Complaint before this Court in 2017 (as detailed below — 3:17-cv-00089-SLG). Seventh, *as extensively detailed below,* the F.B.I. serendipitously drugs the plaintiff for the purpose of "brainwashing" the plaintiff into believing all of events are these schizophrenic hallucinations as opposed to actual events. For example, the F.B.I. serendipitously drugs the plaintiff with hallucinogens that last 48 hours and simultaneously bombards him psychological operations only for those 48 hours. *In fact, between 5/13 – Present, the plaintiff has been drugged hundreds of times with hundreds of different drugs.* Although the plaintiff recognizes

COMPLAINT (BIVENS – SEC. 1983) - 38

**some of the drugs he was been serendipitously drugged with, the plaintiff does not know what the vast majority of the drugs he has been serendipitously drugged with are. That is to say, the plaintiff has no idea if the vast majority of the drugs he has been serendipitously drugged with come from a pharmacy, are illegal narcotics, or come from a chemical weapons laboratory.**

70. Initially, the F.B.I. only serendipitously drugged the plaintiff once or twice a week in Corpus Christi. As detailed below, the F.B.I. would serendipitously drug the plaintiff vastly more frequently in later years.

71. Under these conditions, it took plaintiff a very long time to finally sue in Sec. 1983. In January, 2014, plaintiff was being housed in a storm drain, which the F.B.I. had surrounded. Plaintiff attempted to use the Corpus Christi city library's computers to draft the appropriate Sec. 1983 to address all of these U.S. Constitutional violations. The entire time the plaintiff tried to work, his F.B.I. tail harassed him and bombarded him with non-stop innuendo. On 1/31/14, plaintiff finally managed to file a Sec. 1983 action complaining of all these events in Federal District Court for the Southern District of Texas at Corpus Christi (2:14-cv-00033). The lawsuit successfully conveyed the gist of the situation but left much to be desired. The plaintiff had been legally tortured for nearly a year by that time. Therefore, the lawsuits phraseology was very poor. The F.B.I. filed a confidential filing in response. It's unknown what the contents F.B.I.'s

confidential filing was. Because of the facts (1) the things the F.B.I. were and are doing to the plaintiff suspend disbelief, (2) the lawsuits phraseology left much to be desired, the Federal District Court for the Southern District of Texas at Corpus Christi dismissed the case as "delusional" and therefore "frivolous" on 3/19/14.

72.     As noted, the F.B.I. suspended basically all of the plaintiff's U.S. constitutional rights after it robbed the plaintiff in Los Angeles in 3/13. As explained, thereafter, the plaintiff was not allowed to work except for the F.B.I. on "pretend" jobs that were contrived from start to finish. To reiterate, plaintiff was never allowed to work for a real employer or do actual work that a business, person, or institution actually needed done from 3/13 to present. Likewise, the working conditions in Corpus Christi were same as they had been in Los Angeles wherein the plaintiff was allowed to do day labor but only as a member of a "team" of day laborers all of whom were undercover F.B.I. speaking and pantomiming in nonstop innuendo. Under these conditions, the plaintiff did work about a dozen days of day labor in Corpus Christi between 5/13 – 1/14. Each "pretend" day labor project was designed to be demeaning and replete with innuendo from start to finish. The projects were designed to reinforce the fact the plaintiff was a "pretend" "transient" "homeless" person with "cognitive dullness" inherently.

73.     Although the plaintiff repeatedly asked Federal District Court for the Southern District of Texas at Corpus Christi for reconsideration and to hold a

COMPLAINT (BIVENS – SEC. 1983) - 40

hearing, all his requests were denied (2:14-cv-00033). By that time, plaintiff's mental health was suffering quite badly from more than a year of legal torture. Court action having failed despite his best efforts, the plaintiff believed he had no choice but to make another attempt to leave the country. Whereas the United Kingdom was clearly a full co-conspirator in the suspension of all plaintiff's (1) U.S. constitutional rights, (2) all plaintiff's fundamental human rights under the European Convention on Human Rights, plaintiff resolved to travel to continental Europe. As a British citizen, the plaintiff was also an E.U. citizen and could legally live in any E.U. country. Surely, the plaintiff thought, his E.C.H.R. rights would be fully enforced in continental Europe.

74. A few days after the plaintiff's Sec. 1983 was dismissed (3/19/14 — 2:14-cv-00033). Plaintiff resolved to work for the F.B.I. in a pretend job long enough to earn enough money to fly to continental Europe. The plaintiff applied to work at a small grocery store in Corpus Christi (the Port Aransas I.G.A.). The F.B.I. allowed the plaintiff to be hired as a grocery store stocker (a sufficiently demeaning position to satisfy the F.B.I.) When plaintiff showed up to work at the I.G.A., he found that every other employee in the store was wearing an F.B.I. earpiece, speaking in thinly veiled innuendo, and pantomiming in thinly veiled innuendo nonstop. Moreover, there was a 1:1 ratio between real customers and "pretend" customers in the I.G.A. all day. The F.B.I. paid hundreds of private citizens to wear F.B.I. ear pieces and pretend to be customers as they spoke and

pantomimed in thinly veiled innuendo. Finally, the plaintiff was forced to wear a store employee radio ear piece that spoke in thinly veiled innuendo nonstop as he worked. The sensory bombardment with psychological operations was the worst the plaintiff had ever experienced. Despite that, the plaintiff managed to work for the F.B.I. as a pretend grocery store stock clerk for about two weeks. By doing so, the plaintiff earned about $800 and used the money to buy an advance fare ticket to Norway (the flight departed in two months — 5/14).

75.     As noted, plaintiff was "only" drugged about twice a week for most of him time in Corpus Christi. Probably because the people of Corpus Christi were becoming concerned, the F.B.I. decided to relocate the plaintiff shortly after he concluded his about two weeks work at the I.G.A. A few days after plaintiff's about two weeks at the I.G.A. ended, the F.B.I. began serendipitously drugging the plaintiff multiple times a day. At the same time, the F.B.I. changed its thinly veiled innuendo to a command to move from Corpus Christi to another city. The plaintiff resisted leaving Corpus Christi for about a week despite the fact he was being drugged multiple times per day. However, the plaintiff was eventually forced to comply and bought a bus ticket to Brownsville, TX in early April, 2014, with his "allowance" from the F.B.I.

76.     Plaintiff lived in Brownsville, TX about two months while he awaited his flight to Norway. He slept behind the Brownsville public library. Behind the Brownsville public library there were bushes where the plaintiff could find shelter

COMPLAINT (BIVENS – SEC. 1983) - 42

from the rain. Like the storm drain behind the Corpus Christi public library, the F.B.I. kept the plaintiff totally surrounded in the bushes behind the Brownsville. Likewise, the F.B.I. replicated in Brownsville, TX, the exact same circumstances the plaintiff has encountered in Los Angeles, Guadalajara, Mexico City, and Corpus Christi.

77.     Plaintiff flew to Oslo, Norway around May, 2014. Obviously, plaintiff presumed his European Convention on Human Rights rights (same as U.S. constitutional rights in this context) would be fully enforced in Norway. Therefore, shortly before plaintiff traveled to Oslo, he terminated communications with his mother formally (his *point of contact* with F.B.I. through whom the F.B.I. sent him "bread and water" weekly "allowance" in Texas). When plaintiff traveled to Oslo, he fully intended to "start from scratch" there. He presumed his rights would be fully enforced and he would be able to get a job consistent with his education level. In addition, plaintiff knew he was not mentally well after having been legally tortured for about two years. Therefore, the plaintiff was looking forward to getting appropriate psychiatric medical care in Oslo. The plaintiff presumed his cognitive abilities would return once the sensory bombardment stopped with just a little help from medical professionals.

78.     Although the plaintiff was pretty sure his European Convention on Human Rights rights would be fully enforced in Oslo, he also thought there was some possibility they won't and therefore prepared for the worst. Accordingly, plaintiff

COMPLAINT (BIVENS – SEC. 1983) - 43

located in Oslo the best place in the world to either (1) "start from scratch," (2) isolate himself from the F.B.I.'s sensory bombardment. Sognsvann is the Norwegian equivalent of a state park. It is also the Oslo metro system's last subway stop. Camping is allowed there. In Texas, plaintiff had bought himself a tent and some basic camping gear. If plaintiff had to "start from scratch," he would do so by pitching a tent in Sognsvann and finding a job. If plaintiff had to isolate himself from the F.B.I. in Norway, he would do so by pitching a tent in the middle of the woods. Whereas plaintiff's F.B.I. tail is usually comprised of about a 1:1 ratio to members of the actual public, the F.B.I. would have little excuse to have undercover agents and paid private citizens follow him into the woods at Sognsvann.

79.    Immediately upon arrival in Oslo, plaintiff discovered the F.B.I. has replicated in Oslo exactly the same conditions that has existed in Los Angeles, Mexico, Corpus Christi, and Brownsville. Plaintiff's F.B.I. tail had followed him to Oslo wholesale. Now, it was Norwegian store employees that were wearing F.B.I. ear pieces, speaking in thinly veiled innuendo, and pantomiming in thinly veiled innuendo. And now, it was members of the Norwegian public who the F.B.I. was paying to wear ear pieces and pretend to be customers. In fact, plaintiff's F.B.I. tail made its presence known about an hour after plaintiff landed by taking over a grocery store just outside the Oslo airport.

80. Although plaintiff was surprised his U.S. constitutional/E.C.H.R. rights were suspended in Norway too, he was prepared for it. Thus, he pitched a tent about a kilometer from Oslo's last subway stop in the middle of the woods at Sognsvann. Whereas conditions in Oslo were just exactly the same as they had been in Los Angeles, Guadalajara, Mexico City, Corpus Christi, and Brownsville, the plaintiff was forced to make email contact with his formal *point of contact* with the F.B.I. (his mother) yet again. Eventually, the F.B.I. raised plaintiff's "bread and water" weekly allowance from $50-$60/week in Texas to about $110 per week in Oslo. Each week, plaintiff would send an email to this mother with the notion at the bottom "* You are the F.B.I.'s spokesperson" and each week the F.B.I. would Western Union the plaintiff about $110 in response to that email. It was a one email a week arrangement.

81. The plaintiff lived in Oslo (camping at Sognsvann) from 5/14 – 11/15. From the plaintiff's tent, the F.B.I. continued to modulate loud motor vehicle noises in reaction to the things the plaintiff (1) said to himself, (2) his actions, (3) his activities on his cellular phone. However, only a few times a day did the F.B.I. have members of plaintiff's F.B.I. "tail" walk by the tent speaking in contrived dialogue (relative peace compared to the streets of Los Angeles, Guadalajara, Mexico City, Corpus Christi, and Brownsville). In Oslo, the plaintiff purchased a cellular phone and filled it with downloaded history documentaries. The F.B.I. hijacked the device. It modulated the phones volume and screen

brightness to highlight certain words and phrases in the history documentaries. Plaintiff spent about half his time in Oslo at his tent watching those documentaries. He spent of the other half of his time exploring Oslo store by store, and street by street, with his F.B.I. "tail" in tow.

82. _When plaintiff entered the law firm on 5/12, he was in perfect mental health. He was a graduate of Notre Dame Law School whom had never experienced a moment of "cognitive dullness" in his life. He had never in his entire life ever experienced a hallucination of any kind either. Likewise, there are no witnesses to plaintiff ever experiencing a hallucination of any kind prior to 5/12. Moreover, plaintiff would happily take a polygraph to that effect. This fact is of central importance because of what would happen to the plaintiff as a result of these events (years of legal torture)._ First, the plaintiff started experiencing "cognitive dullness" as evidenced by the Sec. 1983 action filed in Federal District Court for the Southern District of Texas on 1/31/14 (2:14-cv-00033). Second, by the time plaintiff arrived in Oslo in 5/12, the plaintiff's mental health gotten much worse. Around the time he arrived in Oslo in 5/14, the plaintiff started experiencing "delusions of reference" for the first time in his life. "...Delusions of reference describe the phenomenon of an individual experiencing innocuous events or mere coincidences and believing they have strong personal significance. It is 'the notion that everything one perceives in the world relates to one's own destiny', usually in a negative and

hostile _____ manner."
*https://en.wikipedia.org/wiki/Ideas_and_delusions_of_reference*. Simply put, a
"delusion of reference" is when a person perceives a "secret message" in an
innocuous happening. What "delusions of reference" did the plaintiff
experience starting in Oslo? 100% of the content of his "delusions of
reference" were exactly the same as the content of the F.B.I.'s program of
"psychological operations." To this day, plaintiff has never had a "delusion
of reference" that off-topic in any way from the F.B.I.'s program of
"psychological operations." Third, as will be detailed, for the first time in his
life the plaintiff started hearing "voices" beginning in 4/17. What did these
"voices" the plaintiff started hearing in 4/17 say? 100% of what they said was
identical to the F.B.I.'s program of "psychological operations" again. To this
day, plaintiff has never heard a "voice" that was off-topic in any way from
the F.B.I.'s program of "psychological operations." Fourth and finally, as
will be detailed, for the first time in his life the plaintiff the plaintiff started
having muscular problems beginning in 9/17. In short, after 9/17, the
plaintiff had to endure the experience of having these newfound "voices"
(whose agenda was identical to the F.B.I.'s program of "psychological
operations") manipulate his muscles and body language. Although this may
sound remarkable, in fact, within the *reddit* community of *r/schizophrenia*
about one-third of people who actually have real schizophrenia report their

COMPLAINT (BIVENS – SEC. 1983) - 47

**"voices" can move this body parts (e.g., about one-third of people who actually have real schizophrenia report their "voices" can, for example, turn their head to the left).**

83.    It is surprising the plaintiff (1) starting hearing "voices" in 4/17, and (2) starting having muscular problems in 9/17 (the details of those events are below). By contrast, it is not surprising the plaintiff started experiencing "delusions of reference" around the time he arrived in Oslo on 5/14. By 5/14, the plaintiff had been continuously bombarded by stimuli (stimuli = independent acts of thinly veiled innuendo) for two years straight. Put another way, by 5/14, the plaintiff had been forced to consume hundreds of thousands of independent acts of "psychological operations" while at the same time (1) being held in a state of extreme deprivation, (2) being subjected to constant, sustained, derogation of every kind. In other words, the plaintiff had been legally tortured for two years by 5/14. Likewise, about the time plaintiff arrived in Oslo, plaintiff started seeing the very same thinly veiled innuendo in places it really didn't exist (such as in TV shows and in magazines).

84.    Thus, plaintiff's mental health was obviously very poor when his arrived in Oslo in 5/12 and it only continued to decline for the one- and one-half years he was in Oslo (5/12 - 11/15). In fact, the F.B.I. wanted the plaintiff to have "cognitive dullness" in Texas and the same was true of the plaintiff's dramatically worse mental condition in Oslo (experiencing "delusions of reference"). For this

reason, the F.B.I. arranged to have Norwegian authorities ignore the fact plaintiff badly needed medical attention for his 1.5 years in Norway.

85.     Shortly after plaintiff arrived in Oslo in 5/14, he went to an Oslo police station (Majorstuen).  In Norway, you obtain a restraining order at the police station, not through the courts.  The plaintiff filled out the appropriate forms and formally requested a restraining order against the F.B.I.  The plaintiff also complained that his F.B.I. "tail" had been feeding him by prompting him to "pretend" to steal bread from grocery stores (a few times — to make videos wherein it appeared the plaintiff was "homeless" and "stealing").  Plaintiff's request for a restraining order was denied summarily.  Plaintiff persisted.  While continuing to deny anything was going on, the Norwegian local police station stated that restraining orders appeals could only be done through the Norwegian equivalent of the F.B.I.  Plaintiff was sent to the Norwegian equivalent of the J. Edgar Hoover Building.  Inside, Norway's top detectives wore F.B.I. earpieces and spoke in thinly veiled innuendo in a contrived skit.  Basically, they denied anything was going on and gave the plaintiff the run-around too.

86.     In fact, considerable effort and resources were put into the plan to force plaintiff to "pretend" to steal bread to make videos.  First, the F.B.I. arranged for the plaintiff to not receive his F.B.I. "allowance" his first couple weeks in Oslo. Second, the F.B.I. arranged to have both the Oslo police and Oslo homeless shelters deny knowledge of where Oslo's soup kitchens were located.  Third, the

COMPLAINT (BIVENS – SEC. 1983) - 49

F.B.I. gave the plaintiff fake Google search results and removed from those search results the locations of Oslo's soup kitchens. Consequently, in order to put an end to the skits wherein the F.B.I. prompted the plaintiff to "pretend" to steal bread, plaintiff had to walk up and down the streets of Oslo, one by one, until he located Oslo's only two soup kitchens. One soup kitchen provided meat two lunches a week. The other charity provided one bag of groceries a week (whereas Norwegian cash welfare system is very generous, there isn't much need for soup kitchens in Oslo).

87. Eventually, as stated, the F.B.I. restarted plaintiff's weekly "bread and water" allowance, which it raised to about $110 per week. $110 a week is very, very, little money in Norway. Prices in Norway are approximately double prices in the continental United States. **Plaintiff settled into a rigid routine in Oslo quickly**. Each week, plaintiff used his allowance from the F.B.I. to buy (1) mostly bread every day, (2) IKEA hot dogs twice a week, (3) Ice Cream and a 1.5-liter soda on Sunday, (4) a museum visit on Sunday (plaintiff visited every museum in Oslo over 1.5 years), (5) one all you can eat meal at a pizza buffet on Sundays, (6) a gym membership to shower, and (7) an Oslo metro pass.

88. **For 1.5 years, every week in Oslo was exactly the same.** Every day, plaintiff explored Oslo during daylight hours on the metro. He visited just about every store in the Oslo, F.B.I. "tail" in tow, of the course of his 1.5 years there. And, after dark, plaintiff watched history documentaries on his cellular phone in

COMPLAINT (BIVENS – SEC. 1983) - 50

his tent every night starting at about 6pm. As noted, the F.B.I. modulated the screen brightness and volume on these nonstop.

89.     Given the facts that plaintiff visited Oslo stores throughout daylight hours for 1.5 years with his F.B.I. tail in tow, and (2) plaintiff eventually started passing out hand written notes daily asking for help, "everybody who was anybody" in Oslo eventually knew (1) all of these events were occurring, (2) the plaintiff badly needed medical care. Despite this, plaintiff was held captive in a state of total disability by the F.B.I. for 1.5 years in Oslo.

90.     Eventually, after about a year in Oslo, plaintiff finally managed to file suit for his civil rights in the Oslo Tingrett (Norwegian trial court of first instance). The suit left much to be desired because plaintiff's mental health was very, very poor. That said, the Oslo Tingrett was no doubt aware the gist of plaintiff's allegations were true (that plaintiff's E.C.H.R. and fundamental human rights were being violated wholesale). Despite that, the Oslo Tingrett dismissed the plaintiff's case as "delusional" and therefore "frivolous."

91.     In 9/15, plaintiff finally caused a scene. Prior to 9/15 in Oslo, he had simply consumed "psychological operations" passively. As noted in ¶ 65, the F.B.I. has always forced the plaintiff to "pretend nothing is going on" (holding him hostage for the purpose of bombarding him with "psychological operations" passively and issuing draconian punishments for acknowledging the situation for what it really was. The scene the plaintiff caused was a minor one. Plaintiff

COMPLAINT (BIVENS – SEC. 1983) - 51

shouted at a citizen the F.B.I. had hired to be part of his tail for a few seconds. In retaliation for acknowledging the situation for what it really was, the F.B.I. arranged to have plaintiff committed to the first of several "psihushkas" (as detailed below).

92.     "Psihushka (Russian: психушка; [pʲsʲɪˈxuʂkə]) is a Russian ironic diminutive for psychiatric hospital. In Russia, the word entered everyday vocabulary. This word has been occasionally used in English, since the Soviet dissident movement and diaspora community the West used the term. In the Soviet Union, psychiatric hospitals were often used by the authorities as prisons, in order to isolate political prisoners from the rest of society, discredit their ideas, and break them physically and mentally. As such, psihushkas were considered a form of torture." https://en.wikipedia.org/wiki/Psikhushka.

93.     The F.B.I. arranged to rent a wing of an Oslo psychiatric ward. It filled the wing with undercover F.B.I. agents initially speaking in thinly veiled innuendo ("pretend" patients).   The F.B.I. arranged to have doctors forcibly provide a combination of drugs and cognitive behavioral therapy to the effect that 5/12-9/15 was merely plaintiff experiencing the onset of schizophrenia for the first time. Hearing and seeing "secret messages" in ordinary events, after all, is a symptom of schizophrenia.

94.     Upon being committed the Oslo "psihushka," plaintiff immediately called the British embassy.   A British embassy official visited the rented wing of the

COMPLAINT (BIVENS – SEC. 1983) - 52

psychiatric ward. Plaintiff demanded the British embassy official confirm that the plaintiff was in a "psihushka." The British embassy official wore an F.B.I. ear piece and spoke only in contrived dialogue. Instead of confirming the plaintiff was in a "psihushka," the British embassy official followed the script and said (1) nothing was going on, and that (2) that plaintiff had been suffering from an episode of schizophrenia since 5/12.

95.     Inside the Oslo "psihushka," F.B.I. doctors prescribed the plaintiff Abilify to legally torture him further. After about two weeks on Abilify, the plaintiff developed severe "akathisia." This akathisia made it impossible for plaintiff to sit down so long as he was awake. By prescribing Abilify, the F.B.I. forced the plaintiff to pace ceaselessly every moment he was awake in the Oslo "psihushka." That was the first instance (not the last), that the F.B.I. overtly rather than serendipitously drugged the plaintiff to accomplish legal torture.

96.     Plaintiff spent about two months in the Oslo "psihushka." The F.B.I. gradually turned down the thinly veiled innuendo over those two months. By the end of those two months, the thinly veiled innuendo had completely stopped (11/15). As the F.B.I. gradually turned down the thinly veiled innuendo, F.B.I. doctors forcibly provided cognitive behavior therapy and drugs designed to make the plaintiff believe 5/12 — 11/15 was merely the onset of schizophrenia. The plaintiff was told he developed schizophrenia on 5/12 and had an acute episode, which lasted until 11/15.

97.      In fact, the Oslo "psihushka" did not, at first, achieve its intended purpose, which was to "brainwash." Even after two months in the Oslo "psihushka," the plaintiff was as sure as ever 5/12 – 11/15 was real. And, after his two months in the Oslo "psihushka," Norwegian authorities directed plaintiff to leave the country. As a British national, the plaintiff was only entitled to live in Norway if he had found a job within six months of arrival. Whereas the F.B.I. obviously would not let the plaintiff work in Norway either, Norway had a pretext to deport the plaintiff in 11/15.

98.      In 11/15, the plaintiff was released from the Oslo "psihushka." He proceeded immediately to Oslo's ferry terminal and took the next ferry to Helsinki, Finland (an E.U. country like Britain at the time). As stated, the F.B.I. had switched off the entire project off over a period of two months in the Oslo "psihushka." Likewise, there was no obvious visible signs of the plaintiff's F.B.I. tail throughout his week in Helsinki. Despite the fact the project was turned off (for the first time since 5/12), the plaintiff obviously wanted protection from further human rights abuses and thought Finland would be a good choice (again, to "start from scratch"). Despite being an E.U. national, the F.B.I. arranged to have Finnish authorities refuse to allow the plaintiff to stay at any Helsinki homeless shelter. Instead, the F.B.I. had Finnish authorities offer to let the plaintiff avoid the winter cold overnight at a pretend shelter wherein the plaintiff would have had

to spend all night "seated" at a desk. Consequently, the plaintiff pitched a tent in suburban Helsinki instead.

99.     The plaintiff was only in Helsinki for about a week. The Abilify that the F.B.I. had used to legally torture the plaintiff with in the Oslo "psihushka" was still in his bloodstream and he was still unable to sit down or stop pacing. Over a period of about a week in Helsinki, plaintiff went from being 100% certain everything he experienced 5/12 – 11/15 was real, to 80% sure he had merely had his very first episode of schizophrenia 5/12 – 11/15 (as his F.B.I. doctors had told him). After all, "delusions of reference" (hearing and seeing "secret messages" in innocuous events) is a symptom of schizophrenia. And, absolutely everything the F.B.I. had done had been by saying and pantomiming in thinly veiled innuendo ("secret messages"). Equally importantly, the plaintiff had never commit a crime against a woman nor ever had an improper thought about an underage girl in his life. Moreover, by the time the plaintiff had been in Helsinki for a week, the F.B.I.'s entire project has been visabily "switched off" for several weeks.

100.    From 5/12 - 11/15, the F.B.I. had arranged to have plaintiff's mother claim the plaintiff was experiencing the onset of mental illness and nothing was going on. After a week in Helsinki, the F.B.I. succeeded in "brainwashing" the plaintiff of this to the point of 80% certainty. When plaintiff finally called his his mother by phone, she was now speaking normally again (speaking as she had before 5/12). Thus, the plaintiff agreed to fly back to his Anchorage hillside family home

COMPLAINT (BIVENS – SEC. 1983) - 55

80% certain he had merely developed schizophrenia in 5/12 and suffered a three-year episode consequently (5/12 – 11/15).

101. **As noted in § X, "[t]he F.B.I. has an open and notorious 'case theme' to 'justify' serendipitously drugging the plaintiff]: *'Whereas the plaintiff drugs women, he deserves to be serendipitously drugged.'"* The same applies to the F.B.I.'s use of "psihushkas" on the plaintiff (Oslo was merely the first of three long-term "psihushkas"). Apparently, all plaintiff's "pretend" victims recanted their statements to psychiatric professionals. Given their behavior after the alleged occurrences, this is certainly not surprising. In committing the plaintiff to "psihushkas" the F.B.I. sought to "blame the victim" (the plaintiff). Obviously, plaintiff's "pretend" victims recanted their allegations to psychiatric professionals voluntarily without their psychiatric professionals having any agenda. Furthermore, plaintiff's "pretend" victims recanted their allegations in outpatient therapy sessions, not prolonged inpatient treatment. Despite that, as with the hundreds of serendipitous druggings, the plaintiff later learned the F.B.I. had an open and notorious "case theme" to "justify" its use of "psihushkas:" *"Whereas the plaintiff had psychiatric professionals convince his victims that they weren't victims, the plaintiff deserved to be 'brainwashed' by psychiatric professionals too"* (both in 'psihushkas' and in outpatient treatment).**

102.     **Thus, by 11/15, the F.B.I. made the plaintiff a (1) "pretend" "felon" in 3/13 (3AN-11-02041CR), (2) "pretend" "homeless person" in 3/13 (beginning in Los Angeles and proceeding through Oslo), and finally a (3) "pretend" "schizophrenic" in 11/15. The F.B.I. had also gotten plaintiff to resign his law license by mail in 4/13 (1) while totally disoriented is Los Angeles, and (2) on the advice of plaintiff's counsel who was actually parroting contrived dialogue for the F.B.I. (See § X).**

103.     The plaintiff's mother and brother lived in the plaintiff's family home (a $400,000 house on the Anchorage hillside). Given that the plaintiff believed he had "lost everything" because he developed schizophrenia in 2012 and had just endured a three-year episode schizophrenia, moving back into the Anchorage hillside family home was the natural thing to do. Plaintiff moved back into the Anchorage hillside family home in late November, 2015. Inside the family home, his mother and brother behaved normally (as they had before 5/12) and reinforced the fact the plaintiff had just experienced a three-year episode of schizophrenia by every means possible. Meanwhile, the Abilify the F.B.I. had legally tortured the plaintiff with remained in his body for six weeks after he returned to Anchorage. The plaintiff could neither sit down nor stop pacing for six weeks after returning to the Anchorage hillside family home. **Within a month of returning home, the plaintiff went from 80% certain 5/12 - 11/15 had merely been the onset of**

**schizophrenia to 100% certain that 5/12 - 11/15 had merely been the onset of schizophrenia**.

104.     Obviously, plaintiff's F.B.I. tail was not gone but merely invisible 11/15 – 4/17. During that period of time, plaintiff lived in his Anchorage hillside family home. For that whole time, plaintiff 100% believed 5/12 – 11/15 was merely the onset of schizophrenia. In fact, however, during this time the F.B.I. continued to control every facet of plaintiff's life without his knowledge. First, the F.B.I. had all of plaintiff's friends basically disown him ostensibly on the basis they were prejudice against mental illness. Second, the F.B.I. would not let the plaintiff meet any new people (friends or love interests) on social media. The F.B.I. made it appear that suddenly the plaintiff had become undesirable as either a friend of a boyfriend (the F.B.I. gave the plaintiff fake versions of social media websites wherein he couldn't talk to anyone new or "real"). Third, the F.B.I. secretly "warned off" all potential employers, persons plaintiff might want to contract with, friends, and girlfriends by phone. All the above was instructed to make up an excuse to have nothing to do with the plaintiff. Fourth, the F.B.I. continued to control plaintiff's internet. In the past, plaintiff's search results had been half real and half thinly veiled innuendo. From 11/15 – 4/17, the F.B.I. continued to (1) censor plaintiff's internet, (2) manipulate it as much as possible, but did so covertly.

105. With regard to the fact that suddenly plaintiff could not find a girlfriend after 12/15, that was another untrue "case theme" of the F.B.I.'s. The plaintiff has basically always been in a relationship since he was 15 years old. From age 15 onward, the plaintiff has spent very little time single. The plaintiff is the sort of person who go from one relationship to the next very quickly. Finally, the plaintiff began dating his future wife in 2003 and that relationship ended in separation in 2008. In any event, since age 15, the plaintiff has only rarely been single and basically always had an attractive girlfriend. Suddenly in 12/15, the F.B.I. created the illusion the plaintiff was no longer desirable by "warning off" every potential girlfriend and censoring plaintiff's internet.

106. And, thus, in 12/15 the plaintiff was confronted with a totally contrived "pretend life." Worse still, he 100% believed his "pretend life" was real. In the "pretend life" the F.B.I. had created for him he was a "pretend" "felon" and "pretend" former "crazy homeless person." Of course, the plaintiff was upset he voluntarily resigned in law license during what he believed was the onset of schizophrenia. In any event, after a three-year episode of schizophrenia the Alaska Bar Association would no doubt want the plaintiff to demonstrate a couple years mentally stable before readmitting him. Therefore, the plaintiff had to find work as a non-lawyer for at least 1-2 years. Finally, the plaintiff now had serious doubts about his own mental stability. Therefore, he decided he would enter the workforce gently.

107.     In reality, the F.B.I. had "warned off" all the plaintiff's real potential employers. In spring 2016, the F.B.I. knew the plaintiff was looking for a job on *craigslist.org* and (1) censored it, (2) "warned off" every employer it couldn't control completely. High Frequency Wireless is, apparently, a real cellular phone repair store. It still exists to this day. That said, the F.B.I. "corralled" the plaintiff into applying for a job there around 3/16. And, two or more of High Frequency wirelesses four employees were actually F.B.I. agents (or at the very least, wearing F.B.I. ear pieces the entire time).  Plaintiff worked there, with at least two undercover F.B.I. agent coworkers, from 3/16 – 4/17.

108.     By controlling plaintiff's internet and "warning off" almost every other employer, the F.B.I. corralled the plaintiff into applying for a job at High Frequency Wireless around 3/16. The man purporting to be the "owner" of the High Frequency Wireless was probably an undercover F.B.I. agent but the plaintiff is not certain. It's also possible the owner of the store was simply debriefed on how the F.B.I. wanted him to behave and frequently wore an F.B.I. ear piece from 3/16 - 4/17. In any event, plaintiff's job interview was contrived and the man purporting to be the "owner" of High Frequency Wireless was wearing an F.B.I. ear piece for the duration of the job interview.

109.     The F.B.I. arranged for High Frequency Wireless to put an ad on craigslist.org for the position of cellular phone repair technician and sales representative. High Frequency Wireless itself was a very poorly run business,

COMPLAINT (BIVENS – SEC. 1983) - 60

Like the TV show, it was in obvious need of a "Bar Rescue." As soon as plaintiff

saw the store, the plaintiff knew he could improve it dramatically with a little work

(the F.B.I. set it up that way). At the job interview, the "owner" indicated he

planned to move Washington state in one or two years. He also made it clear the

store didn't official store manager and needed one. Plaintiff accepted High

Frequency Wirelesses offer of employment because he believed he could become

the store's owner when the owner moved in 1-2 years. The basis of plaintiff's

belief was the fact he knew he could greatly increase the store's bottom-line in a

short amount of time. From the look of the place, the plaintiff thought he could

probably double the stores revenue in a short amount of time. And, the plaintiff

presumed the owner would be willing to negotiate a deal to sell him the store after

the plaintiff dramatically improved the store's net income.

110. Thus, plaintiff was hired by High Frequency Wireless around 3/16 and

quickly became High Frequency Wirelesses de facto store manager. In this

capacity, the plaintiff did in fact succeed in approximately doubling High

Frequency Wirelesses' net earnings from 3/13 to 3/14. The store had four

employees and an "owner." It was definitely a real business with real customers.

However, all the other employees had been at least briefed on the situation before

plaintiff was hired. For example, right from the beginning, all the other employees

tried to get plaintiff to smoke marijuana and continued to try to get him to smoke

marijuana throughout plaintiff's time working at High Frequency Wireless (3/16 -

COMPLAINT (BIVENS – SEC. 1983) - 61

4/17). In fact, the plaintiff can't smoke marijuana because it makes him paranoid but the F.B.I. wanted to argue otherwise. For another example, a few weeks after being hired, one of the store's employees asked the plaintiff for legal advice regarding the fact he had talked to an underage girl online while he was "high." Whereas that's the F.B.I.'s general case theme regarding the plaintiff, that was surely an F.B.I. contrived "script" too. For yet another example, throughout plaintiff's entire time working at High Frequency Wireless the F.B.I. had an older black female coworker make sexual advances toward him. She was surely an undercover F.B.I. agent or, at least always wearing an F.B.I. earpiece. In fact, the older black female employee didn't actually contribute to the business in anyway. Or, for example, the store had many real customers but many "pretend" customers too. One such pretend customer was a very light skinned, attractive, black girl who constantly made sexual advances toward the plaintiff as well. As to these two last example, the F.B.I. had wanted to argue the plaintiff was sexually attracted to black people (despite the fact his about ten years of *Pornhub.com* is entirely white).

111.    Despite these facts, High Frequency Wireless was a real business. Only the older black female employee was obviously an undercover F.B.I. agent (or designee) whom contributed nothing to the functioning of the business. And, the F.B.I. did its best hide its agenda and intermittent "skits" between 3/13 to 3/14.

112.     As noted, the F.B.I. "warned off" every potential girlfriend the plaintiff
might want to date after 12/15. Also as noted, the F.B.I. tried very hard to get the
plaintiff to have sexual relations with two black women. In the parlance of
intelligence agencies, attempts to lure someone into bed with a person with an
agenda is called a "honey trap." Although plaintiff is not sexually attracted to
black people and avoided those two "honey traps," while working at High
Frequency Wireless did, out of desperation, fall for two other "honey traps" with
two white women. One was a drug addict. One was a prostitute. The plaintiff
had sex with each of them once. The sex is on video tape. These "honey traps"
were merely for the purpose of associating the plaintiff with ne'er-do-wells.

113.     After the plaintiff had spent about five months at High Frequency Wireless,
he had greatly improved it both the physical store and its net income (as de facto
store manager). At that time (8/16), the "owner" of High Frequency Wireless
began openly talking about selling the store to the plaintiff by way of owner-
finance. In retrospect, the F.B.I. had set everything up that way (e.g., created a
"Bar Rescue" opportunity by design).

114.     High Frequency Wireless was worth about $200,000. In the beginning of
2017, the plaintiff and the "owner" began openly negotiating the sale of High
Frequency Wireless to the plaintiff by way of Alaska-style owner finance. By
2017, the plaintiff has increased High Frequency Wireless' net income sufficiently
that he had proven his ability to make timely monthly payments toward a business

COMPLAINT (BIVENS – SEC. 1983) - 63

sale price of around $200,000. Likewise, in approximately 2/17 the plaintiff and the "owner" agreed to a verbal contract for the sale of the business. The "owner" and plaintiff further verbally contracted to iron out the minor details and reduce the agreement to writing in the near future. In preparation for the impending sale, in 3/17 the owner agreed to begin the transfer of ownership. The plaintiff was given store "owner" business cards. The "owner" (former) further agreed the plaintiff ought to present himself to customers as the new owner. In order to legally transfer title to the business, there was nothing left to be done but iron-out the minor details and reduce the sale to writing.

115.    As noted, at least one of High Frequency Wireless' four employee was definitely an undercover F.B.I. agent (or designee). The older black female who made sexual advances toward the plaintiff throughout his time at High Frequency Wireless basically served no purpose at the store. She answered the phone sometimes and when she did, she did a terrible job (every employee answered the phone on the basis of whom was available at the moment). Other than answering the phone occasionally, she contributed to High Frequency Wireless in no way. Every employee of High Frequency Wireless agreed she contributed to the business in no way. For example, she had been delegated the task of setting up a new computerized "point of sale" system. At the time, each employee had to type the price of each item into the cash register manually. The new "point of sale" system was supposed to transition High Frequency Wireless to a bar code cash

COMPLAINT (BIVENS – SEC. 1983) - 64

register system. For an entire year (3/16 – 3/17), the older black female employee claimed to be working on setting up the new "point of sale" software. She carried the new "point of sale" software system's manual to and from work every day for a year. Once plaintiff was finally made the presumptive new owner, he had the authority to intervene. He studied the manuals and discovered setting up the new "point of sale" software system was a two-day project, at most. Given the fact she contributed to the store in no way, both the plaintiff and all the other employees agreed she needed to be "let go".

116.    The now former "owner" of High Frequency Wireless expressed some loyalty toward the older black female employee on the basis of the fact they had supposedly worked together for about ten years. The now former "owner" of High Frequency Wireless indicated that the plaintiff could not "fire" the older black female employee outright until (1) the contract for the sale of the store was signed, and (2) the former "owner" had moved to Washington state. That being the case, the plaintiff and other employees agreed to "phase" the older black female employee out and "phase in" a replacement for her. For a time, both would be working at High Frequency Wireless. The older black female employee would be let go once the former "owner" moved to Washington state.

117.    The plaintiff changed everything about High Frequency Wireless (3/13 – 3/14). The F.B.I. chose to reactivate the previous program of overt "psychological operations" shortly after the plaintiff hired a new employee in 3/16. As the

COMPLAINT (BIVENS – SEC. 1983) - 65

replacement for the older black female employee, the plaintiff hired a girl was going to turn 16 years old in about two weeks (in fact, she celebrated her 16th birthday at High Frequency Wireless). In Alaska, you have to be at least 14 years old to work a job and hiring a 15-year-old is, of course, completely legal. The plaintiff filed the appropriate paperwork with the State of Alaska on behalf of High Frequency Wireless and the young lady was legally hired.

118. Now, of course, the plaintiff had no idea whatsoever that anyone, anywhere had ever made an accusation against him regarding underage girls when he decided to hire a teenage girl to replace the older black female. Of course, he was 100% certain 5/12 – 11/15 was merely the onset of schizophrenia when he made that business decision. In fact, its immaterial. Between 11/15 – 4/17, the F.B.I. video-taped the plaintiff at home, audio-taped the plaintiff at home, video-taped the plaintiff work, audio-taped the plaintiff at work, tapped the plaintiff's phone, and tapped the plaintiff's internet, all without the plaintiff's knowledge. In reality, the plaintiff printed out every statute relevant to employing minors and minors generally before he hired the young lady. He kept a file of those Alaska statutes in desk and construed them very broadly. For example, on one occasion the F.B.I. had the young lady try to hug the plaintiff and the plaintiff declined because he was construing the statutes so broadly. Likewise, of course the plaintiff never had a social conversation with her after work, by phone, or by text. The fact that the

plaintiff's conduct with the teenage girl employee was exemplary in all respects is all recorded on F.B.I. audio and video.

119.    For about a week, the teenage girl worked at the store uneventfully. The "owner" (former) and the plaintiff continued the process of transferring ownership of the business. About a week after the teen girl was hired, however, strange coincidences started happening. Customers started coming into High Frequency Wireless repetitively (1) overtly lecturing the teenage girl employee about "cat fish," (2) implying to plaintiff that it was inappropriate to have a teenage girl employee per se. Although the coincidences started to pile-up, the plaintiff still suspected nothing. Given the neighborhood High Frequency Wireless was located in (Fairview), he brushed off these comments as "trailer park" concerns.

120.    About ten days after High Frequency Wireless hired the teenage girl employee, the F.B.I. switched the entire project back on. The F.B.I. arranged to switch the project back on overtly gradually over the course of about a week. One thing is certain, about a week after the teenage girl employee was hired every employee in High Frequency Wireless and the "owner" (former) were all outfitted with F.B.I. ear pieces full-time and spoke only in contrived dialogue.

121.    About ten days after hiring the teenage girl employee (4/16), the plaintiff definitely started hearing thinly veiled innuendo is what his coworkers and customers were sayings. It was periodic but it was there. The plaintiff made an emergency lunch-time appointment to see his psychiatrist (whom was actually

COMPLAINT (BIVENS – SEC. 1983) - 67

working for the F.B.I.) The plaintiff explained to his psychiatrist that he thought he was having a relapse of schizophrenia (a second episode of schizophrenia). When plaintiff returned to High Frequency Wireless from that psychiatrist's appointment the F.B.I. had turned the entire project back on at full force. All of a sudden, Anchorage was just exactly like Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville and Oslo had been 5/12 -- 11/15. This occurred in 4/16.

122.   When it happened, plaintiff presumed that he was in fact having a second episode of schizophrenia.   Whereas he was in the middle of buying High Frequency Wireless, he resolved to hide the fact he was suffering from an acute episode of schizophrenia as best as he possibly could from the "owner" (former) and employees of High Frequency Wireless.   He was concerned that if the "owner" (former) knew he was prone to episodes of schizophrenia he was renege on the deal to sell High Frequency Wireless. After all, the owner (former) might conclude the plaintiff would not be able to reliably make monthly payments reliably if he was prone to episodes of schizophrenia.

123.   Thus, from the moment plaintiff returned from his psychiatrist appoint (4/16), plaintiff's F.B.I. "tail" went from being small and invisible to enormous again.   Every time plaintiff went into a store, all the employees were wearing F.B.I. ear pieces, which instructed them to talk and pantomime in thinly veiled

innuendo. Likewise, every store the plaintiff went into was half filled with "pretend" customers.

124. High Frequency Wireless itself, however, was different than the rest of Anchorage in 4/16. The "owner" (former) and three employees didn't speak in thinly veiled innuendo, they spoke overtly. They all abruptly reversed their opinions of the plaintiff with regard to every characteristic about him. Whereas in the past the "owner" (former) and three employees had been highly complimentary as the to plaintiff's education, intelligence, management ability, and technical skill, now every word out of their mouths was implicitly insulting. Each and everyone of them insulted everything about the plaintiff basically non-stop. This begun as soon as the plaintiff returned from the psychiatrist's office.

125. Despite all this happening, the plaintiff continued to believe he was merely suffering a second episode of schizophrenia and that he needed to hide it from everyone. The situation came to a head when the F.B.I. somehow managed to blockade nearly every real customer from coming to High Frequency Wireless. In their place, was an endless parade of "pretend" customers speaking in thinly veiled innuendo and buying nothing. In plaintiff's best week, he sold fifty triple digit priced cellular phone. On an average week, plaintiff sold half as many expensive cellular phones. In the week after the plaintiff returned from the psychiatrist's office in 4/16, High Frequency Wireless probably only sold ten expensive cellular phones. The cash register ran dry quickly under the F.B.I.'s blockade.

COMPLAINT (BIVENS – SEC. 1983) - 69

126.     In addition to the fact High Frequency Wireless wasn't selling any phones, in the week after plaintiff returned from the psychiatrist's office, the F.B.I. tore apart High Frequency Wireless physically.     Supposedly, it was a series of unbelievable coincidences: (1) the heating system broke down, (2) pumping problems occurred, (3) the store's electrical system needed repair, (4) a vandal cracked one of the store's side glass windows, and (5) several pieces of furniture broke, simultaneously.  High Frequency Wireless went from looking stellar to looking like a disaster area over the period of one week: (1) 1/3 of the ceiling tiles were removed and wires were hanging down from where those tiles used to be, (2) industrial heating equipment was deposited in the center of the store, (3) there were exposed pipes, and (4) all High Frequency Wireless' best furniture disappeared.  In fact, all this had been done to try and make it look like the teenage girl employee was in an unsuitable environment.  For example, plaintiff arranged a desk for her to study her home school material from in an extra office High Frequency Wireless had facing out a window.   Not only did the F.B.I. break her desk, but it also shattered the window it was facing.  One day during that week, plaintiff came into High Frequency Wireless one morning and, to his horror, found the teenage girl employee studying by sitting Indian style in a windowless back storage room.  Plaintiff continued to believe he was merely suffering another episode of schizophrenia throughout all this.  Plaintiff proceeded to try to clean-up

COMPLAINT (BIVENS – SEC. 1983) - 70

the office as best he could. All the other employees fought the plaintiff every step

of the way as he tried to tidy-up High Frequency Wireless.

127. About two weeks after the plaintiff returned from his lunchtime

appointment with his psychiatrist (4/16), the F.B.I. started serendipitously

drugging the plaintiff. It started abruptly and viciously. All of sudden, the

plaintiff was being drugged multiple times a day all over Anchorage. For

examples, the plaintiff was serendipitously drugged at McDonalds, Arctic

Roadrunner, and many other Anchorage establishments. Plaintiff had to

repeatedly pull his car over to the side of the road for fear of being framed for

D.U.I. When the F.B.I. started serendipitously drugging the plaintiff multiple

times a day, the plaintiff finally realize (1) he was not having a second episode of

schizophrenia, (2) 5/12 – 11/15 was not the onset of schizophrenia but actual

events. As soon as the plaintiff realized 5/12 – 11/15 was real and happening

again (4/19/17), he filed a Sec. 1983 action before this Court (3:17-cv-00089-

SLG).

128. Plaintiff wrote the complaint in 3:17-cv-00089-SLG in a hurriedly manner.

It was an emergency and he was being serendipitously drugged constantly. Thus,

plaintiff wrote the complaint in about four hours from his desk at High Frequency

Wireless. Plaintiff's complaint wasn't great but articulated situation perfectly fine

(in plain language). The complaint asked for monetary damages and a T.R.O.

requiring (1) the F.B.I. and its designees maintain a certain distance from High

COMPLAINT (BIVENS – SEC. 1983) - 71

Frequency Wireless (stop disrupting the business), (2) the F.B.I. cease and desist from using the former owner and employees of High Frequency Wireless as "confidential informants" (wearing ear pieces and speaking in contrived dialogue), (3) the F.B.I. cease and desist serendipitously drugging the plaintiff, (4) the F.B.I. confine its activities to passive invisible surveillance only (the only constitutionally permissible form of law enforcement surveillance), (5) the F.B.I. publicly disclose the fact it had been repeatedly serendipitously drugging the plaintiff since 3/13 (to mitigate the harm done to plaintiff's reputation by being drugged hundreds of times). Finally, given the fact the Alaska Bar Association had done something it had no authority to do, completely suspend plaintiff's Fifth and Sixth Amendment right to counsel, the complaint also asked for appointment of 28 U.S.C. § 1915(e) civil rights counsel.

129. In fact, the Sec. 1983 complaint filed before this Court on 4/19/17 bluntly stated: "Thus, this drugging is part and parcel to a failed conspiracy to block Plaintiff DAVID YORK's access to the United States District Court." In an ominous warning of what was to come, the complaint also noted that as a result of all the serendipitously druggings and "psychological operations:" "...HALF of Plaintiff DAVID YORK's inner-monologue is now 'the governments voice'"

130. In retaliation for filing 3:17-cv-00089-SLG on 4/19/17, the F.B.I. drugged the plaintiff to incoherence immediately after he filed the complaint. This Court ought to review the file (3:17-cv-00089-SLG). Plaintiff's complaint is coherent,

and succinct. Only one sentence in the complaint is delusional (the last sentence). The last sentence in the complaint stated that High Frequency Wireless' teenage girl employee might be plaintiff's long-lost daughter. The reason the plaintiff wrote that last sentence in the complaint is because the F.B.I. had stated the teenage employee was the plaintiff's long-lost daughter many, many times through thinly veiled innuendo over the preceding two weeks. Aside from the last sentence, everything else in the complaint is a true statement of fact, written hurriedly and in plain English. In contrast to the complaint, every pleading the plaintiff filed in 3:17-cv-00089-SLG subsequent to the complaint was incoherent. It was incoherent because the F.B.I. drugged the plaintiff horrifically in retaliation for filing the complaint. In point of fact, the plaintiff has been drugged many, many, times in trying to file this complaint too (detailed below).

131. As stated, when the plaintiff returned from his psychiatrist's office (1) Anchorage was made the same as all the cities that preceded it, (2) High Frequency Wireless was taken over and also blockaded. That's not all that happened when plaintiff returned from his psychiatrist's office, however. In addition to that, plaintiff's Anchorage hillside family home was turned into a "spy house."

132. During the Cold War, both the C.I.A. and K.G.B. confined captured enemy agents to "spy houses." A "spy house" is a house or room wherein the entire environment is controlled. In other words, a "spy house" is a house or room in

COMPLAINT (BIVENS – SEC. 1983) - 73

which the entire environment is controlled "psychological operations:" "Psychological operations (PSYOP) are operations to convey selected information and indicators to audiences to influence their emotions, motives, and objective reasoning, and ultimately the behavior of…individuals." https://en.wikipedia.org/wiki/Psychological_operations_(United_States). The purpose of cold war era "spy houses" was to "break" enemy agents. Their purpose was to get enemy agents to divulge their secrets and hopefully "turn" enemy agents. Cold War era spy houses featured things like: (1) clocks that sped up and slowed down, (2) furniture constantly being modified to different angles, (3) lights directly at odds with circadian rhythms, (4) repeating musical songs all hours of the night, (5) a voice over an intercom orchestrating the entire affair (all "spy houses" were designed to induce "Patty Hurst" syndrome), (4) starvation, (5) profound derogation, (6) filth, etc, etc, etc. In fact, these non-digital Cold War era "spy houses" were extremely effective. It's a true statement of fact that even the most hardened C.I.A. or K.G.B. agent was drooling and insane after thirty days confinement to a Cold War era "spy house." In fact, if an enemy agent escaped 30 days in a "spy house" only "drooling and insane," but not having betrayed his country, then that agent was a ideal one.

133.     __In contrast to Cold War era "spy houses," plaintiff's hillside family home was converted into a *digital, computerized "spy house."* It was converted into something infinitely worse than C.I.A. and K.G.B. agents__

**endured during the Cold War**. When plaintiff returned to his Anchorage hillside family home after his psychiatrists appointment (4/17), within the house (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an F.B.I. earpiece: (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples, (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples: (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censors thousands of websites in this fashion by

COMPLAINT (BIVENS – SEC. 1983) - 75

anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for examples: (a) it modulated the volume on the TV to highlight certain phrases and also (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's Anchorage hillside family home beginning when he returned home from work, the day he visited the psychiatrist. **By deploying all those techniques simultaneously, the plaintiff's Anchorage hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era "spy house." And, plaintiff's "spy house" was augmented by drugs too.**

134.     Despite the fact the plaintiff's Anchorage hillside family home had been converted into a "spy house" infinitely more dangerous than an analogue Cold War era "spy house", the F.B.I. had the plaintiff's mother insist nothing was going on at all and the plaintiff was merely suffering from a second episode of schizophrenia. In short, the plaintiff was forced to "act" like nothing was going on within the "spy house" (just like everywhere else in Anchorage and as it was 5/12 – 11/15). As noted in §X, the F.B.I. has always issued draconian "punishments" upon the plaintiff (such as a "psihushka" or loss of shelter) if ever he states facts for what they really are. **The entire project is premised on forcing the plaintiff to consume as much "psychological operations" as possible passively.**

135.    It was under these combined conditions: (1) Anchorage was made the same as all the cities that proceeded it 3/13 – 11/15, (2) High Frequency Wireless was taken over by the F.B.I. and blockaded, (3) plaintiff was living in a digital "spy house" more dangerous than any "spy house" in now-unclassified history, (4) the F.B.I. was serendipitously drugging the plaintiff multiple times a day with an array of powerful drugs in retaliation for filing the Sec. 1983 action, that plaintiff filed all the incoherent pleadings in 3:17-cv-00089-SLG that proceeded the initial complaint. That's why they are incoherent.

136.    And, because of the fact plaintiff's filings in 3:17-cv-00089-SLG were incoherent except for the initial complaint (4/19/17), this Court dismissed 3:17-cv-00089-SLG as "delusional" and therefore "frivolous" on 4/26/17.

137.    Having failed to open a federal Sec. 1983 action (3:17-cv-00089-SLG) before this Court, the plaintiff turned his litigation efforts to Alaska State Court. Plaintiff lived in his Anchorage hillside family home, a digital "spy house" from 4/26/17 – 5/15/17, unsure of what to do. On 5/15/17, he finally filed four lawsuits designed to open the matter in Alaska State Court (3AN-17-06691CI, 3AN-17-06692CI, 3AN-17-06693CI, 3AN-17-06694CI). Each lawsuit complained of a single individual civil rights violation the F.B.I. had commit against the plaintiff at a private business (such as a serendipitous drugging at Arctic Roadrunner). Although those complaints were hysterical in tone, they were short and they were coherent. Despite the facts (1) 5/12 – 11/15 was a huge undertaking involving

COMPLAINT (BIVENS – SEC. 1983) - 77

hundreds of Alaskan elites, (2) what was presently occurring in Anchorage was a huge undertaking inconveniencing thousands of people, the Alaska state courts also dismissed all of the plaintiff's complaints as "delusional" and therefore "frivolous."

138.    The plaintiff resolved to keep attempting litigation.    The F.B.I. had plaintiff's mother say he was merely suffering a second episode of schizophrenia and she would evict him if he filed any more "delusional" lawsuits. The plaintiff began to draft more lawsuits, despite this threat. In open retaliation for continuing to try to litigate, the F.B.I. arranged to take away the plaintiff's shelter.

139.    On 5/23/17, the F.B.I. had plaintiff's mother file a restraining order against the plaintiff on a fabricated basis for the purpose of achieving a no-notice eviction (3AN-17-01469CI). Whereas a month had passed since the plaintiff last received a paycheck, he was out of money. In addition, the F.B.I. had again replicated the circumstances of 3/13 – 11/15 and plaintiff's U.S. constitutional right to work was again suspended.    On 30 minutes notice, the F.B.I. again made plaintiff a "pretend" "homeless person" in 3AN-17-01469CI.

140.    There are some mysteries that the plaintiff does not have the answer to. As explained, plaintiff was a Notre Dame Law graduate in perfect mental health when he entered the F.B.I. law firm in 2012. And, as explained, the plaintiff did experience some "delusions of reference" in Oslo. And, as detailed, that was to be expected given the circumstances (legal torture and

COMPLAINT (BIVENS – SEC. 1983) - 78

bombardment with more "psychological operations" material than probably anyone in unclassified human history 3/13 – 11/15). The mystery the plaintiff does not know the answer to is that immediately after the no-notice eviction (5/23/17 - 3AN-17-01469CI), the plaintiff started hearing "voices" for the first time in his life. Not only did he hear "voices" but he heard them loudly and clearly as is typical with organic schizophrenia. Did the F.B.I. drug the plaintiff with a long-term dopamine (D2) active drug that simulated schizophrenia? The plaintiff does not know the answer to that question. But, the plaintiff would continue hearing "voices" until the project was switched off again in 5/18.

141.    Thus, the plaintiff started hearing "voices" for the first time in his life immediately after the no-notice eviction. He heard them loudly and clearly. And, the "voices" he heard spoke basically non-stop. What did these "voices" say? The "voices" said exactly what the F.B.I.'s program of "psychological operations" says verbatim. In fact, in plaintiff's entire life, he has never heard a "voice" that said anything other than what the F.B.I.'s program of "psychological operations" says just exactly. *To reiterate, in his entire life, the plaintiff has never heard one off-topic "voice" or any 'voice" that contradicted the F.B.I.'s program of "psychological operations" in any way, shape, or form.*

142.    Thus, the plaintiff was evicted penniless on 5/23/17 (3AN-17-01469CI). He did have his car and a tank of gas but no money. Immediately upon being

evicted, plaintiff fled the legal torture that was occurring in Anchorage by driving to Fairbanks. Plaintiff had practiced law in Fairbanks for three years (2005-2008) and been very popular with some people. There had been about one hundred people at plaintiff's Fairbanks wedding on December 27th, 2007. Most of them had been part of the Fairbanks legal community. Plaintiff had less than a gallon of gasoline left when he arrived in Fairbanks in the early morning of 5/24/17.

143.     By the time the plaintiff got to Fairbanks, he was hearing "voices" non-stop. He was very mentally unwell and it was obvious. In Fairbanks, plaintiff encountered the same conditions that had prevailed in Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo and Anchorage.

144.     In Fairbanks, plaintiff discovered all his former friends (mostly lawyers) were wearing F.B.I. ear pieces and speaking in contrived dialogue. They all said what their F.B.I. ear pieces told them to say. Each and every one of them acted as if plaintiff (1) was inherently deeply mentally ill, (2) was inherently "stupid," (3) was inherently a "pretend" "homeless person," (4) refused to help the plaintiff get medical attention, (5) refused to provide shelter, (6) refused to loan the plaintiff money.

145.     As noted, the Alaska Bar Association had already pertained to use its authority to compel lawyers to cooperate in disciplinary investigations to completely suspend plaintiff's Fifth and Sixth Amendment right to counsel (See above, below). Likewise, apparently, the Alaska Bar Association used this same

authority to compel every lawyer in Fairbanks to behave in this manner toward the plaintiff.

146.     Thus, plaintiff had to live in his car. He parked his car at the downtown Fairbanks dog park (by the Carlson Center). Plaintiff slept in his car there for about four months. In fact, the plaintiff was entitled to Alaska unemployment insurance (about $1000/month) but, hearing "voices" nonstop, he was too mentally ill to navigate Alaska's unemployment insurance bureaucracy. In his condition, it took him four months to figure out he was entitled to unemployment insurance and apply for it (9/17).

147.     As noted, the plaintiff was represented by F.B.I. agents ("Attorney Keri Brady" and "Attorney Kevin Brady") in what began as a real Alaska D.U.I. court case (3AN-11-02041CR). Thus, apparently the Alaska Bar Association had given two undercover F.B.I. fake Alaska Bar credentials. Next, as noted, the plaintiff received an attorney-client consultation from Fairbanks Attorney William R. Satterberg wherein Mr. Satterberg had wore an F.B.I. earpiece and rehearsed contrived dialogue. After that, plaintiff's "general counsel" Fairbanks attorney Robert John (1) had received all of plaintiff's attorney-client secrets on these matters via attorney-client U.S. mail and turned that mail over to the F.B.I., (2) had also insisted the plaintiff was "delusional" just like plaintiff's mother and (3) persuaded the plaintiff to voluntarily resign his law license while totally disoriented in Los Angeles (3/13). In Fairbanks, plaintiff sought two more

COMPLAINT (BIVENS – SEC. 1983) - 81

attorney client consultations. He sought consultations from Fairbanks attorney Robert Sparks and Fairbanks attorney Allen Vacura. Attorney Allen Vacura had obviously worn an F.B.I. earpiece and rehearsed contrived dialogue (he extensively implied the plaintiff was inherently a "criminal"). Attorney Robert Sparks (1) implied he didn't remember the plaintiff, (2) pretended he did not know anything about the plaintiff's situation. Whereas these were both lies pertaining directly to "loyalty", the plaintiff knew he too had been co-opted by the F.B.I. (through the Alaska Bar Association).

148. In addition, the Alaska Bar Association pertained to use its power to compel attorneys to cooperate in disciplinary investigations to (1) compel all the attorneys in Fairbanks to deny the plaintiff medical care, and (2) operate what can only be described as a "Warsaw Ghetto" type situation (See above, below).

149. As noted, the F.B.I.'s overall "spokesperson" and "point of contact" has always been plaintiff's mother. Whereas plaintiff was aware of this when he was in Fairbanks (despite his mental condition), he would not make contact with her. In Fairbanks, the F.B.I. designated Fairbanks Attorney H. Van Z. Lawrence as it's Fairbanks "spokesperson" and "point of contact." For plaintiff's first four months in Fairbanks (living in car), the plaintiff spent most of each day digging through trash cans looking for cigarette butts. Once per day, he visited the office of Attorney H. Van Z. Lawrence and through him the F.B.I. gave the plaintiff his "bread and water" allowance of about $10 per day. Attorney H. Van Z. Lawrence

wore an F.B.I. ear piece and spoke only in contrived dialogue during these exchanges. On average, Attorney H. Van Z. Lawrence extended each F.B.I. "allowance" encounter to about 15 minutes. Each day, in order to get his F.B.I. allowance, the plaintiff was forced to participate in an F.B.I. "skit" wherein Attorney H. Van Z. Lawrence for about 15 minutes implied (1) plaintiff was inherently deeply mentally ill, (2) plaintiff was inherently "stupid," (3) plaintiff was inherently a pretend "homeless person," (4) plaintiff inherently had bad hygiene, and (5) imply just about every other bad thing about the plaintiff possible.

150. Through its power to compel attorneys to cooperate in disciplinary investigations, the Alaska Bar Association pertained to compel Attorney H. Van Z. Lawrence (1) behave in this manner, (2) deny the plaintiff medical care. In fact, Attorney H. Van Z. Lawrence was a member of both the Alaska and Washington state bars preceding these events. Because of the fact what was occurring in Alaska was patently illegal, Attorney H. Van Z. Lawrence resigned his Washington state bar license upon learning the Alaska Bar Association intended to compel him to participate in illegal conspiracy to deny a citizen of the United States basically all his U.S. constitutional rights (and commit grotesque human rights abuses too).

151. Around 9/17, plaintiff (hearing "voices" nonstop) finally succeeded in navigating Alaska's unemployment insurance bureaucracy. For the next six months, the plaintiff had an income of about $1000 per month. As noted, the

COMPLAINT (BIVENS – SEC. 1983) - 83

F.B.I. warns off every member of the public not to have anything to do with the plaintiff (in any capacity). Likewise, the F.B.I. arranged for the plaintiff to rent a water-less cabin around September, 2017. The landlord was an F.B.I. agent who spoke only in contrived dialogue. The water-less cabin was near a bus stop on Farmer's Loop Road. It had a cable modem but no cable television.

152.   The water-less cabin was a digital "spy house" exactly the same as plaintiff's hillside family home had been. Inside the water-less cabin: (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples: (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples, (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for

COMPLAINT (BIVENS – SEC. 1983) - 84

example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit). All of these techniques were deployed simultaneously as they had been in plaintiff's Anchorage hillside family home. Furthermore, as had been the case in Anchorage, the water-less cabin "spy house" was augmented by serendipitous druggings.

153.     **As emphasized, plaintiff was in perfect mental health when he entered the F.B.I. law firm in 2012**.  As noted, plaintiff did perceive "delusions of reference" in Oslo and that is to be expected given the fact he consumed more psychological operations than probably anyone in unclassified human history 5/12 – 11/15. And, as noted, it's a mystery why the plaintiff started hearing voices for the first time in his life immediately after the no notice eviction (5/23/17 - 3AN-17-01469CI).  It's also been emphasized that in his whole entire life the only "voices" the plaintiff has ever heard have said verbatim what the F.B.I.'s "psychological operations" program said — without a single word ever being off topic.  **To add to that, a few days after plaintiff entered the water-less cabin (9/17) in Fairbanks the plaintiff started having "muscle problems" for the very first time in his life too**.

154.     Beginning a few days after the plaintiff entered the water-less cabin "spy house" in Fairbanks, plaintiff's "voices" could manipulate his muscles.  Whereas

plaintiff experienced the phenomenon of having his "voices" manipulate his muscles. Whereas plaintiff's "voices" said only what the F.B.I.'s "psychological operations" said, that, in practice meant the plaintiff's body language was changed to reflect the F.B.I.'s wishes. Plaintiff is aware this sounds far-fetched. In fact, if you read (r/schizophrenia) on *reddit.com* you will discover about one-third of people with *organic* schizophrenia report that their "voices" can move their body parts slightly too.

155. For example, the people with *organic* schizophrenia on *reddit.com*'s r/schizophrenia report their "voices" are able to (for examples): (1) clench their fist, (2) move their arm to the left, (3) hunch them over, and/or (4) manipulate their facial expressions. Like the people with organic schizophrenia, a few days after the plaintiff moved into the water-less cabin "spy house" in Fairbanks, the plaintiff too had the experience of having his "voices" began moving his body parts slightly. Plaintiff would continue to suffer from these "muscle problems" throughout his time in Fairbanks (5/17 – 5/18).

156. Between 5/12 – 11/15, plaintiff's Fifth Amendment right to remain silent had been seriously compromised. During that time, the (1) plaintiff had consumed more "psychological operations" than probably anyone in unclassified human history, (2) be subjected to sustained degradation the entire time, (3) had all his basic needs denied, (4) been serendipitously drugged hundreds of times to force him to talk. In lieu of all this, it would have been humanly impossible for plaintiff

to completely remain silent. Thus, the plaintiff had many brief outbursts between 5/12 – 11/15. **Despite that, the plaintiff invoked his right to remain silent in 2012 and clung to it tightly as humanly possible. In point of fact, by 9/17 he had sued eight times ultimately for enforcement of his right to remain silent (in Sec. 1983 in the Federal District Court for The Southern District of Texas at Corpus Christi in 2014, by requesting a restraining order from the Norwegian police in 2014, in the Oslo Tingrett in 2015, in Sec. 1983 before this Court in 2017, and four times in Alaska state court in 2017). Yet, all plaintiff's lawsuits seeking enforcement of his right to remain silent were dismissed as "delusional" and therefore "frivolous." Shortly after plaintiff's newfound "voices" started causing him "muscle problems" plaintiff's Fifth Amendment right to remain silent was completely annihilated**. Living in the water less cabin "spy house," the plaintiff finally completely lost touch with reality. While totally out of touch with reality, the plaintiff proceeded to (1) write about one hundred pages about the accusations and post them to *scribd.com* and, (2) make more then a hundred hours of video about the accusations. This occurred in Fairbanks between 9/17 – 3/18.

157.     Around January, 2018, the plaintiff's "muscle problems" became much worse. Using the thinly veiled innuendo and technology, augmented by drugs, the F.B.I. had been repeating the same statements hundreds of thousands, if not millions of times, at the plaintiff (2012-2017). First, plaintiff's face became

contorted into a grotesque frown perpetually. Basically, plaintiff's cheeks were pulled down to the level of his chin. Next, the plaintiff began involuntarily hunching over around minors and more attractive than average men (F.B.I. case themes). This was a physical manifestation of the fact the F.B.I. had repeated to the plaintiff hundreds of thousands, if not millions of times (through innuendo and technology) that the plaintiff (1) was sexually attracted to minors, and (2) was a homosexual. **In actuality, plaintiff reiterates, that his *Pornhub.com* (all ten years of it) is among the most conservative in the country and world and he wants to put it in the public domain through this lawsuit. Compared the population at large, the plaintiff is only attracted to a narrow range of white girls engaging in a narrow range of sex acts.**

158.    In reality, from the moment he arrived in Fairbanks in 5/17, plaintiff's mental condition was a city-wide spectacle. "Everyone who was anyone" in Fairbanks knew the plaintiff was hearing "voices" and was too sick even to apply for Alaska unemployment insurance. In reality, the F.B.I. has made the plaintiff so mentally ill intentionally with drugs and legal torture. Likewise, the F.B.I. intended to keep the plaintiff in this deeply mentally ill condition as long as possible. Therefore, the F.B.I. arranged for (1) the Fairbanks police, (2) the Fairbanks state judiciary, and (3) the Fairbanks hospital to all deny the plaintiff basic medical care throughout his time in Fairbanks (5/17 - 5/18). Despite the fact the plaintiff's mental health in Fairbanks was a city-wide spectacle from the

COMPLAINT (BIVENS – SEC. 1983) - 88

beginning, the situation reached an epic new level of monstrousness around January, 2018. It's at that time that (1) plaintiff's face was stuck permanently contorted into a grotesque frown, (2) plaintiff involuntarily hunched over to 90 degrees every time he saw a minor and (3) plaintiff involuntarily hunched over to 90 degrees every time he saw more attractive than average man, and (4) plaintiff spent days jumping up and down at busy intersections pointing at the "spy satellites" controlling his body. By that time, just about all 100,000 residents of the Fairbanks area were aware of the situation. The Fairbanks Police Department was flooded with concerned phone calls but the F.B.I. still arranged for the plaintiff to be denied basic medically care.

159.    Instead, the F.B.I. arranged for the Fairbanks police department to make sport out of the plaintiff's mental condition. One day around January, 2018 when plaintiff was in this condition, a Fairbanks police officer accused the plaintiff of "setting fires" in the Walmart Parking (the plaintiff had put out a cigarette with his foot in the usual fashion). The plaintiff took the Fifth Amendment because he knew it was an F.B.I. "skit" of some sort. The F.B.I. had the Fairbanks police officer throw the plaintiff to the ground unprovoked. Next, the F.B.I. had the Fairbanks police officer use his knuckles to break all the cartilage between the two halves of the plaintiff's rib cage (plaintiff's "sternum"). Rather than defend himself, the plaintiff just lay on the ground as the Fairbanks police officer slowly worked his way from the top of the plaintiff's rib cage to the bottom (it took the

Fairbanks police officer about a minute to break all the cartilage in the plaintiff's sternum). The assault left the plaintiff with boney and jaded cartilage between the two halves of his rib cages — very much like the scar left after heart by-pass surgery.

160. The reason the F.B.I. had the Fairbanks police officer attack the plaintiff unprovoked was to attempt to get plaintiff to engage in an act of self-defense. Despite all the years of serendipitous druggings and legal torture, the F.B.I. had never succeeded in getting the plaintiff respond physically to any provocation. As noted, the F.B.I. wanted to say the plaintiff was violent whereas in reality the plaintiff has never commit a violent act in his life. When the Fairbanks police officer broke all the cartilage in the plaintiff's sternum, it was an act of desperation on the part of the F.B.I. In point of fact, there were two other occasions in Fairbanks wherein the F.B.I. had private security guards "beat up" the plaintiff for the same reason. These lesser beatings left the plaintiff with the typical bruises and scars that healed over time. In neither of these two other cases either, did the plaintiff engage in an act of self-defense.

161. The F.B.I. created the plaintiff's mental health crisis intentionally with drugs and years of legal torture. And, the F.B.I. wanted to keep the plaintiff in that condition. While the plaintiff was in that condition, the F.B.I. arranged to deny the plaintiff access to the two showers in Fairbanks he had reliable access to. The F.B.I. wanted to make videos of the plaintiff both "crazy" and "dirty." First, the

F.B.I. arranged to trespass the plaintiff from UAF (UAF has free public shower s) indefinitely on the pretext he peed in the woods at UAF. Next, an undercover F.B.I. agent and a planet fitness employee jointly falsely accused the plaintiff of stealing from lockers in an F.B.I. "skit." On this pretext, the F.B.I. trespassed the plaintiff from Planet Fitness.

162.    On January 3, 2018, the F.B.I. had the Fairbanks Walmart falsely accuse the plaintiff of shoplifting as he walked out the Walmart airlock. The plaintiff was incoherent but knew it was an F.B.I. "skit" of some kind. The plaintiff just walked out the Walmart door silently. Before he left, the F.B.I. had Walmart security tell the plaintiff he was trespassed from Walmart indefinitely. In fact, the F.B.I. had chosen that particular time to engage in such a "skit" for a particular reason. The plaintiff had accidentally left his laptop inside of Walmart when he left.

163.    Plaintiff was hearing "voices" non-stop and was physically maimed. Despite that, he did his very best to follow the law at all times in Fairbanks. When the plaintiff discovered he had left his laptop inside of Walmart the next day, he went back to Walmart (January 4th, 2018). He entered the Walmart entrance way airlock from which one can knock on Walmart security's door directly. The plaintiff asked Walmart security to give him back his laptop. The F.B.I. arranged for (1) Walmart security to return plaintiff's laptop, and (2) for the Fairbanks police department to arrest the plaintiff for criminal trespass (4FA-18-00032CR).

The plaintiff was brought to jail, pled "not guilty," and bailed out immediately on his "own recognizance."

164.     A few days after he was charged (1/4/18), the plaintiff made contact with the Alaska Public Defender agency.  He discovered his public defender was wearing an F.B.I. earpiece and speaking in contrived dialogue.  Despite this, the plaintiff signed the document required for his public defender to litigate the case in his absence (an Alaska pleading called a "Consent to Proceed in Defendant's Absence.")  The F.B.I. arranged to have plaintiff's public defender not file the "Consent to Proceed in Defendant's Absence" with the Court.  Consequently, a bench warrant issued without the plaintiff's knowledge.

165.     Between 1/4/18 - 3/14/18, the epic and monstrous situation continued.  Whereas plaintiff's face was stuck contorted into a grotesque frown, he walked the streets everyday wearing a bandanna over his mouth to hide his disfigurement.  In addition, the plaintiff was constantly being hunched over to 90 degrees involuntarily.  This occurred constantly when walking down the side walk and when in stores.  Finally, the plaintiff spent a great deal of time at Fairbanks busiest intersections pointing to the U.S. Gov. "spy satellites" that were controlling his body.  This went on for about three months.  Then on 3/14/18, the F.B.I. had the Alaska State Troopers execute the bench warrant that was issued without the plaintiff's knowledge (4FA-18-00032CR).

166.     On 3/14/18, the F.B.I. arranged to have the Alaska State Troopers make contact with the plaintiff as he walked home along a rural road. There was no pretext for the police contact. The Alaska State Troopers asked for plaintiff's I.D., which he provided. While the Alaska State Troopers were processing the plaintiff's I.D. in there squad car, the plaintiff pulled out his cellular phone and started incoherently sending messages to foreign governments that he feared he was about to be extra-judicially jailed again. While the plaintiff was sending these incoherent (but true) messages to foreign governments, two Alaska State Troopers emerged from there car and told the plaintiff he was under arrest for the outstanding bench warrant. Next, an Alaska state trooper told the plaintiff to put his hands behind his back. The plaintiff ignored him as he tried to finish typing a message to a foreign government on his cellular phone. On pretext that the plaintiff (hopelessly disabled) did not put his hands behind his back fast enough, the F.B.I. arranged to have the Alaska State Troopers charge plaintiff with "resisting arrest" (4FA-18-00692CR) in addition to criminal trespass (4FA-18-00032CR).

167.     The plaintiff had been totally, totally, incoherent for a long time by the time of his arrest on 3/14/18. Despite that, he knew his public defender was wearing a wire and speaking only in contrived dialogue. Thus, he knew he was being subject to yet another "mock" court proceeding and being extra-judicially jailed pursuant to it (4FA-18-00692CR). The plaintiff resolved the boycott the proceedings

entirely. As soon as he was brought to jail on 3/14/18, the plaintiff opted for solitary confinement, which he received. When the jail attempted to bus him to court the next day, the plaintiff refused to leave his jail cell. He also refused to talk to his public defender whom was wearing an F.B.I. earpiece. Ultimately, the plaintiff boycotted the "mock" court proceeding more than a month — refusing to leave his jail cell or attend court (3/14/18 – 4/20/18).

168.     Boycotting this second "mock" Alaska state proceeding may or may not have been the right thing to do (the 2012 D.U.I. being the first "mock" Alaska state court proceeding the plaintiff was subjected to — 3AN-11-02041CR). Whether or not boycotting the proceedings was the right thing to do, the plaintiff was not of sound mind when he decided to do so. The F.B.I. videotaped every moment the plaintiff was in solitary confinement. Plaintiff, his face and body contorted, spent all day, every day, in solitary confinement, half-naked, writing passages from the Book of Revelation on his cell wall with pencil lead (the F.B.I. won't allow the plaintiff whole pencils). For more than a month, the F.B.I. arranged for the Alaska Department of Corrections not to provide medical care and video taped him instead.

169.     The plaintiff draws this Court's attention to (4:18-cr-00004-RRB-1). On 3/30/18, the plaintiff wrote a federal civil rights removal action in pencil lead and filed it with the Federal District Court, District of Alaska at Fairbanks. In fact, federal civil rights removal is the appropriate procedural vehicle for one whom is

being subjected to "mock" state court proceedings to utilize. Unfortunately, the federal civil rights removal action the plaintiff filed was totally incoherent. It corrected stated the plaintiff was being subject to a "mock" state court proceeding but rambled for several pages about the Book of Revelation. Plaintiff's action for federal civil rights removal was denied by the Federal District Court, District of Alaska at Fairbanks, without comment on 4/10/17.

170.    Despite the fact the plaintiff's action for federal civil rights removal was incoherent (4:18-cr-00004-RRB-1), as stated, by 3/30/18 just about everyone in Fairbanks were aware of the plaintiff's mental health crisis. Likewise, "everybody who was anybody" in Fairbanks knew all about the plaintiff's F.B.I. "tail," which followed him from store to store. To put it bluntly, Fairbanks is a small town and by 3/30/18 just about everyone knew what was going on. Likewise, plaintiff finds it surprising the Federal District Court, District of Alaska at Fairbanks did not grant his request for federal removal.    The Court must have had personal knowledge the plaintiff really was being held pursuant to a "mock" state court proceeding.    And, the fact the federal civil rights removal action rambled incoherently only provided striking evidence of what just about everyone in Fairbanks already knew — that the F.B.I. was violating the plaintiff's fundamental human rights systematically.

171.    The situation finally came to a head around 4/17/18 (4FA-18-00692CR). The plaintiff had been taken into custody on 3/14/17. The maximum sentence for

"resisting arrest" is 30 days and that maximum sentence had been exceeded. At that point, the F.B.I. finally arranged to have the Alaska Department of Corrections provide the plaintiff with some medical care (medication). In fact, the F.B.I. did nothing except drug the plaintiff to be a compliant "zombie". On 4/20/18, drugged into compliance, the plaintiff finally participated in the "mock" Alaska state court proceeding and plead "guilty" to "resisting arresting." Thus, F.B.I. had arranged a second extrajudicial jailing and second constitutionally invalid paper conviction (4FA-18-00692CR).

172.    The plaintiff stayed in Fairbanks for about three more weeks after release from his extrajudicial jailing on 4/20/18 (4FA-18-00692CR). The plaintiff's Alaska unemployment insurance income of about $1000 per month had been terminated by the State of Alaska early at the behest of the F.B.I. (most people can renew there claim to get additional six months but plaintiff was not allowed to). For those three-weeks, plaintiff's medical condition remained the same (1) hearing voices non-stop, (2) face contorted into a grotesque frown he had to cover with a bandanna, (3) hunching over to 90 degree every couple of minutes, and as such, he remained an ever-growing community spectacle.

173.    Despite his medical condition, the plaintiff was aware his mother was the F.B.I.'s point of contact. About three weeks after plaintiff's release from his second extrajudicial jailing (4FA-18-00692CR), plaintiff's newfound "muscle problems" became so excruciatingly painful he couldn't take it anymore. He

called his mother knowing she represented the F.B.I. (5/18). The F.B.I. arranged to fly the plaintiff back the family's Anchorage hillside home. Plaintiff presumed it would still be active as a digital "spy house" when he arrived.

174.    When plaintiff arrived to the family's Anchorage hillside home in 5/18, the F.B.I. had turned all visible signs of the project off again. His mother spoke as she had before 5/12. She repeatedly tried to convince the plaintiff he had merely experienced a **second episode of schizophrenia**. She said 5/12 – 11/15 had been the onset of schizophrenia and 4/17 – 5/18 had been plaintiff's second episode of schizophrenia. In contrast to Oslo psihushka, plaintiff actually was really hearing "voices" this time when he was told that. At first, the plaintiff resisted and sought out an examination from a neurologist regarding the "muscle problems" he was having. But eventually, the plaintiff agreed to see a psychiatrist.

175.    The psychiatrist the plaintiff agreed to see in 5/18 in Anchorage was working for the F.B.I. He gave the plaintiff outpatient therapy and drugs to the effect that the plaintiff had suffered two independent episodes of schizophrenia: 5/12 – 11/15, 4/17 – 5/18. The first episode had included only "delusions of reference." The second episode had included "delusions of reference," "voices," and "voices" that could manipulate plaintiff's body language (See *reddit.com* /schizophrenia). Over a period of about 30 days, the plaintiff went from 100% certain 5/12 – 11/15, 4/17 – 5/18 were real events to 100% certain they were

merely two independent episodes of schizophrenia. This was what the F.B.I. intended.

176.    As it has been in Anchorage 11/15 – 3/17, in 5/18 the F.B.I. again resumed the role of controlling every aspect of the plaintiff's life covertly instead of overtly: "In fact, however, the F.B.I. continued to control every facet of plaintiff's life without his knowledge...First, the F.B.I. had all of plaintiff's friends basically disown him ostensibly on the basis they were prejudice against mental illness. Second, the F.B.I. would not let the plaintiff meet any new people (friends or love interests) on social media. The F.B.I. made it appear that suddenly the plaintiff had become undesirable as either a friend of a boyfriend (the F.B.I. gave the plaintiff fake versions of social media websites wherein he couldn't talk to anyone new or "real"). Third, the F.B.I. secretly warned off all potential employers, persons plaintiff might want to contract with, friends, and girlfriends by phone. All the above was instructed to make up an excuse to have nothing to do with the plaintiff. Fourth, the F.B.I. continued to control plaintiff's internet. In the past, plaintiff's search results had been half real and half thinly veiled innuendo (the F.B.I. "impersonated" Google, Bing, and Yandex). From 11/15 – 4/17, the F.B.I. continued to (1) censor plaintiff's internet, (2) manipulate it as much as possible, but did so covertly." See ¶ 104 .

177.    In 5/18, the F.B.I. arranged for the plaintiff to put on Social Security disability by virtue of his two episodes of schizophrenia that had now consumed

four years of his life (5/12 – 11/15, 4/17 – 5/18). Plaintiff was extremely resistant to accepting disability because within sixty days of returning from Fairbanks he was no longer hearing "voices" or having any "muscle problems". Whereas the plaintiff was now 39 years old, he was running late (1) having a career, (2) getting married again, and (3) having children. However, when plaintiff learned his student loans would be forgiven if he accepted Social Security disability for three years, he decided to accept it (a Department of Education program called "Total and Permanent Disability Discharge" forgives the student loans of all individuals who require three or more years of Social Security disability. That's because the plaintiff owed more than $100,000 in federal student loans from Notre Dame Law School.

178.    In actuality, the plaintiff was cognitively dull for about a year after Fairbanks. The trauma of the events in Fairbanks no doubt caused that. Since he was on disability, he lived in the Anchorage Hillside family home full-time again. Therein, for about a year, the hobbies he chose to pursue reflected some cognitive dullness (such as buying and selling internet domains). As will be detailed, plaintiff's cognitive recovery to pre-trauma 2012 levels would not be fully complete until about 2020.

179.    In early 2019, about nine months after returning from Fairbanks (5/18), the F.B.I. reactivated the project overnight. It reactivated the project not for years this time but only about three months. This reactivation of project was different than

all preceding incarnations of the project in the plaintiff almost never left his Anchorage hillside family home during those three months.

180. One day, in early 2019, the F.B.I. abruptly, in an instant, turned the plaintiff's Anchorage hillside family home back into a digital "spy house:" "...within the house (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an F.B.I. earpiece: (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples, (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples: (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of

the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for examples: (a) it modulated the volume on the TV to highlight certain phrases and (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's hillside family home beginning when he returned home from work, the day he visited the psychiatrist. By deploying all those techniques simultaneously, the plaintiff's Anchorage hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era 'spy house.' And, plaintiff's 'spy house' was augmented by drugs too." See ¶ 133. The F.B.I. arranged to keep the plaintiff's Anchorage hillside family home activated as a "spy house" as described for about sixty days. In contrast to the past, the plaintiff only left the Anchorage hillside family home a few times during that about sixty days. On the 3-4 occasions the plaintiff did venture out of the "spy house," however, Anchorage stores had been taken over by plaintiff's F.B.I. tail in exactly the same manner as they had been in Los Angeles, Guadalajara, Corpus Christi, Brownsville, Anchorage (4/18-5/18), and Fairbanks previously.

181.    Within about a week of turning the plaintiff's Anchorage hillside family home back into a digital "spy house," the plaintiff started hearing "voices" again

(for the second time in his entire life). Yet again, these "voices" started abruptly and then continued nonstop. And, yet again: "What did these "voices" say? The 'voices' said exactly what the F.B.I.'s program of 'psychological operations' says verbatim. In fact, in plaintiff's entire life, he has never heard a 'voice' that said anything other than what the F.B.I.'s program of 'psychological operations' says just exactly. To reiterate, in his entire life the plaintiff has never heard one off-topic "voice" or any 'voice' that contradicted the F.B.I.'s program of 'psychological operations' in any way, shape or form." See ¶ 140-141. And also, within a week of turning plaintiff's Anchorage hillside family home back into a digital "spy house," the plaintiff started having "muscle problems" again (for the second time in his entire life). The "muscle problems" he experienced were the same as the ones that had plagued him in Fairbanks only worse. Plaintiff found his body twisted and contorted in horribly painful ways. As soon as the plaintiff started having "muscle problems" again, he became too physically disabled to leave the "spy house". Instead, as soon as the plaintiff started having "muscle problems" again, he filmed them using his laptop camera. He ultimately posted more than a hundred hours of this phenomenon (mostly facial contortions were captured by the laptop camera) to Internet Archive (*archive.org*) as he cried for help online.

182. After about sixty-days totally mentally and physically disabled, inside the family's hillside home activated as a "spy house," the F.B.I. arranged for the

plaintiff to be committed to a long-term "psihushka" for the second time. The F.B.I. had the plaintiff's mother submit an application for a 30-day committal to Alaska probate court. At the hearing, the F.B.I. had the plaintiff's mother perjury herself and say plaintiff had imagined all of the above. An Alaska state magistrate ordered the plaintiff committed to a "psihushka" operated entirely by the F.B.I. for 30-days. This time, the F.B.I. rented a wing of Alaska Psychiatric Institute (A.P.I.). It was administered exactly the same as the Oslo "psihushka:" "The F.B.I. gradually turned down the thinly veiled innuendo over [one month]. By the end of [one month], the thinly veiled innuendo had completely stopped.... As the F.B.I. gradually turned down the thinly veiled innuendo, F.B.I. doctors forcibly provided cognitive behavior therapy and drugs designed to make the plaintiff believe 5/12 – 11/15 [, 4/17 – 5/18, and plaintiff's present experience were] merely...[now three] episodes of schizophrenia." See ¶ 96.

183.      When plaintiff left this second long-term F.B.I. "psihushka" in early 2019, he was not yet entirely "brainwashed." Exactly as it had been twice before, the family's Anchorage hillside home had been returned to normal and his mother was behaving as she did before 5/12 again. On the day the plaintiff left this second long-term "psihushka" in early 2019, plaintiff thought the chances were 50%/50% that: (1) 5/12 – 11/15, 4/17 – 5/18, three months in early 2019 were three episodes of schizophrenia or (2) everything he experienced was real. Therefore, on the day he left this second long-term F.B.I. "psihushka" the first thing he did was buy a

COMPLAINT (BIVENS – SEC. 1983) - 103

ticket to the United Kingdom. However, by the day of his flight one-week later the plaintiff failed to take the flight because by then he was 80% sure 5/12 – 11/15, 4/17 – 5/18, and the three months in early 2019 were merely three independent episodes schizophrenia. About two weeks after that, the plaintiff was 100% certain all of the above was merely three independent episodes of schizophrenia. This is what the F.B.I. intended, of course.

184. For about the next nine months, the F.B.I. again resumed its role of covertly and secretly controlling every aspect of plaintiff's life: "In fact, however, the F.B.I. continued to control every facet of plaintiff's life without his knowledge...First, the F.B.I. had all of plaintiff's friends basically disown him ostensibly on the basis they were prejudice against mental illness. Second, the F.B.I. would not let the plaintiff meet any new people (friends or love interests) on social media. The F.B.I. made it appear that suddenly the plaintiff had become undesirable as either a friend of a boyfriend (the F.B.I. gave the plaintiff fake versions of social media websites wherein he couldn't talk to anyone new or "real"). Third, the F.B.I. secretly warned off all potential employers, persons plaintiff might want to contract with, friends, and girlfriends by phone. All the above was instructed to make up an excuse to have nothing to do with the plaintiff. Fourth, the F.B.I. continued to control plaintiff's internet. In the past, plaintiff's search results had been half real and half thinly veiled innuendo (the F.B.I. "impersonated" Google, Bing, and Yandex). From 11/15 – 4/17, the F.B.I.

COMPLAINT (BIVENS – SEC. 1983) - 104

continued to (1) censor plaintiff's internet, (2) manipulate it as much as possible, but did so covertly." See ¶ 104 .

185. About nine months after the three months in early 2019 wherein the project had been switched back on, the project was reactivated on a fourth time around 12/19. As in early 2019, this fourth time the project was reactivated consisted only of about three months. Around 12/19, the F.B.I. again abruptly, in an instant, turned the plaintiff's Anchorage hillside family home back into a digital "spy house:" "...within the house (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an F.B.I. earpiece: (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples, (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples, (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the

F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for examples: (a) it modulated the volume on the TV to highlight certain phrases, and (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's Anchorage hillside family home beginning when he returned home from work, the day he visited the psychiatrist. By deploying all those techniques simultaneously, the plaintiff's hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era 'spy house.' And, plaintiff's 'spy house' was augmented by drugs too." See ¶ 133. And, just as it had been in earlier that year, the plaintiff's hillside family home was kept activated as a "spy house" for about sixty days a second time (around 12/19-1/20). And also, just as it had been early 2019, the plaintiff only left the Hillside family home a few times during that about sixty days. And, on those few occasions the plaintiff did venture out of the "spy house" Anchorage stores had been taken over by plaintiff's F.B.I. tail in exactly the same manner as they had been in in the past

in Los Angeles, Guadalajara, Corpus Christi, Brownsville, Anchorage-past, and Fairbanks.

186.     Furthermore, just had occurred in early 2019, within about a week of turning the plaintiff's Anchorage hillside family home back into a digital "spy house," the plaintiff started hearing "voices" again (now for the third time in his entire life). And, yet again, these "voices" started abruptly and then continued nonstop. And, now for a third time: "What did these "voices" say? The 'voices' said exactly what the F.B.I.'s program of 'psychological operations' says verbatim. In fact, in plaintiff's entire life, he has never heard a 'voice' that said anything other than what the F.B.I.'s program of 'psychological operations' says just exactly. To reiterate, in his entire life the plaintiff has never heard one off-topic 'voice' or any 'voice; that contradicted the F.B.I.'s program of 'psychological operations' in any way, shape or form." See ¶ 140-141.

187.     And, also, just had occurred in early 2019, within about a week of turning the plaintiff's Anchorage hillside family home back into a digital "spy house," the plaintiff started having "muscle problems" (now for the third time in his entire life). The "muscle problems" the plaintiff experienced during this sixty-day activation of the plaintiff's Anchorage hillside family home on the hillside as "spy house" were the worst this project has ever caused him (before or since). Every time the F.B.I. presented certain stimuli to the plaintiff (through technology), plaintiff's lower-jaw involuntarily thrust to the left. For example, the F.B.I. would

COMPLAINT (BIVENS – SEC. 1983) - 107

hijack the plaintiff's computer and put a picture of underage girl on plaintiff's computer screen. The moment the plaintiff saw the image the F.B.I. put on his screen, his lower-jaw would very painfully thrust to the left. Or, for another example, the F.B.I. would hijack the plaintiff's computer a put a picture of gay man on plaintiff's computer screen. The moment the plaintiff saw the image the F.B.I. put on his screen, his lower-jaw would very painfully thrust to the left. Over about sixty days, this excruciatingly painful involuntary jaw motion occurred hundreds of times. And, as a result, the plaintiff now has temporomandibular joint syndrome to this day. To this day, it hurts when the plaintiff eats food. The "muscle problems" plaintiff experienced during this about sixty-day period beginning around 12/19 did not stop there. The plaintiff found himself hunching over 90 degrees to each and every object F.B.I. had assigned significance (through repetition). During that about sixty-day period of time, going from plaintiff's bedroom upstairs to eat was an excruciatingly painful process wherein had to remain hunched over at 90 degrees. Ultimately, during that about sixty-day period beginning around 12/19 plaintiff's body was twisted and contorted in unimaginably horrible ways in reaction to the F.B.I. bombardment of the plaintiff with F.B.I. "stimuli" (underage girls, gay men, etc). **By 12/19, of course, the F.B.I. had bombarded the plaintiff literally millions of times (when you include the lights that modulated about once every three seconds to whatever**

COMPLAINT (BIVENS – SEC. 1983) - 108

**the plaintiff was saying or doing) with same about one-hundred basic concepts (hereafter "F.B.I. stimuli").**

188.  This fourth time the F.B.I. reactivated the project began around 12/19 and continued in the family's Anchorage hillside home for about sixty-days. Just exactly like in early-2019, in early-2020 the F.B.I. had plaintiff mother petition the Alaska state probate court for a 30-day committal order after about 60 days. She again perjured herself at the hearing and said the plaintiff had imagined all of the above. And, for a second time an Alaska state magistrate ordered the plaintiff committed to a "psihushka" operated entirely by the F.B.I. for 30-days (plaintiff's third long-term commitment to a "psihushka"). As had been the case in early-2019, in early-2020 the F.B.I. again rented a wing of Alaska Psychiatric Institute (A.P.I.). And, the F.B.I. again administered the rented psychiatric ward exactly the same way it had in Oslo and in early-2019: "The F.B.I. gradually turned down the thinly veiled innuendo over [one month]. By the end of [one month], the thinly veiled innuendo had completely stopped.... As the F.B.I. gradually turned down the thinly veiled innuendo, F.B.I. doctors forcibly provided cognitive behavior therapy and drugs designed to make the plaintiff believe 5/12 – 11/15 [, 4/17 – 5/18, three months in early-2019, and plaintiffs present experience were all merely...[four] episodes of schizophrenia."

189.  In contrast to plaintiff's two previous long-term confinements to F.B.I. "psihushkas" (Oslo and early-2019), this commitment to a F.B.I. "psihushka"

COMPLAINT (BIVENS – SEC. 1983) - 109

achieved its intended goal. After about two weeks inside this third long-term "psihushka" plaintiff was 100% certain that 5/12-11/15, 5/17-6/18, three months in early 2019, and his present experience were now four episodes of schizophrenia. After thirty days, the plaintiff was released and when he returned home the Anchorage hillside family home had yet again been returned to normal and his mother was behaving as she did before 5/12 yet again. After release from this third long-term psihushka, the plaintiff promptly returned to his life ostensibly on Social Security disability. And, the F.B.I. resumed its total control over the plaintiff's life covertly: "In fact, however, the F.B.I. continued to control every facet of plaintiff's life without his knowledge...First, the F.B.I. had all of plaintiff's friends basically disown him ostensibly on the basis they were prejudice against mental illness. Second, the F.B.I. would not let the plaintiff meet any new people (friends or love interests) on social media. The F.B.I. made it appear that suddenly the plaintiff had become undesirable as either a friend of a boyfriend (the F.B.I. gave the plaintiff fake versions of social media websites wherein he couldn't talk to anyone new or "real"). Third, the F.B.I. secretly warned off all potential employers, persons plaintiff might want to contract with, friends, and girlfriends by phone. All the above was instructed to make up an excuse to have nothing to do with the plaintiff. Fourth, the F.B.I. continued to control plaintiff's internet. In the past, plaintiff's search results had been half real and half thinly veiled innuendo (the F.B.I. "impersonated" Google, Bing, and Yandex). From 11/15 –

4/17, the F.B.I. continued to (1) censor plaintiff's internet, (2) manipulate it as much as possible, but did so covertly." See ¶ 104.

190.     As noted, the plaintiff suffered from significant "cognitive dullness" after the trauma he experienced in Fairbanks. Despite the fact the F.B.I. activated the project twice in 2019 for about three months, the plaintiff managed to fully recover his cognitive abilities by mid-2020. By mid-2020, his cognitive function had again returned to what it was before F.B.I. began this undertaking in 5/12. Likewise, by mid-2020, plaintiff's hobbies resumed being appropriately cerebral. And, the plaintiff even went on an uneventful vacation to Brazil for month in October, 2020 (on vacation). Although plaintiff's covert F.B.I. tail no doubt followed him to Brazil, it did not make its presence known there.

191.     In December, 2020, the F.B.I. for the fifth time reactivated the project back on. This time for four months (12/20 – 4/21). For about three days preceding the wholesale reactivation of the project, the plaintiff's internet was modified. At first, the plaintiff thought he was seeing things in December, 2020, when (1) *Pornhub.com* appeared to have illegal content in unclicked previews, and (2) plaintiff's internet was being modified to make the entire country of Brazil appear "pervy." After about three days of this, the plaintiff's family home was reactivated as digital "spy house" wholesale: "...within the house (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an

F.B.I. earpiece, (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples: (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples: (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for examples: (a) it modulated the volume on the TV to highlight certain phrases and (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were

COMPLAINT (BIVENS – SEC. 1983) - 112

deployed simultaneously within plaintiff's Anchorage hillside family home beginning when he returned home from work, the day he visited the psychiatrist. By deploying all those techniques simultaneously, the plaintiff's hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era 'spy house.' And, plaintiff's 'spy house' was augmented by drugs too." See ¶ 133.

192.    In contrast to the previous four occasions when the F.B.I. activated this undertaking, the plaintiff had monetary means by December, 2020. By December, 2020, the plaintiff had rebuilt his credit and had more than $10,000 in available credit.   Just as soon as the family home was reactivated as "spy house," the plaintiff checked into an Anchorage hotel.  As noted, the plaintiff does not know why he started hearing "voices" for the first time in his life immediately after the no-notice eviction (05/23/2017 - 3AN-17-01469CI) and for the duration of time the plaintiff was in Fairbanks (5/17 – 5/18). Likewise, the plaintiff does not why he heard "voices:" (1) during the three months the project was reactivated in early-2019 and, (2) during the three months the project was reactivated beginning in 12/19.  Therefore, the plaintiff does not know whether (1) the F.B.I. intentionally serendipitously drugs him with a dopamine (D2) active drug the simulates schizophrenia, or (2) the sensory bombardment itself (2012-2020) causes plaintiff to hear "voices."  As noted, the plaintiff has never in his entire life heard a 'voice' (1) that doesn't say what the F.B.I.'s "psychological operations" says verbatim or,

COMPLAINT (BIVENS – SEC. 1983) - 113

(2) when the F.B.I.'s project wasn't active. In any event, the plaintiff escaped the family home activated as a "spy house" in December, 2020 before he heard "voices." Likewise, he heard no "voices" during this fifth activation of the F.B.I.'s project from 12/20 – 4/21.

193.     Although the plaintiff never heard any "voices" during this fifth activation of the project from 12/20 – 4/21, he did suffer from (1) "delusions of reference" (seeing "secret messages" in innocuous events that aren't there), (2) "cognitive dullness," and (3) "muscle problems" throughout this fifth activation of the project. The plaintiff does not know if this is because of the lingering trauma of all of the above (2012 - 2021) or if the F.B.I. serendipitously drugs the plaintiff to make him cognitively slow and low-level hallucinate. As to "muscle problems," the only one he experienced during this fifth activation of the project (12/20 - 4/21) was a reoccurring grotesque frown in the presence of objects and classes of people designated "stimuli." As will be detailed, the F.B.I. did serendipitously drug the plaintiff extensively later in 2021 and therefore the notion that the F.B.I. has used long-term drugs on the plaintiff is not as far fetched as it might sound at first glance.

194.     As soon as the family home was reactivated as a "spy house" in December, 2020, the plaintiff checked into a Anchorage hotel. By the time he checked into the hotel, he was (1) experiencing "delusions of reference," (2) suffering from "cognitive dullness," and (3) had the "muscle problem" of a reoccurring grotesque

frown. In other words, by the time the plaintiff checked into the Anchorage hotel he was not thinking straight probably because of past trauma (2012- 2020). As noted, the F.B.I. had began this fifth activation of the project by hijacking plaintiff's internet to associate the entire country of Brazil with underage girls. In fact, the reason the plaintiff was researching Brazil in first place was because he had to wait another year on disability before his student loans were discharged. He planned to travel during that year. Whereas he went to Brazil for a month in October, 2020 and liked it, he was considering returning. Plaintiff's desire to return to Brazil was two-fold: (1) for another vacation, (2) perhaps to meet a girl to marry. In any event, as soon as the F.B.I. reactivated the project in December, 2020, plaintiff knew he had to leave the country. First, if the plaintiff stayed in the United States than the F.B.I. would no-doubt brainwash him again in a "psihushka." Second, the basic premise of entire project is to force the plaintiff to consume "psychological operations" without ever acknowledging what is really going on. As noted in ¶ 65, over the preceding nine years, the F.B.I. had always issued draconian "punishments" (like deprivation of shelter) for directly confronting any of there undercover agents or anyone wearing an F.B.I. earpiece. Whereas the F.B.I. had begun this fifth activation of project by trying to slander Brazil, in his diminished mental state the plaintiff concluded Brazil would be a good place to be go because there he would (1) safe from being "brainwashed" in another psihushka and, (2) could directly confront the government officials whom

COMPLAINT (BIVENS – SEC. 1983) - 115

had legally tortured him 2012-2020. Thus, after two days in an Anchorage hotel, the plaintiff flew to Rio De Janeiro.

195. The plaintiff's enormous F.B.I. tailed followed him to Rio De Janeiro. The F.B.I. replicated in Rio De Janeiro the same condition that existed in all the cities that preceded it: Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Anchorage, and Fairbanks. Within plaintiff's hotel room in Rio De Janeiro: (1) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples, (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, and (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (2) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples, (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, and (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the

F.B.I. ⎯ the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (3) the F.B.I. took control of plaintiff's TV and cable box ⎯ it modulated the volume on the TV to highlight certain phrases and also switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's Rio De Janeiro hotel room. **However, plaintiff's Rio De Janeiro hotel room was different than all preceding "spy houses" (the water-less cabin in Fairbanks and the Anchorage family home) in one very major respect, the lights were not modulated about once per three seconds to plaintiff's words and actions**.

196.  As noted, plaintiff already had diminished capacity by the time he got to Rio De Janeiro.  Once the plaintiff arrived in his Rio De Janeiro hotel room, he proceeded to leave multiple voice mail messages for (1) the federal prosecutor of Alaska, (2) the Alaska Attorney General, (3) the Anchorage District Attorney's office, and (4) the Alaska Bar Association.  In fact, he spent an entire month in Rio De Janeiro "telling all of them off" via voicemail.  For the preceding nine years, plaintiff had not been allowed to confront these people directly under threat of (1) "psihushka," and/or (2) legal torture.  In addition to these calls, in his diminished mental state, plaintiff also started making hours of almost coherent videos about the false accusations in Rio De Janeiro. He posted those publicly on *Mega.nz*.

197. After about one month in Rio De Janeiro leaving telephone messages and making videos, plaintiff brought his F.B.I. tail to the equator for about four days. The F.B.I. basically occupied Macapa, Brazil, which is a small isolated city in the middle of the amazon for four days. The F.B.I. replicated in Macapa the same conditions that existed in all the cities that preceded it: Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Anchorage, Fairbanks, and Rio De Janeiro.

198. After about a month in Rio De Janeiro and four days in Macapa, the plaintiff's F.B.I. tail followed him to Recife, Brazil. Conditions in Recife were the same as in Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Anchorage, Fairbanks, Rio De Janeiro, and Macapa before it. Plaintiff spent 2/21 – 4/21 in Recife. Plaintiff's hotel room in Recife was the same as his hotel room in Rio De Janeiro had been — a digital "spy house" in every way except the lights were not modulated to plaintiff's words and actions.

199. Thus, the plaintiff spent about two months in Recife — almost entirely in that hotel room. During those two months, plaintiff continued leaving voice mail messages for (1) the federal prosecutor of Alaska, (2) the Alaska Attorney General, (3) the Anchorage District Attorney's office, and (4) the Alaska Bar Association. And, the plaintiff made several dozen hours of almost coherent videos about the false accusations and continued posting them publicly to *Mega.nz*.

200. As noted in ¶ 82, plaintiff was a Notre Dame Law graduate in perfect mental health when he entered the "The Law Office of Keri and Kevin Brady" in 5/12. In fact, plaintiff is always in perfect mental health so long as this F.B.I. project is not active. The plaintiff has never had a (1) "delusion of reference," (2) heard a "voice," (3) had a "muscle problem" except when this project has been activated: 5/12-11/15 (Los Angles, Guadalajara, Mexico City, Corpus Christi, Brownsville, and Oslo),

4/17 – 5/18 (Fairbanks), three months in early-2019 (Anchorage), three months mostly in early 2020 (Anchorage), and 12/20 – 4/21 (Rio De Janeiro, Recife, and Macapa). And, as noted, every "voice" the plaintiff has ever heard in his life (1) occurred when this project was active and, (2) said exactly what the F.B.I.'s program of "psychological operations" says verbatim: "What did these "voices" say? The 'voices' said exactly what the F.B.I.'s program of 'psychological operations' says verbatim. In fact, in plaintiff's entire life, he has never heard a 'voice' that said anything other than what the F.B.I.'s program of 'psychological operations' says just exactly. To reiterate, in his entire life the plaintiff has never heard one off-topic "voice" or any 'voice" that contradicted the F.B.I.'s program of 'psychological operations' in any way, shape or form." See ¶ 140-141. While the voice mail messages the plaintiff left from Brazil and the videos the plaintiff made in Brazil might sound voluntary, they most certainly are not. The F.B.I.

created plaintiff's temporary mental health problems by designed with drugs and legal torture.

201. After about two months in Recife (4/21), the plaintiff began to hear a few "voices." The plaintiff sought out the care of a Brazilian doctor for "schizophrenia." The doctor prescribed "amisulpride," which is a European drug for schizophrenia. Within forty-eight hours of taking his first dose, the plaintiff was no longer perceiving "delusions of reference" in television shows. The F.B.I. seized on that moment as an opportunity to turn off this fifth activation of the project. Whereas plaintiff's (1) "delusions of reference," (2) "cognitive dullness," (3) "muscle problems," (4) and all the F.B.I.'s "psychological operations" all disappeared over the same two-day period, it seemed to the plaintiff that 12/20 – 4/21 had just been an episode of schizophrenia (his fifth now). That was, of course, the F.B.I.'s intention.

202. When the F.B.I. shut down it's "psychological operations" at the exact same moment plaintiff took "amisulpride," it was repeating just exactly what it had done in the three prior "psihushkas." In the three prior commitments to "psihushkas," the F.B.I. had gradually turned down it's "psychological operations" in concert with (1) medication for schizophrenia, (2) cognitive behavioral therapy designed to make the plaintiff belief all of the above are merely episodes of schizophrenia.

*203.* *2021 marks a new level of mental health damage done to the plaintiff by the F.B.I. After 5/12-11/15 (California, Mexico Texas, Norway), it took about 60 days for plaintiff to become 100% certain he had merely suffered the onset of schizophrenia. After 4/17 – 5/18 (Fairbanks), it took about 60 days for plaintiff to become 100% certain he had merely two episodes of schizophrenia. After three months in early 2019 (Anchorage), it took about 45 days for plaintiff to become 100% certain he had merely three episodes of schizophrenia. After three months mostly in early 2020 (Anchorage), it took about 14 days for plaintiff to become 100% certain he had merely four episodes of schizophrenia. After 12/20 – 4/21 (Brazil), it took about 48 hours for plaintiff to become 100% certain he had merely five episodes of schizophrenia. After 4/21, the plaintiff's transition from (1) believing with 100% certainty all these events are real, to (2) believing with 100% certainty all these events are isolated episodes of schizophrenia has become a matter not of months, or weeks, or days, but hours. Throughout 2021, plaintiff went back and forth between beliefs in a matter of hours, with no exceptions (as detailed below).*

*204.* After the 48-hour period wherein the plaintiff went from 100% certain all of the above was real to 100% percent certain all of the above was merely now five episodes of schizophrenia, the plaintiff stayed in Brazil another three weeks. He proceeded to have a regular vacation and visited Campo Grande, Brazil to see the world's largest rodent in the wild (the "capybara"). And, of course, when

plaintiff returned to his Anchorage family home in 4/21 everything was normal again. The home had been returned to normal and his mother was behaving as she did before 12/5.

*205.* **The rest of 2021 was different than all the events that preceded it. The F.B.I. switched tactics to only activating the program for between 8 hours and two days. Between 4/21 – 10/21, the F.B.I. did this several times.**

*206.* Plaintiff was prescribed adderall during his first semester at George Washington University and remained on it until 5/5. The plaintiff has a learning disability. Despite his verbal IQ being in the 98th percentile, his reading rate (the speed at which he reads is in the 8th percentile of all adults). Adderall solved this problem for the plaintiff between 1997 – 2005. During that time, he graduated George Washington University and Notre Dame Law school.

*207.* Despite that, it had been a case theme of the F.B.I.'s that Adderall, Dexedrine, Vyvanse, etc (stimulants), had unusual effects on the plaintiff (they don't). Throughout 2020, the plaintiff was prescribed Vyvanse and it had no unusual effects. The F.B.I. did not like this. Consequently, between 4/21 – 9/21 on several occasions the F.B.I. switched plaintiff's Vyvanse with powerful combinations of drugs that cause hallucinations. These powerful combinations of drugs were timed to last a certain duration. The F.B.I. arranged to activate the plaintiff's family home as a "spy house" for exactly the same duration of time the plaintiff was drugged to hallucinate.

COMPLAINT (BIVENS – SEC. 1983) - 122

208. Thus, on 3-4 occasions between 4/21 and 9/21, (1) the plaintiff was drugged for a specified duration ranging from 8 hours to two days, (2) the plaintiff's family home was activated as a "spy house" for exactly the same duration of time: "(1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an F.B.I. earpiece, (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples, (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff typed, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples, (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli

Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for examples: (a) it modulated the volume on the TV to highlight certain phrases and (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's Anchorage hillside family home beginning when he returned home from work, the day he visited the psychiatrist. By deploying all those techniques simultaneously, the plaintiff's hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era 'spy house.' And, plaintiff's 'spy house' was augmented by drugs too." See ¶ 133. This reactivations of the F.B.I.'s project where different from all past ones in that (1) they were very short, and (2) they occurred entirely within the plaintiff's family home.

209. Every time this happened, the plaintiff (1) was 100% certain that all of the above was in fact real while he was being drugged and family home was activated as a "spy house" and (2) took "amisulpride" just in case he was having a miniature episode of schizophrenia.

210. **Whereas the F.B.I. arranged for the hallucinogens it serendipitously drugged the plaintiff with to wear off at the exact same time the plaintiff's family home was returned to normal, plaintiff woke up the next morning each**

COMPLAINT (BIVENS – SEC. 1983) - 124

**time and everything had returned to normal. Plaintiff was no longer being drugged. The technology wasn't being hijacked. And, his mother was behaving as she did prior to 5/12. Likewise, each morning the plaintiff returned to being 100% certain what he experienced was a miniature episode of schizophrenia within less than eight hours.**

*211.*     Basically (4/21 - 8/21), the F.B.I. had created that illusion that after twenty-four years Adderall, Dexedrine, and Vyvanse (stimulants) suddenly caused the plaintiff to have the unwanted side effect of triggering schizophrenia. Given that the plaintiff had been taking these drugs uneventfully for a quarter-century, he simply didn't believe this was possible. He thought either mother was switching his pills or the pharmacy was chronically making mistakes.

*212.*     During the 3-4 occasions between 4/21 and 8/21 wherein the plaintiff was very badly drugged and the project active, ranging from 8 hours to two days, the plaintiff made several phone calls to the Alaska Bar Association and Washington Bar Associations hysterically reporting the fact he was being drugged. He also sent numerous intoxicated emails to government agencies.

*213.*     Plaintiff was not particularly phased by these 3-4 miniature "relapses of schizophrenia." The F.B.I. had created the illusion in both Brazil and on these 3-4 occasions that "amisulpride" cured his episodes of schizophrenia wholesale within 48 hours. If it really was the case that Adderall, Dexedrine, and Vyvanse now suddenly, after a quarter of century, had the unwanted side effect of triggering

schizophrenia than the solution was a simple one: "stop taking Adderall, Dexedrine, Vyvanse" (stimulants). In any event, by September, 2021, the plaintiff knew his prognosis was a good one. From his perspective, he was only prone to have organic episodes of schizophrenia about once a year. And, now that he had "amisulpride" he could cure those within 48 hours. Plaintiff considered 2021 proof of his recovery. Instead of having schizophrenic episodes that lasted years or months, he was now only suffering from episodes that lasted 8 hours to two days. From the plaintiff's perspective, it appeared he would never again have to suffer an episode of schizophrenia that would last more than two days thanks to amisulpride. Of course, the F.B.I. had created that illusion intentionally.

*214.* Thus, when the F.B.I. created the illusion the plaintiff had 3-4 miniature "episodes of schizophrenia" between 4/21 and 9/21, it gave the plaintiff a new sense of confidence. "Amisulpride" obviously worked. The plaintiff had never been "sick" longer than two days. Therefore, the plaintiff would never again be disabled for months or years. It certainly seemed unbelievable to plaintiff that after a quarter century, Adderall, Dexedrine, or Vyvanse all of sudden triggered schizophrenia. But, if they did it was no big deal. In that event, the solution was a simple one (stop taking them).

*215.* As noted, the plaintiff had to spent three years on Social Security disability to have his student loans from Notre Dame Law School discharged (more than $100k). Plaintiff's three years on Social Security disability would finally be over

in December, 2021. Thereafter, the plaintiff could return to work as Juris Doctor non-lawyer making at least $50,000 per year. In point of fact, at this very moment, the federal government has hundreds of job opening requiring only a Juris Doctor and not requiring a law license. And, each of those job openings has a starting salary over $50,000. While awaiting his student loan discharge, the plaintiff decided to go on one last vacation before we returned to work. In September, 2021, the plaintiff went to Kharkiv, Ukraine.

216.    In college, the plaintiff was a Cold War history major. He wanted to go to Ukraine for two reasons (1) to tour Cold War history sites and maybe, (2) to meet a girl perhaps to marry. Plaintiff's F.B.I. tail followed him silently to Kharkiv. Plaintiff's first day in Kharkiv he did something he had been putting off for a long time. He called the Alaska Bar Association and left a 15-minute voicemail. In his voicemail the plaintiff explained he had schizophrenia and apologized for all the hostile voice mail messages he had left while in Brazil. He also explained he had a reoccurring schizophrenic "complex delusion" that he was the suspect in a big sex case. He explained to the Alaska Bar Association he was working on the problem and could now guarantee his episodes of schizophrenia would never again last more than 48 hours thanks to "amisulpride." In addition to apologizing for the messages he left from Brazil, the plaintiff berated the Fairbanks state judiciary and legal community for the events of 2017-2018 on the Alaska Bar Association's voicemail. The plaintiff explained to the Alaska Bar Association that he had been

denied basic medical care for over a year in Fairbanks. He explained (1) the Fairbanks Police Department, (2) Fairbanks state judiciary, and (3) Fairbanks legal community all knew he was hallucinating for a year and not one of them made the effort to get the plaintiff basic medical care.

217. Immediately after the plaintiff left the Alaska Bar Association the voicemail message from Kharkiv, the F.B.I. reactivated the entire project in Kharkiv, Ukraine (9/21). The F.B.I. recreated in Kharkiv the same conditions that had existed in all the cities that preceded it: Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Fairbanks, Anchorage, Rio de Janeiro, Macapa, and Recife. Shortly after the F.B.I. reactivated the project in Kharkiv, the F.B.I. serendipitously drugged the plaintiff with a hallucinogen that last 2-3 days. For 2-3 days, the F.B.I. ran the plaintiff drugged through the streets of Kharkiv. He was, of course, surrounded on all sides by thinly veiled innuendo. After about three days of this, the F.B.I. rented a wing of Ukrainian psychiatric ward and committed plaintiff to a short-term "psihushka" (9/21). Although every other patient in the rented Ukrainian psychiatric ward was wearing an F.B.I. earpiece there was no thinly veiled innuendo in the psychiatric ward and all viable signs of the project were turned off. The morning after he was committed to the short-term "psihushka" in Kharkiv, the plaintiff explained to his F.B.I. doctor in Ukrainian he was prone to short episodes of schizophrenia and had the cure in his hotel room ("amisulpride"). He further explained to his F.B.I. doctor in Ukraine that he was

COMPLAINT (BIVENS – SEC. 1983) - 128

now feeling totally fine and wanted to be released. In fact, within four hours of waking up in the Ukrainian psychiatric ward the plaintiff was again 100% certain all of the above were merely episodes of schizophrenia. After about five days, in this Ukrainian "psihushka," the F.B.I. released the plaintiff.

218.    After being released from the short-term Ukrainian "psihushka," the plaintiff switched hotels and embarked upon having the vacation he had planned. He photographed sites associated with Cold War history and tried to meet a girl via both *Tinder.com* and *Ukraindate.com*. Unbeknownst to the plaintiff, the F.B.I. had arranged it so he could not really use *Tinder.com* or *Ukrainiandate.com*. The F.B.I. blocked his access to every real Ukrainian girl and instead the plaintiff was only allowed to talk to Ukrainian girls wearing F.B.I. ear pieces. In Kharkiv, the plaintiff went out on a series of dates with Ukrainian girls wearing F.B.I. earpieces. On each of these 5-6 dates, the F.B.I. had these girls variously imply the plaintiff was undesirable for a variety of reasons. The plaintiff choked up the experience to bad luck and a remarkable series of coincidences (meeting only rude and degrading girls while in Kharkiv). About six weeks after his release from the Kharkiv short-term "psihushka," the plaintiff had had enough of the abuse that had been dolled out on him by dates wearing F.B.I. earpieces. In 10/21, plaintiff flew back to the Anchorage family home wherein everything was normal and his mother was behaving as she had before 5/12. Naturally, plaintiff suspected nothing.

219.    It is hard for plaintiff to remember 12/21 – 3/22 accurately. The F.B.I. serendipitously drugged plaintiff extensively 12/21 - 3/22. It also switched on and off the project several times for 2-3 days each time. Each of these occurrences except for one occurred entirely with the plaintiff's family home (activated as a "spy house").

220.    It's plaintiff's impression the situation came to head for the F.B.I. after Ukraine. That is, the F.B.I. was no longer able to hide the fact that the plaintiff spent the vast majority of his time 100% certain all of the above represented isolated episodes of schizophrenia only. It's plaintiff's perception that the F.B.I. switched on and off the project several times between 12/21 – 3/22 in an effort to get plaintiff to believe all of these events were real even when the F.B.I.'s "psychological operations" were turned-off.

221.    By serendipitously drugging the plaintiff and activating the project for several times between 12/21 – 3/22, the F.B.I. in fact proved the reverse. Each time the drugs wore off and F.B.I. stopped bombarding the plaintiff with "psychological operations," within hours the plaintiff believed he had experienced a miniature episode of schizophrenia only. As the plaintiff stated in ¶ 203, "*2021 marks a new level of mental health damage done to the plaintiff by the F.B.I......After 4/21, the plaintiff's transition from (1) believing with 100% certainty all these events are real, to (2) believing with 100% certainty all these events are isolated episodes of schizophrenia has become a matter not of*

*months, or weeks, or days, but hours. Throughout 2021, plaintiff went back and forth between beliefs in a matter of hours, with no exceptions..."*

222.  **On the several occasions the F.B.I. serendipitously drugged the plaintiff and reactivated the project between, 12/21 – 3/22, two major events happened.** First, on one occasion the F.B.I. serendipitously drugged the plaintiff so he could barely think at all. While he was in that condition, the F.B.I. threatened to confine the plaintiff to a "psihushka" again. The plaintiff used the little money he had left to buy a ticket to London, Gatwick airport. Plaintiff's F.B.I. tail followed him to the United Kingdom. Gatwick Airport was made the same as all the cities that preceded it: Los Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Fairbanks, Anchorage, Rio de Janeiro, Macapa, Recife, and Kharkiv. While this was occurring, the F.B.I. had the plaintiff serendipitously drugged into a zombie-type state. Rather than litigate the matter in British Court, the plaintiff bought a ticket back to the United States with the intent of litigating the matter before this Court. Plaintiff never left Gatwick Airport while in the United Kingdom and spent the night in a hotel at the airport. As soon as the plaintiff bought a ticket back to Anchorage, the F.B.I. shut down the entire project. Plaintiff's return ticket went from Gatwick to Iceland to Seattle to Anchorage. By the time the plaintiff was in Iceland, he was 100% certain all of the above was merely isolated episodes of schizophrenia again.

223.     The other major event that happened on one of the several occasions between 12/21 – 3/22 that the F.B.I. serendipitously drugged the plaintiff for several days and simultaneously reactivated the project, is that the plaintiff uploaded the entire contents of his hard drive to many of the world's major intelligence agencies (Russia, China, Israel, United Kingdom, France, and Germany). The reason the plaintiff uploaded the contents of his hard drive to all the world's intelligence's agencies was to prove (1) his intelligence was intact (5/12 intelligence), (2) his personality was intact, (3) the plaintiff had no idea whatsoever all of the above was anything but isolated episodes of schizophrenia the vast majority of the time, and (4) to prove the F.B.I. only allowed the plaintiff to know these events were real the F.B.I. had the plaintiff drugged.

224.     On plaintiff's hard drive, was hundreds and hundreds of pages of first-rate legal scholarship into the issue of appealing the extrajudicial third D.U.I. that began this matter in 5/12 (3AN-11-02041CR). Those documents sought to appeal the D.U.I. on the ordinary basis's. It's clear from those hundreds of pages of first-rate legal scholarship that the plaintiff had no idea whatsoever "The Law Office of Keri and Kevin Brady" was not a real law firm or that that "pretend" "felony" D.U.I. was a constitutionally invalid worthless piece of paper. Obviously, the plaintiff would not have spent hundreds of hours researching ordinary means of appeal had he known the entire case was a "mock" court case. Also on plaintiff's hard drive were motions to seal (1) plaintiff's 2014 Sec. 1983 case before the

COMPLAINT (BIVENS – SEC. 1983) - 132

Federal District Court, Southern District of Texas at Corpus Christi (2:14-cv-00033), (2) plaintiff's 2017 Sec. 1983 case before this court (3:17-cv-00089-SLG), (3) plaintiff's 2018 federal civil rights removal action before Federal District Court, District of Alaska at Fairbanks (4:18-cr-00004-RRB-1), all on the basis the plaintiff had schizophrenia and that each case had been filed during an episode of schizophrenia.

225. After the plaintiff emailed emailed the contents of his hard drive to many of the world's major intelligence agencies (Russia, China, Israel, United Kingdom, France, Germany), finally the F.B.I. reactivated the project in Anchorage in 4/22 without serendipitously drugging the plaintiff (initially) for the first time.

226. In 4/22, plaintiff's family home was reactivated as a "spy house:" "…within the house (1) all the lights were being modulated about once every three seconds (either brighter or dimmer) to words plaintiff said and things he did, (2) plaintiff's mother was wearing an F.B.I. earpiece, (a) speaking and pantomiming in thinly veiled innuendo, (b) practicing sustained derogation, (3) the F.B.I. let it be known it had a back door into each and every one of plaintiff's devices (computers, tablets, phones) and controlled them by remote control (for examples: (a) the F.B.I. modulated the screen brightness and volume of all plaintiff's devices to highlight certain words or phrases (i) as the plaintiff types, (ii) in lyrics in music, (iii) in audio in videos, (b) the F.B.I. remotely spawned Windows and Android programs relentlessly (such as opening Microsoft Word Documents or playing

music filled with innuendo), (5) the F.B.I. let it be known that it sat in-between the plaintiff and the actual internet (for examples, (a) the F.B.I. impersonated Google and other search engines and produced page, after page, of manufactured search results filled with thinly veiled innuendo, (b) the F.B.I. blocked access to real search results and also blocked access to many real websites, (c) the F.B.I. presented the plaintiff with censored copies of real websites that omitted critical information — for example, recently, the version of the Israeli Prime Minister's website the plaintiff was allowed to access had Israeli Prime Minister's email address censored out by the F.B.I. — the F.B.I. part censored thousands of websites in this fashion by anticipating what websites the plaintiff was likely to visit), (6) the F.B.I. took control of plaintiff's TV and cable box, for example: (a) it modulated the volume on the TV to highlight certain phrases and (b) switched on and off the cable TV to highlight the last sentence spoken on the TV. All of these techniques were deployed simultaneously within plaintiff's hillside family home beginning when he returned home from work, the day he visited the psychiatrist. By deploying all those techniques simultaneously, the plaintiff's hillside family home was converted into a "spy house" infinitely more dangerous than an analogue Cold War era 'spy house.' And, plaintiff's 'spy house' was augmented by drugs too." See ¶ 133. And, at the same time (4/22), the F.B.I. made conditions in Anchorage the sane as all the cities that preceded it: Los

Angeles, Guadalajara, Mexico City, Corpus Christi, Brownsville, Oslo, Fairbanks, Anchorage, Rio de Janeiro, Macapa, Recife, and Kharkiv.

227.     Upon F.B.I. reactivating the project in Anchorage in 4/22, the plaintiff ordered camping gear online with the last bit of money he had left. The plaintiff only makes $1200 per month through Social Security disability.  And, the Brazilian debacle had nearly bankrupt the plaintiff (12/20 - 4/21).  After his camping gear arrived, the plaintiff pitched a tent in Chugach State Park near Prospect Heights trail.  Thereafter, the plaintiff began his efforts to bring this lawsuit.

228.     When the plaintiff started drafting this lawsuit, the F.B.I. retaliated by trying to "rendition" the plaintiff to the United Kingdom.  Obviously, the European Convention on Human Rights (E.C.H.R.) would never allow an extradition in these circumstances.  The European Convention on Human Rights flatly prohibits extradition (1) in all instances where "cruel" or "degrading" treatment has been used, (2) in all instances where drugs have been used, (3) in all instances where the right to counsel has been violated, and (4) in all instances where the right to remain silent has been violated (just for starters).  In an effort to force the plaintiff to go the United Kingdom, in 4/22 the F.B.I. began a multi-front war on plaintiff: (1) attacks with serendipitously drugging and (2) economic warfare.

229. As noted, the plaintiff is on federal disability and only makes $1200 per month. Shortly after the plaintiff moved out of his family home (now a "spy house"), the F.B.I. began serendipitously drugging the plaintiff all over Anchorage. As the plaintiff tried to work on this lawsuit (4/22), the F.B.I. began serendipitously drugging the plaintiff multiple times per day. The plaintiff was forced to flee F.B.I.'s serendipitously druggings by checking into a hotel. The F.B.I. arranged for an inexpensive motel ($60/night) to lock its doors when the plaintiff arrived. Plaintiff was forced to rent a room at the Dimond Center Hotel wherein the F.B.I. arranged for him to pay the "rack-rate" of $200 per night. Still fleeing being serendipitously drugged by the F.B.I., the plaintiff was forced to spend another night isolated in another hotel costing him yet another $100. Next, the plaintiff bought a bicycle at Fred Meyer (Abbott) to bike to and from Chugach Park. First, the F.B.I. disabled the air pumps at both Fred Meyer (Abbott) and Chevron (Abbot and Lake Otis). The plaintiff was forced to spent $30 on a bike pump. Two days later, the F.B.I. broke the plaintiff's bicycle by making the front breaks stay permanently engaged (requiring special tools to fix). Between 4/22 and the present time, the F.B.I. has (1) the F.B.I. arranged to have Fred Meyer (abbot) sell the plaintiff a headlamp missing vital components required to strap it on — forcing the plaintiff to waste another $30 on another headlamp at Walmart, (2) removed the generic diet soda from every grocery store plaintiff visits in order to force him to buy the more expensive brand name soda, (3) removed all the large

cans of Red Bull from every grocery story plaintiff visits in order to force him to buy more expensive smaller cans, (4) arranged to have Best Buy sell the plaintiff a cellular phone battery pack that didn't work — forcing the plaintiff to waste another \$59.99 on another battery back, (5) arranged to have many taxi drivers run-up there meters by pretending not to know where stores are located, and (6) stolen plaintiff's home-made cigarettes. In fact, this list is only the "tip of the iceberg" of the F.B.I.'s economic warfare on the plaintiff. In reality, every moment of every day since the program was reactivated the plaintiff's F.B.I. tail has done everything possible to bankrupt the plaintiff.

230.    The F.B.I. efforts to "rendition" the plaintiff to the United Kingdom run further than attacks with drugs and wholesale economic warfare. For the duration of time the plaintiff has been writing this lawsuit he has availed himself of "life insurance" by emailing the intelligence's agencies of Russia, China, Israel, United Kingdom, France, and Germany approximately once every thirty minutes with (1) reporting each and every illegal act the F.B.I. has commits against the plaintiff and (2) sending updated copies of this lawsuit as the plaintiff works on writing it. In an effort to stop this, the F.B.I. arranged for (1) plaintiff's cellular phone battery to fail, (2) an extra cellular phone battery back to fail, and (3) a third cellular phone battery back to fail, simultaneously.   The plaintiff reported this conduct to intelligence agencies of Russia, China, Israel, United Kingdom, France, and Germany promptly.   The F.B.I. was forced to relent but, even so, it has only

partially relented. The F.B.I. relented insofar is it finally allowed the plaintiff to buy a second functional cellular phone battery pack but the F.B.I. continues to drain plaintiff's internal cellular phone battery from 100% to 0% in less than two hours. Therefore, plaintiff cannot use his phone or the internet unless it's attached to an external battery back.

231.    Likewise, at the time of the filing of this suit, the plaintiff is continuing to give half-hourly updates to the intelligence agencies of Russia, China, Israel, Germany, France, and Britain directly through a Russian-based email account. And, the plaintiff will continue to do so until an injunction is granted and his U.S. constitutional rights are restored. The F.B.I. has modified plaintiff's internet so that he cannot access the email addresses of any agency within the Israeli government (the F.B.I. provides the plaintiff with fake copies of Israeli government websites). Therefore, the plaintiff has kept Mossad updated on these events by sending his half-hourly status reports to the Jerusalem Post instead. As is the case with Israel, the F.B.I. is presently censoring the plaintiff's internet to prevent him from contacting anymore intelligence agencies then he already has. For example, the F.B.I. has blocked the plaintiff's access not just to Indian intelligence but to just about every website with a ".in" domain name.

232.    Because the F.B.I.'s wholesale warfare against the plaintiff's U.S. constitutional rights, the plaintiff only has about $50 left. Therefore, the plaintiff requires service by U.S. Marshalls, as is customary in cases in forma pauperis. In

fact, the F.B.I. has been destroying the formatting of this complaint as the plaintiff writes it.

## V. INJURIES TO PLAINTIFF DAVID YORK

233.     As a direct and proximate result of the conduct of the defendants the plaintiff suffered substantial damages including (1) grotesque psychological injury, (2) loss of liberty for about ten years, (3) about ten years loss of income, (4) loss of nearly all the plaintiff's personal property, (5) spent about five years living outdoors as a prisoner of the F.B.I., (6) was falsely labeled a "felon" (felony D.U.I.) in an extrajudicial Alaska State Court proceeding (3AN-11-02041CR), (7) was falsely labeled convicted of "resisting arrest" in a second extrajudicial Alaska State Court proceeding(4FA-18-00032CR), (8) loss of reputation, (9) loss of employment opportunities, (10) severe emotional distress, and (11) was beaten several times suffering injury — once severely. In sum, the plaintiff lost ten years of his life. He was legally "tortured" for ten years. Consequently, he now has grotesques psychological injury (see above).

## VI. CONSTITUTIONAL CLAIMS

### COUNT I: VIOLATION OF FIFTH AND SIXTH AMENDMENT RIGHT TO COUNSEL.

234.     Since 5/12, the plaintiff's Fifth and Sixth Amendment right to counsel has been violated. From 5/12-3/13, the plaintiff was given F.B.I. agents whom masqueraded as loyal defense counsel in a D.U.I. (3AN-11-0241CR). From 5/12 — present, every attorney plaintiff has tried to have an attorney-client consultation

COMPLAINT (BIVENS – SEC. 1983) - 139

with has been wearing both and F.B.I. earpiece and wire. Each attorney the plaintiff attempted a consultation with not only tape-recorded the attorney-client consultations, but parroted contrived dialogue from an F.B.I. car piece throughout the consultation. Thus, the plaintiff's Fifth and Sixth amendment right to counsel has been violated.

## COUNT II: VIOLATION OF U.S. CONSTITUTIONAL RIGHT TO BE FREE OF LAW ENFORCEMENT HARASSMENT.

235.    It is unconstitutional law enforcement harassment for law enforcement to even park a squad car in front of a suspect's residence (citation forthcoming). Since 3/13, on the dates listed above, the plaintiff has been subject to "psychological operations" totally nonstop. As described, the F.B.I. has "talked at" the plaintiff probably millions of times 2012 — 2022 ( harassment). Thus, the plaintiff's U.S. constitutional right not to be harassed by law enforcement has been violated.

## COUNT III: VIOLATION OF U.S. CONSTITUTIONAL RIGHT TO PRIVACY (PERSONAL AUTONOMY -- SERENDIPITOUS DRUGGINGS).

236.    A penumbra of explicitly stated constitutional protections guarantees a U.S. constitutional right to privacy. The U.S. constitutional right to privacy includes a right to personal bodily autonomy. As detailed above, since 3/13 (estimate), the F.B.I. has serendipitously drugged the plaintiff many, many, times. These drugs have been administered to (1) violate the plaintiff's Fifth Amendment right to remain silence, (2) make the plaintiff appear a particular way on video, audio, or

online, (3) make the plaintiff do things he won't have chosen to, (4) to "brainwash" the plaintiff into believing things that are not true, (5) create the appearance of mental illnesses and drug addiction, (6) cause the plaintiff to believe this entire affair was a schizophrenic delusion, and (7) grotesquely harm the plaintiff psychologically. Thus, the plaintiff's U.S. constitutional right to privacy has been violated.

## COUNT IV: VIOLATION OF FIFTH AMENDMENT RIGHT TO REMAIN SILENT.

237. As described, the plaintiff has been subject to nonstop law enforcement harassment involving thousands of people beginning on 3/13 and occurring on the dates listed above. Beginning in Corpus Christi, the F.B.I. began drugging the plaintiff to violate his right to remain silent and for other enumerated reasons. Plaintiff sued in Sec. 1983 in the Southern District of Texas for all these constitutional violations including the violation of the right to remain silent on 1/13/14 (2:14-cv-00033). That case was dismissed as "delusional" and therefore "frivolous." As described above, the F.B.I.'s overt harassment stopped from 11/15 — 4/17. When the harassment resumed in 4/17, the F.B.I. aggressively coupled it with vastly more serendipitous druggings. On 4/19/17, the plaintiff sued again in Sec. 1983 in the District of Alaska at Anchorage for all these constitutional violations including the violation of his right to remain silent and the fact he was being drugged. That case was also dismissed as "delusional" and therefore "frivolous." On 5/15/17, the plaintiff attempted four more times to open the

COMPLAINT (BIVENS – SEC. 1983) - 141

matter in Alaska state court but each case was also dismissed as "delusional" (3AN-17-06691CI, 3AN-17-06692CI, 3AN-17-06693CI, 3AN-17-06694CI). It's humanly impossible not to eventually talk when being bombarded with nonstop "psychological operations," augmented by drugs, for years on end. The nonstop bombardment "psychological operations," augmented by drugs, on the dates listed above, did force the plaintiff to speak extensively about the accusations (3/13 — Present). Thus, plaintiff's constitutional right to remain silent has been violated.

## COUNT V: VIOLATION OF U.S. CONSTITUTIONAL RIGHT TO PRIVACY (RIGHT TO MEDICAL CARE).

238.  A penumbra of explicitly stated constitutional protections guarantees a U.S. constitutional right to privacy. The U.S. constitutional right to privacy includes a right to medical decision making ("medical care"). As described above, beginning on 10/15, the F.B.I. has used both inpatient and outpatient treatment to harm the plaintiff. As described above, the F.B.I. has used "psihushkas" three times to "brainwash" the plaintiff into believing all of the above was the onset of schizophrenia followed by independent episodes. The F.B.I. also tried, unsuccessfully, to use "psihushkas" to brainwash the plaintiff into believing he had commit a crime. Also, as described above, the F.B.I. has arranged for outpatient treatment to be given to the plaintiff to (a) do as much harm psychological as possible, (b) achieve the same ends as the aforementioned "psihushkas." Thus, the plaintiff's constitutional right to privacy has been violated.

## COUNT VI: VIOLATION OF FIRST AMENDMENT AND ARTICLE I, SEC 10 CONSTITUTIONAL RIGHT TO WORK AND CONTRACT.

239.     In combination, the First Amendment and Article I, Sec. 10 (contracts clause) protect the U.S. constitutional right to work and also to contract. Since 5/12, as described above, plaintiff's constitutional right to work has been entirely suspended by the F.B.I. The F.B.I. has "warned off" all the plaintiff's potential employers. Likewise, since 5/12, the F.B.I. has "warned off" every party the plaintiff may want to "contract" with. As described above, the F.B.I. only allows the plaintiff to buy goods and services available to every member of the public. For example, a lease is a contract. If the plaintiff applied for an apartment, the F.B.I. would call up the landlord and tell him to create a pretext to deny a tenancy. Likewise, the plaintiff cannot start a business either (buying and selling is premised on a verbal contract of sale) because the F.B.I. would "warn off" all plaintiff's potential customers. Thus, the plaintiff's constitutional right to work and contract has been violated.

## COUNT VII: VIOLATION OF FOURTH AMENDMENT RIGHT TO HAVE AND POSSESS PERSONAL PROPERTY.

240.     As described above, the F.B.I. has stolen the plaintiff's personal property routinely since 3/13. Also as described above, the F.B.I. routinely arranges to have stores sell the plaintiff defective merchandise. Also as described above, the F.B.I. hijacks all the plaintiff's personal electronic devices. And, as described above, the F.B.I. routinely raises the prices of the goods and services the plaintiff

wants to buy. In addition, most American's live pay check to pay check and plaintiff is no different. Without a job, most Americans become homeless in a short time as plaintiff has. Without a home, a person has no place to keep personal property. Furthermore, a person whom cannot work is forced to sell all his personal property to avoid homelessness as long as possible. Whereas the plaintiff's constitutional right to work has been suspended for about ten years, the F.B.I. has made the plaintiff a "prisoner" (surrounded on all sides) on the dates listed above. When the F.B.I. has made the plaintiff homeless, the plaintiff naturally has no place to keep any personal property. Thus, the plaintiff's Fourth Amendment right to have and possess personal property has been violated.

## COUNT VIII: VIOLATION OF FIRST AMENDMENT RIGHT TO "ASSOCIATE."

241. Since 5/12, the F.B.I. has arranged it so that every friend and family member of the plaintiff is wearing an F.B.I. ear piece and speaking in contrived dialogue when speaking with the plaintiff. Furthermore, the F.B.I. makes every effort to predict plaintiff's next social interactive and "warns off" all new potential friends and girlfriends. Even if the plaintiff attempts to make a friend unpredictably, the F.B.I. will "warn off" the person prior to their next encounter with the plaintiff. In addition, if the plaintiff attempts to find a girlfriend, the F.B.I. will "warn off" that girl preemptively. This complete suspension of plaintiff's U.S. constitutional right to "associate" is augmented by the fact that the F.B.I. hijacks the plaintiff's internet so that he cannot use social media meet to

COMPLAINT (BIVENS – SEC. 1983) - 144

meet anyone whom is not wearing an F.B.I. earpiece and speaking in contrived dialogue. Thus, the plaintiff can neither make friends nor find a wife. Accordingly, the plaintiff's First Amendment right to "associate" has been violated.

## COUNT IX: VIOLATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH.

242.     Since 5/12, as described above, the F.B.I. has hijacked the plaintiff's internet. As noted, this has been used to prohibit the plaintiff from making friends or finding a love interest on social media. In addition to this, as described in detail above, since 5/12 this technology has been used to give the plaintiff fake search results too. For example, within the last week the F.B.I. removed every search result from the country of India from its impersonations of Google, Bing, and Yandex. When the plaintiff did eventually find the web addresses of several Indian email providers, the F.B.I. blocked the plaintiff's access to all those web addresses. For another example, within the last week the F.B.I. blocked the plaintiff's access to any of the government of Israel's email addresses. This was done both by manipulating the search results and also by manipulating the web pages of Israeli government sites. Since 5/12, such techniques have been used systematically to block the plaintiff from contacting a huge number of people and institutions online (freedom of speech). In addition to violating the plaintiff's First Amendment right to freedom of speech electronically, the F.B.I. has also violated his First Amendment right to freedom of speech under threat of draconian

COMPLAINT (BIVENS – SEC. 1983) - 145

"punishments." Thus, since 3/13, the plaintiff has been forced to "act" all day, every day, and pretend nothing is going on, or he is subject to draconian "punishments". Thus, the plaintiff's First Amendment Right to Free Speech has been violated.

## COUNT X: VIOLATION OF U.S. CONSTITUTIONAL RIGHT TO PRIVACY (PERSONAL PRIVACY).

243. A penumbra of explicitly stated constitutional protections guarantees a U.S. constitutional right to privacy. The U.S. constitutional right to privacy includes a right to personal privacy. Since 5/12, as described above, the plaintiff has been video and audio taped everywhere except his bathroom and bedroom. As described above, all his devices have been hijacked and monitored since that date too (all screen shots captured). Likewise, since that date all the plaintiff's telephone calls have been tapped as well. Thus, the plaintiff's U.S. constitutional right to privacy has been violated.

## COUNT XI: VIOLATION OF FOURTH AMENDMENT RIGHT AGAINST UNLAWFUL SEIZURE.

244. The Fourth amendment of the U.S. Constitution guarantees no seizure of the person without due process of law. As described above, the plaintiff was given F.B.I. agents masquerading as loyal criminal defense counsel in a D.U.I. case in 5/12 (3AN-11-02041CR). Although the sentence for unaggravated third D.U.I. in Alaska is 120 days on ankle monitor universally by custom, these F.B.I. agents masquerading as loyal defense counsel arranged for the plaintiff to be jailed for six

COMPLAINT (BIVENS – SEC. 1983) - 146

months extra-judicially (as described above). This was done in cooperation with the Alaska Department of Law prosecutor. This extrajudicial jailing was used as a six month "interrogation" wherein, in reality, the plaintiff was told from scratch what he was accused of and the details of those accusations. Also as described above, the plaintiff was subject to another "mock" court proceeding in 2018 (4FA-18-00692CR). From 3/14/18 – 4/20/18, the plaintiff was again extra-judicially jailed and therein denied the basic medical care he required from being legally tortured (as described above). The plaintiff attempted to remove this second "mock" Alaska court proceeding to the Federal District Court at Fairbanks on 3/30/18 (4:18-cr-00004-RRB-1) but his removal action was too mentally ill to succeed. In addition to these extrajudicial jailings, the plaintiff has been unlawfully seized in "spy houses" under threat of draconian "punishments" on the dates listed above (as described above). Thus, the plaintiff's Fourth Amendment right against unlawful seizure has been violated.

## COUNT XII: VIOLATION OF ALL OTHER U.S. CONSTITUTIONAL RIGHTS.

245.    As described above in Counts I - XI, the enumerated violations of the Fifth and Sixth Amendment right to counsel, U.S. Constitutional right to be free of law enforcement harassment, U.S. constitutional right to privacy (personal autonomy - serendipitous druggings), Fifth Amendment right to remain silent, U.S. Constitutional right to privacy (right to medical care), First Amendment and

Article I, Sec 10 right to work and contract, Fourth Amendment right to have and possess personal property, First Amendment right to "associate," First Amendment right to freedom of speech, U.S. constitutional right to privacy (personal privacy), Fourth Amendment right against unlawful seizure, have been nearly completely suspended by the F.B.I. 5/12 - present. By completing or almost completely suspending these eleven U.S. Constitutional rights (counts 1-11), the F.B.I. has intentionally violated every other U.S. constitutional right of the plaintiff to the greatest degree possible. That is to say, the aggravate effect of the complete or near complete suspension of these eleven U.S. constitutional rights (counts 1-11) has been to violate (albeit to a lesser degree) every other U.S. constitutional right of the plaintiff. Thus, the defendants have violated all the plaintiff's other U.S. constitutional rights to a greater or lesser degree.

## COUNT XIII: VIOLATION THIRTEENTH AMENDMENT RIGHT TO BE FREE OF SLAVERY AND INVOLUNTARY SERVITUDE.

246. When plaintiff believes all of the above are merely independent episodes of schizophrenia, (1) he does not know whom he really is nor the basic nature of existence — instead, he lives a "pretend" life created wholesale by the F.B.I. When the plaintiff believes all of the above are merely independent episodes of schizophrenia, the F.B.I. controls every facet of his existence: "...First, the F.B.I. had all of plaintiff's friends basically disown him ostensibly on the basis they were prejudice against mental illness. Second, the F.B.I. would not let the plaintiff meet any new people (friends or love interests) on social media. The F.B.I. made it

COMPLAINT (BIVENS – SEC. 1983) - 148

appear that suddenly the plaintiff had become undesirable as either a friend of a boyfriend (the F.B.I. gave the plaintiff fake versions of social media websites wherein he couldn't talk to anyone new or "real"). Third, the F.B.I. secretly warned off all potential employers, persons plaintiff might want to contract with, friends, and girlfriends by phone. All the above was instructed to make up an excuse to have nothing to do with the plaintiff. Fourth, the F.B.I. continued to control plaintiff's internet. In the past, plaintiff's search results had been half real and half thinly veiled innuendo (the F.B.I. "impersonated" Google, Bing, and Yandex). From 11/15 – 4/17, the F.B.I. continued to (1) censor plaintiff's internet, (2) manipulate it as much as possible, but did so covertly." See ¶ 104. And, when the F.B.I.'s program of "psychological operations" has been active: 5/12-11/15 (Los Angles, Guadalajara, Mexico City, Corpus Christi, Brownsville, and Oslo), 4/17 – 5/18 (Fairbanks), three months in early-2019 (Anchorage), three months mostly in early 2020 (Anchorage), and 12/20 – 4/21 (Rio De Janeiro, Recife, and Macapa), 9/21 (Kharkiv), and 12/21 – present (Anchorage, London — intermittently), it's nothing short of human slavery. The F.BI.'s project is premised on forcing the plaintiff to *passively* consume "psychological operations" ("pretend nothing is going on"), without every acknowledging reality for what it is. As noted, the plaintiff faces draconian "punishments" from the F.B.I. for acknowledging reality for what it really is. Moreover, the F.B.I. has also serendipitously drugged the plaintiff hundreds of times to "perform" in F.B.I.

designed "skits" a particular way: "The F.B.I.'s campaign of serendipitously drugging the plaintiff hundreds of times between 5/13 and the present day has included a very wide variety of drugs used for a very wide variety of purposes. First, the F.B.I. sometimes drugs the plaintiff to "attack" (assault) the plaintiff. For examples, the F.B.I. serendipitously drugs the plaintiff with (1) drugs designed to elevate his heart-rate, make his head feel like it is going to explode, (2) hallucinogens which cause terrifying bouts of hallucinations, to attack (assault) the plaintiff. Second, the F.B.I. sometimes drugs the plaintiff to make the plaintiff appear a particular way on video (contrived "scenes" prearranged by the F.B.I.). For examples, the F.B.I. serendipitously drugs the plaintiff with (1) drugs that make him look "high" at particularly inappropriate times like Church, (2) drugs that cause the plaintiff to be cognitively dull for certain prearranged "skits," and (3) a combination of hallucinogens and drugs that cause the plaintiff to become extremely agitated at the same time in order to create video of the plaintiff appearing both "crazy" and "aggressive." Third, the F.B.I. sometimes drugs the plaintiff to force him to talk about the allegations against him (annihilate his Fifth Amendment right to remain silent with drugs). For examples, the F.B.I. serendipitously drugs the plaintiff with (1) "truth serum" (twice only), (2) hallucinogens that make it impossible not to talk when combined with bombardment by psychological operations. Fourth, the F.B.I. sometimes drugs the plaintiff to get him to do (or not do) certain things at certain times. For examples,

COMPLAINT (BIVENS – SEC. 1983) - 150

the F.B.I. serendipitously drugs the plaintiff with (1) drugs like marijuana to cause him to eat at a particular time, (2) sedatives that make physical activity impossible at a particular time (stop the plaintiff from doing something he was planning to do), (3) sedatives to put the plaintiff to sleep at a particular time, (4) stimulants designed to make the plaintiff engage in physical activity he wouldn't have otherwise, and (5) stimulants designed to make the plaintiff stay up later than usual. Fifth, the F.B.I. serendipitously drugs the plaintiff to emulate the symptoms of certain mental illnesses. For examples, the F.B.I. serendipitously drugs the plaintiff with (1) stimulants to simulation the hypo mania associated with bipolar disorder, (2) stimulants to simulate the poor sleep persons experiencing bipolar hypo-mania experience, and (3) dopamine active drugs designed to trigger episodes of schizophrenia at certain times. Sixth, the F.B.I. serendipitously drugs the plaintiff to for the purpose of blocking his access to this Court. For example, the F.B.I. drugged the plaintiff with hallucinogens after he filed an initial Sec. 1983 Complaint before this Court in 2017 (as detailed below — 3:17-cv-00089-SLG). Seventh, *as extensively detailed below*, the F.B.I. serendipitously drugs the plaintiff to for the purpose of "brainwashing" the plaintiff into believing all of events are schizophrenic hallucinations as opposed to actual events. For example, the F.B.I. serendipitously drugs the plaintiff with hallucinogen that lasts 48 hours and simultaneously bombards him psychological operations only for those 48 hours and then ceases as soon as the hallucinogen wears of. In fact, between 5/13

COMPLAINT (BIVENS – SEC. 1983) - 151

– Present, the plaintiff has been drugged hundreds of times with hundreds of DIFFERENT drugs. Although the plaintiff recognizes some of the drugs he was been serendipitously drugged with, the plaintiff does not know what the vast majority of the drugs he has been serendipitously drugged with are. That is to say, the plaintiff has no idea if the vast majority of the drugs he has been serendipitously drugged with come from a pharmacy, are illegal narcotics, or come from a chemical weapons laboratory." See ¶ 68. Thus, the Thirteen Amendment has been violated. The entire project is human slavery.

Wherefore, plaintiff David York respectfully requests:

A. An permanent injunction requiring the defendants cease and desist from violating the plaintiff's U.S. Constitutional rights. The plaintiff requests an injunction limiting law enforcement to passive, invisible surveillance only as required by law.

B. A Temporary Restraining Order requiring the defendants cease and desist from violating the plaintiff's U.S. Constitutional Rights. The plaintiff requests that Temporary Restraining Order limit law enforcement activities to passive, invisible surveillance only.

C. Discovery in the form of all the video tapes, audio tapes, and computer screen captures the F.B.I. has collected on the Plaintiff for all time.

D. Appointment of loyal 28 U.S.C. § 1915(e) civil rights counsel.

E. Compensatory Damages as to all defendants.

COMPLAINT (BIVENS – SEC. 1983) - 152

F. Punitive damages as to all defendants.

G. Reasonable attorney's fees and costs as to all defendants.

H. Such other and further relief as may appear just and appropriate.


Plaintiff hereby demands a jury trial.


Dated this 24th of May, 2022

David York, Pro Se

This complaint if true to the best of my knowledge and belief, Affidavit forthing coming.